SZAFERMAN, LAKIND, BLUMSTEIN & BLADER, P.C.
101 Grovers Mill Road, Suite 200
Lawrenceville, New Jersey 08648
By: Robert L. Lakind, Esquire
    Arnold Lakind, Esquire
    Steven Blader, Esquire
Telephone: (609) 275-0400
Fax: (609) 275-4511

LEVY, PHILLIPS & KONIGSBERG, LLP
800 Third Avenue, 13th Floor
New York, New York 10022
By: Moshe Maimon, Esquire
    Danielle Disporto, Esquire
Telephone: (212) 605-6200
Fax: (212) 605-6290

Attorneys For Plaintiffs

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| GLENN D. SANFORD, for the use and benefit of the EQ/Large Cap Value PLUS Portfolio, the EQ/Global Multi-Sector Equity Portfolio, the EQ/T. Rowe Price Growth Stock Portfolio and the EQ/GAMCO Small Company Value Portfolio; WILLIAM R. TUCKER, for the use and benefit of the EQ/GAMCO Small Company Value Portfolio and the EQ/T. Rowe Price Growth Portfolio; BRIAN A. SANCHEZ, for the use and benefit of the EQ/Global Multi-Sector Equity Portfolio and the EQ/PIMCO Ultra Short Bond Portfolio; MARY T. CUSACK, for the use and benefit of the EQ/Large Cap Value PLUS Portfolio, the EQ/Core Bond Index Portfolio and the EQ/Mid Cap Value PLUS Portfolio; ROBERT CUSACK, for the use and benefit of the EQ/Large Cap Value PLUS Portfolio, the EQ/Core Bond Index Portfolio and the EQ/Mid Cap Value PLUS Portfolio; PATRICIA F. LYNN, for | **Civil Action No.:**<br><br><br>**COMPLAINT**<br>**AND JURY DEMAND** |

the use and benefit of the EQ/Global Bond
PLUS Portfolio, the EQ/Mid Cap Value
PLUS Portfolio, the EQ/GAMCO Small
Company Value Portfolio and the
EQ/PIMCO Ultra Short Bond Portfolio,

       Plaintiffs,

vs.

AXA Equitable Funds Management Group,
LLC,

       Defendant.

PLAINTIFF, GLENN D. SANFORD, whose street address is 901 Wall Road, Spring Lake,

New Jersey, 07762, brings this action on behalf of, and for the benefit of, the EQ/Large Cap Value

PLUS Portfolio, the EQ/Global Multi-Sector Equity Portfolio, the EQ/T. Rowe Price Growth Stock

Portfolio, and the EQ/GAMCO Small Company Value Portfolio; PLAINTIFF, GLENN D.

SANFORD brings this action on behalf of, and for the benefit of, the EQ Advisors Trust on account

of investment management fees charged to the EQ/Large Cap Value PLUS Portfolio, the EQ/Global

Multi-Sector Equity Portfolio, the EQ/T. Rowe Price Growth Stock Portfolio, and the EQ/GAMCO

Small Company Value Portfolio; PLAINTIFF, WILLIAM R. TUCKER, whose street address is

715A Victoria Court, Monroe, New Jersey, 08831, brings this action on behalf of, and for the benefit

of, the EQ/GAMCO Small Company Value Portfolio and the EQ/T. Rowe Price Growth Portfolio;

PLAINTIFF, WILLIAM R. TUCKER, brings this action on behalf of, and for the benefit of, the EQ

Advisors Trust on account of investment management fees charged to the EQ/GAMCO Small

Company Value Portfolio and the EQ/T. Rowe Price Growth Portfolio; PLAINTIFF BRIAN A.

697636.1

SANCHEZ, whose street address is 69 Avenue G, Monroe Township, New Jersey, 08831, brings this action on behalf of, and for the benefit of, the EQ/Global Multi-Sector Equity Portfolio and the EQ/PIMCO Ultra Short Bond Portfolio; PLAINTIFF BRIAN A. SANCHEZ brings this action on behalf of, and for the benefit of, the EQ Advisors Trust on account of investment management fees charged to the EQ/Global Multi-Sector Equity Portfolio and the EQ/PIMCO Ultra Short Bond Portfolio; PLAINTIFFS ROBERT AND MARY T. CUSACK, whose street address is 32 Francisco Drive, Newton, New Jersey, 07860, bring this action on behalf of, and for the benefit of, the EQ/Large Cap Value PLUS Portfolio, the EQ/Core Bond Index Portfolio, and the EQ/Mid Cap Value PLUS Portfolio; PLAINTIFFS ROBERT AND MARY T. CUSACK, bring this action on behalf of, and for the benefit of, the EQ Advisors Trust on account of investment management fees charged to the EQ/Large Cap Value PLUS Portfolio, the EQ/Core Bond Index Portfolio, and the EQ/Mid Cap Value PLUS Portfolio; PLAINTIFF PATRICIA F. LYNN, whose street address is 87 Tooker Avenue, Springfield, New Jersey, 07081, brings this action on behalf of, and for the benefit of, the EQ/Global Bond PLUS Portfolio, the EQ/Mid Cap Value PLUS Portfolio, the EQ/GAMCO Small Company Value Portfolio and the EQ/PIMCO Ultra Short Bond Portfolio; PLAINTIFF PATRICIA F. LYNN brings this action on behalf of, and for the benefit of, the EQ Advisors Trust on account of investment management fees charged to the EQ/Global Bond PLUS Portfolio, the EQ/Mid Cap Value PLUS Portfolio, the EQ/GAMCO Small Company Value Portfolio and the EQ/PIMCO Ultra Short Bond Portfolio, sues Defendant, AXA Equitable Funds Management Group, LLC, who is located at 1290 Avenue of the Americas, New York, New York 10104, alleges:

697636.1

## I.   NATURE OF ACTION - INVESTMENT COMPANY ACT § 36(b), 15 U.S.C. § 80a-35(b) CLAIM

1.      This action is a derivative action brought by Plaintiffs, for the benefit of, and on behalf of, the AXA Funds[1] in which they are invested, or alternatively, the EQ Advisors Trust, pursuant to the Investment Company Act of 1940 ("ICA") § 36(b).

2.      ICA § 36(b), 15 U.S.C. § 80a-35(b), provides that an investment manager to a registered investment company (more commonly known as a mutual fund) acts in a fiduciary capacity when it charges fees to the registered investment company. Thus, this statute authorizes security holders of the registered investment company to sue the investment adviser for compensation it receives for its advisory services that is in breach of its fiduciary duties. This statute also authorizes a security holder of a registered investment company to sue any affiliated person of such adviser, who also has a fiduciary duty concerning compensation or payments received from such registered investment company, for a breach of fiduciary duty.

3.      The EQ Advisors Trust ("Advisors Trust") is an open-end management investment company registered under the ICA, 15 U.S.C. § 80a-1, *et seq.*, comprised of various mutual funds/portfolios, including the EQ/PIMCO Ultra Short Bond Portfolio; the EQ/Core Bond Index Portfolio; the EQ/T. Rowe Price Growth Stock Portfolio; the EQ/Global Bond PLUS Portfolio; the EQ/Large Cap Value PLUS Portfolio; the EQ/Global Multi-Sector Equity Portfolio; the EQ/Mid Cap Value PLUS Portfolio; and the EQ/GAMCO Small Company Value Portfolio (i.e., the AXA Funds).

---

[1] For purposes of the Complaint, the term "AXA Funds" means the EQ/PIMCO Ultra Short Bond Portfolio; the EQ/Core Bond Index Portfolio; the EQ/T. Rowe Price Growth Stock Portfolio; the EQ/Global Bond PLUS Portfolio; the EQ/Large Cap Value PLUS Portfolio; the EQ/Global Multi-Sector Equity Portfolio; the EQ/Mid Cap Value PLUS Portfolio; and the EQ/GAMCO Small Company Value Portfolio.

697636.1

All of the AXA Funds are contained within the Advisors Trust. Each of the AXA Funds has its own investment objective and goals.

4.    Certain registered investment companies are organized as series trusts, which is a single registered investment company that contains within it numerous portfolios/mutual funds. Each portfolio/mutual fund within a series trust has its own investment strategy. The Advisors Trust is a series trust. The AXA Funds are 8 out of the 72 mutual funds/portfolios contained within the Advisors Trust.

5.    AXA Equitable Funds Management Group, LLC, provides conflicting disclosures as to whether the security it issues, on account of an investment into an AXA Fund, is a share of the AXA Fund, or a share of the Advisors Trust that corresponds to the AXA Fund in which the investor invests.

6.    Plaintiff Glenn D. Sanford, from at least January 15, 2012, through to the present (i.e., continues to be) is a security holder in the following AXA Funds: the EQ/Large Cap Value PLUS Portfolio, the EQ/Global Multi-Sector Equity Portfolio, the EQ/T. Rowe Price Growth Stock Portfolio and the EQ/GAMCO Small Company Value Portfolio.

7.    Plaintiff William R. Tucker, from at least January 15, 2012, through to the present (i.e., continues to be) is a security holder in the following AXA Funds: the EQ/GAMCO Small Company Value Portfolio and the EQ/T. Rowe Price Growth Portfolio.

8.    Plaintiff Brian D. Sanchez, from at least January 15, 2012, through to the present (i.e., continues to be) is a security holder in the following AXA Funds: the EQ/Global Multi-Sector Equity Portfolio and the EQ/PIMCO Ultra Short Bond Portfolio.

697636.1

9.      Plaintiff Robert Cusack, from at least January 15, 2012, through to the present (i.e., continues to be) is a security holder in the following AXA Funds: the EQ/Large Cap Value PLUS Portfolio, the EQ/Core Bond Index Portfolio and the EQ/Mid Cap Value PLUS Portfolio.

10.     Plaintiff Mary T. Cusack, from at least January 15, 2012, through to the present (i.e., continues to be) is a security holder in the following AXA Funds: the EQ/Large Cap Value PLUS Portfolio, the EQ/Core Bond Index Portfolio and the EQ/Mid Cap Value PLUS Portfolio.

11.     Plaintiff Patricia F. Lynn, from at least January 15, 2012, through to the present (i.e., continues to be) is a security holder in the following AXA Funds: the EQ/Global Bond PLUS Portfolio, the EQ/GAMCO Small Company Value Portfolio, the EQ/Mid Cap Value PLUS Portfolio and the EQ/PIMCO Ultra Short Bond Portfolio.

12.     Alternatively, if the Advisors Trust (*i.e.*, the registered legal entity that contains the AXA Funds) issues shares of the Advisors Trust that correspond to each AXA Fund, then Plaintiffs, from January 15, 2012, through to the present (*i.e.*, continue to be) are security holders in the Advisors Trust.

13.     According to the Defendant in a filing with this Court, when investors (i.e., Plaintiffs) invested their money in an AXA Fund, shares of that AXA Fund, (or in the alternative, shares of the Advisors Trust that correspond to that specific AXA Fund)[2], are issued to a Separate Account and Plaintiffs received a "unit" of that Separate Account.  These units "corresponded to [the] selected investments, including the Funds. ...  Therefore, ... the overall value of Plaintiff's units of [a] Separate Account..."increase[d] or decrease[d] as though [Plaintiff] had invested in the

_____

[2] With respect to the first sentence of this paragraph, Defendant has not acknowledged whether it issues shares of the AXA Funds or the Advisors Trust as a consequence of investments into the AXA Funds.

697636.1

corresponding portfolio's shares directly'...." (quotations and bracketed text in the original, with the exception of "[a]").

14.     Thus, Plaintiffs are, and have been since from at least January 15, 2012, security holders of the AXA Funds, or in the alternative, the Advisors Trust.  Furthermore, Plaintiffs are the payers of the investment management fees that AXA Equitable Funds Management Group, LLC, charge to, and receive from, the AXA Funds. *See also Sivolella v. AXA Equitable Life Insurance Company,* No. 11–4194, 2012 WL 4464040 (D.N.J. Sept. 25, 2012).

15.     AXA Equitable Funds Management Group, LLC, in its capacity as investment adviser to the Advisors Trust and/or the AXA Funds, is sued in this derivative Complaint based on its misconduct related to its wrongful receipt of investment management fees paid by the AXA Funds, in violation of ICA § 36(b), 15 U.S.C. § 80a-35(b).

16.     Since SEC filings on behalf of the AXA Funds provide conflicting disclosures as to whether the security that is issued to Plaintiffs, on account of an investment into an AXA Fund, is a share of the AXA Fund, or a share of the Advisors Trust that corresponds to the AXA Fund in which the investor invests, one claim (Count I) is brought on behalf of the AXA Funds and, in the alternative, one claim (Count II) is brought on behalf of the Advisors Trust.

17.     AXA Equitable Funds Management Group, LLC, charged, and continues to charge, the AXA Funds and Advisors Trust, investment advisory fees for alleged investment management services.[3]  These fees are paid from the AXA Funds'/Advisors Trust's assets and thus are borne by Plaintiffs and the other investors.

---

[3] The term "investment advisory services" and "investment management services" are used interchangeably in this Complaint.

697636.1

18.   In addition to having AXA Equitable Funds Management Group, LLC, as its investment adviser/manager, each AXA Fund also has a sub-adviser (or in some cases sub-advisers) that, with minor exceptions, perform all of the investment management services for each AXA Fund.

19.   AXA Equitable Funds Management Group, LLC, has contracted with these sub-advisers, and such sub-contracts require the sub-advisers to perform, with minor exceptions, all of the investment management services that are needed by each AXA Fund.

20.   AXA Equitable Funds Management Group, LLC, collects from the Advisors Trust, through each of the AXA Funds, a "management fee" for its alleged investment management services to each AXA Fund. Defendant retains the bulk of that investment management fee, and remits a much smaller fee[4] to each of the AXA Funds' sub-advisers, which are the entities that provide, with minor exceptions, all of the investment management services to each AXA Fund. As an example of the significance of the fee retained by AXA Equitable Funds Management Group, LLC, for the EQ/Global Bond PLUS Portfolio, the Defendant retained an investment management fee that was 665% greater than the amount that was paid to that AXA Fund's sub-advisers in 2011.

---

[4] However, in the case of the EQ GAMCO/Small Company Value Portfolio, and the EQ/T. Rowe Price Growth Stock Portfolio, in 2011, AXA Equitable Funds Management Group, LLC's, investment management fee only exceeded the sub-adviser's fee by 109%. However, as explained below, in light of Defendant's minimal investment management services, as compared to the sub-adviser's investment management services, it is unclear why the Defendant's investment management fees are not, in all cases, with respect to all of the AXA Funds, significantly below that of the sub-advisers. Further, with respect to the remaining AXA Funds, Defendant's investment management fees, in 2011, exceeded that of the sub-adviser's fee by a minimum of 207%, and up to a maximum of 2017%.

In 2011, with respect to all of the AXA Funds, AXA Equitable Funds Management Group, LLC, collected a net investment management fee equal to approximately $81 million, while the sub-advisers were paid a net investment management fee equal to approximately $30 million (i.e., a difference of $51 million).

697636.1

21.     Pursuant to the "Funds' [Investment] Management Agreement" (a copy of which AXA Equitable Funds Management Group, LLC, filed with the Court on December 19, 2011, (Docket No. 3:11-cv-04194, PGS-DEA; 19-6)), and is hereinafter referred to as the "IMA")[5], AXA Equitable Funds Management Group, LLC, as the AXA Funds' investment manager, alleges/claims, it performs, for its investment management fees, the following services:

> Subject always to the direction and control of the Trustees of the Trust, Manager [*i.e., AXA Funds Management Group, LLC*] will have (i) overall supervisory responsibility for the general management and investment of each Portfolio's assets; (ii) full discretion to select new or additional Advisers [*i.e., sub-adviser*] for each Portfolio [*i.e., AXA Fund*]; (iii) full discretion to enter into and materially modify existing Advisory Agreements [*i.e., sub-advisory agreements*] with Advisers; (iv) full discretion to terminate and replace any Adviser; and (v) full investment discretion to make all determinations with respect to the investment of a Portfolio's assets **not then managed by an Adviser.** In connection with Manager's responsibilities herein, Manager will assess each Portfolio's investment focus and will seek to implement decisions with respect to the allocation and reallocation of each Portfolio's assets among one or more current or additional Advisers from time to time, as the Manager deems appropriate, to enable each Portfolio to achieve its investment goals. In addition, Manager will monitor compliance of each Adviser with the investment objectives, policies and restrictions of any Portfolio or Portfolios (or portions of any Portfolio) under the management of such Adviser, and review and report to the Trustees of the Trust on the performance of each Adviser. Manager will furnish, or cause the appropriate Adviser(s) to furnish, to the Trust such statistical information, with respect to the investments that a Portfolio (or portions of any Portfolio) may hold or contemplate purchasing, as the Trust may reasonably request. On Manager's own initiative, Manager will apprise, or cause the appropriate Adviser(s) to apprise, the Trust of important developments materially affecting each Portfolio (or any portion of a Portfolio that they advise) and will furnish the Trust, from time to time, with such information as may be appropriate for this purpose. Further, Manager agrees to furnish, or cause the appropriate Adviser(s) to furnish, to the Trustees of the Trust such periodic and special reports as the Trustees of the Trust may reasonably request. In addition, Manager agrees to cause the appropriate Adviser(s) to furnish to third-party data reporting services all currently available standardized performance information and other customary data. (Emphasis added)[6]

---

[5] Through the inclusion of the text of the IMA, which the Defendant filed with this Court, Plaintiffs are in no way conceding that AXA Equitable Funds Management Group, LLC, actually provides or provided the alleged services contained in the IMA.

[6] The IMA is dated May 1, 2011.  According to a May 1, 2012 SEC filing for the Advisors Trust, the IMA was "[i]ncorporated by reference to and/or previously filed with

697636.1

22.     Thus, the services AXA Equitable Funds Management Group, LLC, allegedly provides to the AXA Funds pursuant to the IMA are all predominantly oversight/supervisory services.

23.     The  website of http://www.axa-equitable.com  represents that  "AXA Equitable Funds Management Group (AXA FMG) provides oversight of the outside subadvisors who manage the investment portfolios offered with our variable annuities and variable life insurance." [7] Further, while AXA Equitable Funds Management Group, LLC, alleges it provides oversight services, these services are also presumably limited because, according to the sub-advisory agreements, it is the AXA Fund's sub-adviser(s) who "formulate and implement a continuous investment program for [each AXA Fund]", which is the core investment management service needed for a mutual fund.

24.     Further, AXA Equitable Funds Management Group, LLC's, supervisory role is also presumably limited given that the Advisors Trust's Board is charged with the substantial supervision of the Funds.  According to the Statement of Additional Information for the Advisors Trust, Dated May 1, 2012 (hereinafter "May 1, 2012 SAI"), "the Trust's Board is responsible for the overall management of the Trust and the Portfolios, including general supervision and review of the Portfolios' investment activities and their conformity with federal and state law as well as the stated

---

Post-Effective Amendment No. 83 to the Registrant's Registration Statement on Form N-1A filed on August 16, 2011 (File No. 333-17217)."

[7] *See* "October 2008 Market Volatility Message", *Financial Strength and Stability. Common Questions: AXA Equitable in Today's Markets*, located at: http://www.axa-equitable.com/axa/current-markets-common-questions.html *last visited* January 14, 2013.

697636.1

policies of the Portfolios. The Board elects the officers of the Trust who are responsible for administering the Trust's day-to-day operations."

25.     If AXA Funds Management Group, LLC, performed all of the alleged services listed in the IMA at ¶21 for each AXA Fund, if the fees charged for these alleged services were the product of arm's-length bargaining, they should have been, for each AXA Fund, a fraction of the fees charged by each fund's sub-adviser(s), in light of the substantial investment management services the sub-advisers provide to the AXA Funds under the terms of their respective sub-advisory agreements.

26.     Thus, a comparison of (A) the fees paid to the AXA Fund's sub-advisers for performing, with minor exceptions, all of the investment management services for the AXA Funds, and (B) the fees paid to AXA Equitable Funds Management Group, LLC, for its alleged minor amount of investment management services (especially as compared to the sub-advisers' investment management services), reflects that a substantial portion of the investment management fees paid to AXA Equitable Funds Management Group, LLC, for its investment management services were so disproportionately large that they bore no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining, and were thus in violation of ICA § 36(b), 15 U.S.C. § 80a-35(b).

27.     Plaintiffs, who are current security holders in their respective AXA Funds (or, in the event the Advisors Trust issues shares of the trust, then security holders of the Advisors Trust), and have been since at least January 15, 2012, through to the present, on account of their investments into the AXA Funds, allege that the investment management fees charged by AXA Equitable Funds

697636.1

Management Group, LLC, for its alleged investment management services to each of the AXA Funds, were in breach of its fiduciary duties under ICA § 36(b), 15 U.S.C. § 80a-35(b).

28.    Plaintiffs bring this action derivatively pursuant to ICA § 36(b), 15 U.S.C. § 80a-35(b), on behalf of the respective AXA Funds in which they are invested.  The funds that each Plaintiff is invested in are listed in paragraphs 6 to 11 of this Complaint.

29.    Alternatively, if on account of Plaintiffs' investments, the Advisors Trust issues shares of the trust that correspond to investments into the AXA Funds, Plaintiffs bring this action derivatively pursuant to ICA § 36(b), 15 U.S.C. § 80a-35(b), on behalf of the Advisors Trust.

30.    Plaintiffs seek pursuant to ICA § 36(b)(3), 15 U.S.C. § 80a-35(b)(3), on behalf of the AXA Funds, or in the alternative on behalf of the Advisors Trust, the actual damages resulting from the breaches of fiduciary duties by AXA Equitable Funds Management Group, LLC, which includes a substantial amount of the compensation and payments received by the Defendant for alleged investment management services to the AXA Funds, and/or, pursuant to ICA § 47(b), 15 U.S.C. § 80a-46(b), rescission of the contracts, that resulted in these breaches, due to AXA Equitable Funds Management Group, LLC 's, violation of ICA § 36(b), 15 U.S.C. § 80a-35(b).

31.     Plaintiffs, with respect  to their claims for a violation of  ICA § 36(b), 15 U.S.C. § 80a-35(b),  seek a recovery from the earliest date permitted by the statute through the latest date permitted by the statute.

32.    Most of Plaintiffs' allegations below are based on statements contained in (i) SEC filings for the Advisors Trust, and (ii) agreements that AXA Equitable Funds Management Group, LLC, entered into with each AXA Funds' subadviser(s), on the funds' behalf.  The AXA Funds are contained in the Advisors Trust.

697636.1

33.     Many of the statements relied upon below come from the Advisors Trust's May 1, 2012 N-1A SEC filing (hereinafter "May 2012 N-1A") and the May 1, 2012 SAI, which is filed with the May 2012 N-1A.

34.     On information on belief, the statements that are contained in (i) any SEC filing relied upon below with respect to the AXA Funds/Advisors Trust (including any exhibits whether directly attached or incorporated by reference), and  (ii) any sub-advisory agreement entered into between AXA Equitable Funds Management Group, LLC (these agreements are also filed with the SEC) relied upon below, represent/reflect the conduct/actions of AXA Equitable Funds Management Group, LLC, for the entire time period that Plaintiffs are permitted to seek a recovery under ICA § 36(b)(3), 15 U.S.C. § 80a-35(b)(3).

## II.     THE PARTIES

### A.     Plaintiffs

35.     Plaintiff Glenn D. Sanford resides at 901 Wall Road, Spring Lake, New Jersey, 07762, and from at least January 15, 2012, through to the present is, and continues to be, a security holder in the following AXA Funds: the EQ/Large Cap Value PLUS Portfolio, the EQ/Global Multi-Sector Equity Portfolio, the EQ/T. Rowe Price Growth Stock Portfolio and the EQ/GAMCO Small Company Value Portfolio, or alternatively of the Advisors Trust.

36.     Plaintiff William R. Tucker resides at 715A Victoria Court, Monroe, New Jersey, 08831, and from at least January 15, 2012, through to the present is, and continues to be, a security holder in the following AXA Funds: the EQ/GAMCO Small Company Value Portfolio and the EQ/T. Rowe Price Growth Portfolio, or alternatively of the Advisors Trust.

697636.1

37.     Plaintiff Brian A. Sanchez resides at 69 Avenue G, Monroe Township, New Jersey, 08831, and from at least January 15, 2012, through to the present is, and continues to be, a security holder in the following AXA Funds: the EQ/Global Multi-Sector Equity Portfolio and the EQ/PIMCO Ultra Short Bond Portfolio, or alternatively of the Advisors Trust.

38.     Plaintiff Robert Cusack resides at 32 Francisco Drive, Newton, New Jersey, 07860, and from at least January 15, 2012, through to the present is, and continues to be, a security holder in the following AXA Funds: the EQ/Large Cap Value PLUS Portfolio, the EQ/Core Bond Index Portfolio and the EQ/Mid Cap Value PLUS Portfolio, or alternatively of the Advisors Trust.

39.     Plaintiff Mary T. Cusack resides at 32 Francisco Drive, Newton, New Jersey, 07860, and from at least January 15, 2012, through to the present is, and continues to be, a security holder in the following AXA Funds: the EQ/Large Cap Value PLUS Portfolio, the EQ/Core Bond Index Portfolio and the EQ/Mid Cap Value PLUS Portfolio, or alternatively of the Advisors Trust.

40.     Plaintiff Patricia F. Lynn resides at 87 Tooker Avenue, Springfield, New Jersey, 07081, and from at least January 15, 2012, through to the present is, and continues to be, a security holder in the following AXA Funds: the EQ/Global Bond PLUS Portfolio, the EQ/Mid Cap Value PLUS Portfolio, the EQ/GAMCO Small Company Value Portfolio and the EQ/PIMCO Ultra Short Bond Portfolio, or alternatively of the Advisors Trust.

**B.     Defendant**

41.     Defendant, AXA Equitable Funds Management Group, LLC, is a New York corporation engaged in the business of serving as the investment adviser to the AXA Funds and it received investment management fees on account of Plaintiffs' (and other investors) investments into

697636.1

the AXA Funds. Its principal place of business is 1290 Avenue of the Americas, New York, New York 10104. According to its ADV filing with the SEC, it employs a total of 10 investment advisory employees.

## III.    JURISDICTION AND VENUE

42.    This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 80a-43, 15 U.S.C. § 80a-35(b)(5), and 28 U.S.C. § 1331.

43.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 80a-43.

44.    No pre-suit demand on the Boards of the AXA Funds or the Advisors Trust is required, as the demand requirement under Rule 23.1 of the Federal Rules of Civil Procedure does not apply to actions or counts brought under ICA § 36(b), 15 U.S.C. § 80a-35(b).

## IV.    BACKGROUND

45.    A registered investment company is "typically created and managed by a pre-existing organization known as an investment adviser" that "generally supervises the daily operation of the fund and often selects affiliated persons to serve on the [fund's] board of directors." *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 536 (1984).

46.    A registered investment company is commonly known as a mutual fund.

47.    Congress recognized as early as 1935 that because "a typical fund is organized by its investment adviser which provides it with almost all management services and because its shares are bought by investors who rely on that service, a mutual fund cannot, as a practical matter, sever its relationship with the advisor." S. Rep. No. 91-184, p. 5 (1969). Therefore, "the forces of arm's-

length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy." *Id.*

48.     As a result, Congress enacted the ICA in 1940 recognizing that:

> The national public interest and the interest of investors are adversely affected . . . when investment companies are organized, operated [and] managed . . . in the interest of . . . investment advisers . . . rather than in the interest of [shareholders] . . . or when the investment companies . . . are not subjected to adequate independent scrutiny.

ICA § 1(b)(2), 15 U.S.C. § 80a-1(b)(1994).  Accordingly, the ICA was designed to regulate and curb "abuses inherent in the structure of [the mutual fund industry]," *Jones v. Harris Assoc., L.P.*, 130 S.Ct. 1418, 1422 (2010) (quoting *Daily Income Fund*, 464 U.S. at 536), and to create standards of care applicable to investment advisers, such as AXA Equitable Funds Management Group, LLC.

49.     By the 1960s, it had become clear to Congress that investment advisers to registered investment companies/mutual funds were charging those funds excessive fees, particularly by not taking economies of scale into account.

50.     Thus, ICA § 36(b), 15 U.S.C. § 80a-35(b), was added to the ICA in 1970, (primarily to remedy excessive fees charged by a registered investment company, such as the one in which Plaintiffs own shares on account of investments into the AXA Funds), which created a federal cause of action for breach of fiduciary duty by investment advisers.  ICA § 36(b), 15 U.S.C. § 80a-35(b), – which imposes a fiduciary duty on investment managers (and their affiliates/affiliated persons) with respect to the receipt of compensation for services – states in pertinent part:

> [T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser. ***An action may be brought under this***

16

697636.1

> *subsection . . . by a security holder of such registered investment*
> *company on behalf of such company, against such investment*
> *advisers, or an affiliated person of such investment advisor . . . for*
> *breach of fiduciary duty in respect to such compensation* or
> payments paid by such registered investment company or by the
> security holders thereof to such investment adviser or person.

ICA § 36(b), 15 U.S.C. § 80a-35(b) (emphasis added).

51.     The conflicts in the inherent structure of mutual funds, including those at issue here,

exemplify the concern raised in the preamble to the ICA that "investment companies are organized,

operated and managed in the interest of investment advisers, rather than in the interest of

shareholders." Indeed, the goal of ICA § 36(b), 15 U.S.C. § 80a-35(b), is to empower shareholders

to independently police whether investment advisers have fulfilled their fiduciary obligations.

52.     "The relationship between investment advisers and mutual funds is fraught with

potential conflicts of interest," *Burks v. Lasker*, 441 U.S. 471, 481 (1979), and is "potentially

incestuous." *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 929 (2d Cir. 1982)

53.     Through ICA § 36(b), 15 U.S.C. § 80a-35(b), Congress gave shareholders a "unique

right," *Daily Income Fund*, 464 U.S. at 536, empowering them with the ability to be an independent

check on an adviser's fulfillment of its fiduciary duties and receipt of unfair fees. By enacting ICA

§ 36(b), 15 U.S.C. § 80a-35(b), Congress provided shareholders with a means to redress breaches

of the adviser's fiduciary duty to the funds it manages and distributes while leaving the "ultimate

responsibility for the decision in determining whether the fiduciary duty has been breached [] with

the court." S. Rep. 91-184, p. 6.

54.     ICA § 36(b), 15 U.S.C. § 80a-35(b), itself does not set forth a list of factors to be

considered in determining whether investment advisers, such as AXA Equitable Funds Management

Group, LLC, have breached their fiduciary duties with respect to their receipt of compensation for

investment management services charged to, and paid by, the AXA Funds, or in the alternative, the Advisors Trust on account of investments into the AXA Funds.

55.    If an adviser charges a fee that is "so disproportionately large that it bore no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining" (*see Jones*, 130 S.Ct. at 1418 (quoting *Gartenberg*)), the adviser has violated ICA § 36(b), 15 U.S.C. § 80a-35(b).

56.    In the context of  ICA § 36(b), 15 U.S.C. § 80a-35(b), litigation, courts have historically considered, *inter alia*, the following factors ("*Gartenberg* Factors"):

(1)    the nature and quality of services being paid for by the fund and its investors;

(2)    whether the trustees exercised a sufficient level of care and conscientiousness in approving the investment advisory or management agreements;

(3)    what fees other mutual fund complexes or funds within the same fund family charge for similar services to similar mutual funds;

(4)    whether savings from economies of scale were passed to the funds and their investors or kept by the investment adviser; and

(5)    the costs of providing investment management services and the profitability of providing those services to the funds.

57.    As set forth below, an examination of the *Gartenberg* Factors demonstrates that the investment management fees charged to the AXA Funds, or in the alternative, the Advisors Trust, and their investors, breached and continue to breach AXA Equitable Funds Management Group, LLC's, fiduciary duties to the Advisors Trust.  Indeed, AXA Equitable Funds Management Group, LLC's, receipt of the excessive investment management fees were so disproportionately large that they bore no reasonable relationship to the services rendered, and could not have been the product of arm's-length bargaining.

18

697636.1

58.     Count I of this Amended Complaint alleges that a substantial portion of the investment management fees charged (and paid by Plaintiffs) on account of investments into the AXA Funds violated  ICA § 36(b), 15 U.S.C. § 80a-35(b).   Count II of this Amended Complaint, is substantively the same claim as Count I, with one difference.   As stated above, there are conflicting disclosures in the Advisors Trust's SEC filings as to whether, on account of Plaintiffs' investments, shares of the AXA Funds are issued, or whether shares of the Advisors Trust that correspond to investments in the AXA Funds are issued.   Thus, Count I applies to the former situation (shares of the AXA Funds are issued), while Count II, which is an alternative to Count I, applies to the latter situation (shares of the Advisors Trust are issued).   These claims are based on an analysis of the *Gartenberg* Factors.[8]

## V.     APPLICATION OF THE GARTENBERG FACTORS

### A.     THE NATURE AND QUALITY OF THE INVESTMENT MANAGEMENT SERVICES PERFORMED BY AXA EQUITABLE FUNDS MANAGEMENT GROUP, LLC, DOES NOT JUSTIFY ITS INVESTMENT MANAGEMENT FEES

59.     AXA Equitable Funds Management Group, LLC, serves as the investment manager to each of the AXA Funds, and by serving in that capacity, receives a significant amount of annual compensation for the alleged investment management services it claims to provide to the AXA Funds (which are contained in the Advisors Trust).  Plaintiffs, as security holder of their respective

---

[8] Because the underlying allegations of both Count I and Count II are based on the same operative facts, Plaintiffs' allegations are drafted as if shares of the AXA Funds are issued on account of the Plaintiffs' investments, as opposed to shares of the Advisors Trust. However, in the event that shares of the Advisors Trust (as opposed to shares of the AXA Funds) are issued, the underlying factual allegations that support Count I equally apply to Count II, with the distinction being that shares of the Advisors Trust are issued in exchange for Plaintiffs' investments, as opposed to shares of the AXA Funds.

697636.1

AXA Funds (or the Advisors Trust), are the payers of that compensation as such fees are charged to Plaintiffs, and other investors, on account of their investments in the AXA Funds.

60.     The AXA Funds pay a management fee to AXA Equitable Funds Management Group, LLC, based on a stated percentage of each AXA Fund's asset value.  As such, the investment management fees are not based on the investment management services actually rendered by AXA Equitable Funds Management Group, LLC, or AXA Equitable Funds Management Group, LLC's, actual costs in providing those services to the AXA Funds.

61.     With respect to the AXA Funds, AXA Equitable Funds Management Group, LLC, has contracted with sub-advisers, and such sub-contracts require the sub-advisers to perform, with minor exceptions, all of the investment management services that are needed by each AXA Fund. With respect to the investment management services the Defendant alleges to provide for each AXA Fund, if the fees charged for these alleged services were the product of arm's-length bargaining, they should have been,  for each AXA Fund, a fraction of the fees charged by each fund's sub-adviser(s), in light of the substantial investment management services the sub-advisers provide to the AXA Funds under the terms of their respective sub-advisory agreements.  However, with respect to investment management fees, by comparison, on average, the Defendant's investment management fees, in 2011, exceeded the sub-advisers' investment management fees by approximately 476%.

62.     With respect to the AXA Funds, AXA Equitable Funds Management Group, LLC, has subcontracted investment management duties to, among others: (i) Pacific Investment Management Company, LLC ("PIMCO"), pursuant to an Investment Advisory Agreement ("PIMCO Agreement"); (ii) SSgA Funds Management, Inc., ("SSgA FM") pursuant to an Investment Advisory Agreement ("SSgA FM Agreement"); (iii) T. Rowe Price Associates, Inc., ("T. Rowe Price")

697636.1

pursuant to an Investment Advisory Agreement ("T. Rowe Price Agreement"); (iv) Morgan Stanley Investment Management, Inc. ("MSIM") pursuant to an Investment Advisory Agreement ("MSIM Agreement"); (v) BlackRock Investment Management, LLC ("Blackrock") pursuant to an Investment Advisory Agreement ("BlackRock Agreement"); (vi) Wellington Management Company, LLP ("Wellington Management") pursuant to an Investment Advisory Agreement ("Wellington Agreement"); (vii) AllianceBernstein L.P. ("AllianceBernstein") pursuant to an Investment Advisory Agreement ("AllianceBernstein Agreement"); (viii) GAMCO Asset Management, Inc. ("GAMCO") pursuant to an Investment Advisory Agreement ("GAMCO Agreement"); and (ix) First International Advisors, LLC ("First International") and its affiliate Wells Capital Management, Inc. ("WellsCap") pursuant to an Investment Advisory Agreement ("First International/WellsCap Agreement").[9]

63.     The PIMCO Agreement, the SSgA FM Agreement, the T. Rowe Price Agreement, the MSIM Agreement, the BlackRock Agreement, the Wellington Agreement, the AllianceBernstein Agreement, the GAMCO Agreement, and the First International/WellsCap Agreement (hereinafter collectively referred to as the "Advisory Agreements") are entered into between AXA Equitable Funds Management Group, LLC, on behalf of the AXA Funds, and the respective sub-adviser.

64.     Each of the AXA Funds has a sub-adviser, or in some cases, sub-advisers (which SEC filings occasionally refer to as "Adviser(s)") that are responsible for a substantial portion of the core investment management services required by each AXA Fund.

65.     AllianceBernstein is the sub-adviser to the EQ/Large Cap Value PLUS Portfolio.

---

[9] First International and WellsCap are affiliates and they jointly entered into a single Investment Advisory Agreement with AXA Equitable Funds Management Group, LLC, on behalf of the EQ/Global Bond PLUS Portfolio.  These entities are collectively referred to as "First International/WellsCap"

697636.1

BlackRock is a sub-adviser to the EQ/Global Multi-Sector Equity Portfolio, the EQ/Mid Cap Value

PLUS Portfolio and the EQ/Global Bond PLUS Portfolio.  MSIM is a sub-adviser to the EQ/Global

Multi-Sector Equity Portfolio.  GAMCO is the sub-adviser to the EQ/GAMCO Small Company

Value Portfolio.  Wellington is a sub-adviser to EQ/Mid Cap Value PLUS Portfolio.  SSgA FM is

the sub-adviser to the EQ/Core Bond Index Portfolio. PIMCO is the sub-adviser to the EQ/PIMCO

Ultra Short Bond Portfolio.  T. Rowe Price is the sub-adviser to the EQ/T. Rowe Price Growth Stock

Portfolio.  WellsCap/First International are sub-advisers to the EQ/Global Bond PLUS Portfolio. *See*

the following table.

| AXA Fund | Adviser | Sub-Adviser(s) |
|----------|---------|----------------|
| EQ/PIMCO Ultra Short Bond Portfolio | AXA Equitable FMG | PIMCO |
| EQ/Core Bond Index Portfolio | AXA Equitable FMG | SSgA FM |
| EQ/T. Rowe Price Growth Stock Portfolio | AXA Equitable FMG | T. Rowe Price |
| EQ/Large Cap Value PLUS Portfolio | AXA Equitable FMG | AllianceBernstein |
| EQ/Global Multi-Sector Equity Portfolio | AXA Equitable FMG | MSIM *and* BlackRock |
| EQ/Mid Cap Value PLUS Portfolio | AXA Equitable FMG | Wellington *and* BlackRock |
| EQ/GAMCO Small Company Value Portfolio | AXA Equitable FMG | GAMCO |
| EQ/Global Bond PLUS Portfolio | AXA Equitable FMG | BlackRock *and* First International/WellsCap |

66.     As demonstrated in detail below, despite the fact that the sub-adviser(s) for each of

the AXA Funds performed, with minor exceptions, all of the investment management services, each

AXA Fund was still charged by, and paid to, AXA Equitable Funds Management Group, LLC, a

significant investment management fee, which substantially exceeded the investment management

697636.1

fees that were paid to each Fund's sub-adviser(s).

67.     The table below reflects the total investment management fees paid to AXA Equitable

Funds Management Group, LLC, for its alleged investment management services to each AXA Fund,

and the total investment management fees paid to each AXA Fund's sub-adviser(s), for their

investment management services to each AXA Fund, for year ended December 31, 2011.

| AXA Fund | Advisor Agreement(s) | Net Paid AXA Equitable | Net Paid Sub-Adviser | Difference | Percent AXA Equitable's Fee Greater Than Sub-Adviser(s) |
|---|---|---|---|---|---|
| EQ/PIMCO Ultra Short Bond Portfolio | PIMCO | $10,830,206 | $5,232,548 | $5,597,658 | 207% |
| EQ/Core Bond Index Portfolio | SSgA FM | $22,700,241 | $1,125,066 | $21,575,175 | 2017% |
| EQ/Large Cap Value PLUS Portfolio | Alliance-Bernstein | $11,401,883 | $4,542,377 | $6,859,506 | 251% |
| EQ/T. Rowe Price Growth Stock Portfolio | T. Rowe Price | $3,069,164 | $2,806,118 | $263,046 | 109% |
| EQ/GAMCO Small Company Value Portfolio | GAMCO | $7,902,881 | $7,225,765 | $677,116 | 109% |
| EQ/Mid Cap Value PLUS Portfolio | BlackRock and Wellington | $7,013,763 | $3,230,044 | $3,783,719 | 217% |
| EQ/Global Multi-Sector Equity Portfolio | BlackRock and MSIM | $11,906,493 | $5,078,750 | $6,827,743 | 234% |

697636.1

| EQ/Global Bond PLUS Portfolio | BlackRock and First International/ WellsCap | $6,599,332 | $992,944 | $5,606,388 | 665% |
|---|---|---|---|---|---|
| **TOTALS** | | **$81,423,963** | **$30,233,612** | **$51,190,351** | **269%** |

**The total investment management fee, with respect to all of the AXA Funds, paid in 2011, equals $111,657,575 (i.e., AXA Equitable Funds Management Group LLC,'s investment management fee + the sub-advisers investment management fee).**

68.    Thus, in 2011, AXA Equitable Funds Management Group, LLC's, investment management fees, on average, exceeded the fees paid to the sub-adviser(s) to each AXA Fund, by approximately 476%.  Further, AXA Equitable Funds Management Group, LLC, received, in total, approximately 269% more in investment management fees than were paid to the AXA Funds' sub-advisers.

69.    The  website of http://www.axa-equitable.com  represents that  "AXA Equitable Funds Management Group (AXA FMG) provides oversight of the outside subadvisors who manage the investment portfolios offered with our variable annuities and variable life insurance." [10]  Further, while AXA Equitable Funds Management Group, LLC, provides oversight services to the AXA Funds for its fee, these services are also presumably limited because, according to the sub-advisory agreements, it is the fund's sub-advisers who "formulate and implement a continuous investment program for [each AXA Fund]", which is the core investment management service needed for a mutual fund.

---

[10] See "October 2008 Market Volatility Message", *Financial Strength and Stability. Common Questions: AXA Equitable in Today's Markets*, located at: http://www.axa-equitable.com/axa/current-markets-common-questions.html *last visited* January 14, 2013.

697636.1

(a)   **Nature and Quality of Services: Statements Regarding the Investment Management Services Provided to the AXA Funds That Are Specific To Each Fund**

1.   **EQ/PIMCO Ultra Short Bond Portfolio**

70.   AXA Equitable Funds Management Group, LLC, serves as the investment adviser to the EQ/PIMCO Ultra Short Bond Portfolio, however, the fund's sub-adviser, PIMCO, performs, with minor exceptions, all of the investment management services for this fund.

71.   An SEC filing dated November 30, 2012, which was signed by Steven M. Joenk who serves as President, Chief Executive Officer and Chairman of AXA Equitable Funds Management Group, LLC, as well as Trustee, President and Chief Executive Officer of the Advisors Trust, states:

> The Manager [AXA Equitable Funds Management Group, LLC] currently has retained 36 Advisers to provide the day-to-day investment advisory services for 60 of the 72 current Portfolios.[11] Pursuant to the Advisory Agreements, each Adviser [i.e., PIMCO] generally performs the following functions: (i) furnishes an investment program for its Portfolio(s); (ii) makes investment decisions for its Portfolio(s); (iii) places all orders for the purchase and sale of those investments; and (iv) certain limited related administrative functions.

The EQ/PIMCO Ultra Short Bond Portfolio is one of these 60 Portfolios.

72.   The May 2012 N-1A, with respect to the EQ/PIMCO Ultra Short Bond Portfolio, states the following:

> **Adviser:** Pacific Investment Management Company, LLC. ("PIMCO")
> Portfolio Manager: [listed is the name of a PIMCO Executive Vice President.]

---

[11] There is a footnote to this statement that lists twelve specific Portfolios (none of which are the AXA Funds) and states that, with respect to these twelve specific Portfolios, "the assets of which are managed directly by FMG [i.e., AXA Equitable Funds Management Group, LLC]."

697636.1

73.     Under the terms of the PIMCO Agreement between AXA Equitable Funds Management Group, LLC, and PIMCO, PIMCO has to, among other things,: (i) formulate and implement a continuous investment program for the fund; (ii) take "whatever" steps are necessary to implement the investment program for the fund by arranging for the purchase and sale of securities and other investments; (iii) obtain and evaluate the necessary economic, statistical and financial data with respect to the securities that are included in the fund or those that are under consideration for inclusion; (iv) keep the Board and AXA Equitable Funds Management Group, LLC, informed, in writing, on an ongoing basis, of all material facts concerning the investment and reinvestment of the assets of the fund and of its key investment personnel and operations, and to make written reports of other information that either the Board or AXA Equitable Funds Management Group, LLC, may periodically request; and (v) provide any and all material performance information, records and supporting documentation about accounts PIMCO manages, which have investment objectives, policies and strategies that are substantially similar to those employed by PIMCO in managing the fund, to allow the fund to present information concerning PIMCO's prior performance in the fund's SEC filings.

74.     Furthermore, under the terms of the PIMCO Agreement, in connection with performing, with minor exceptions,  all of the investment management services to the EQ/PIMCO Ultra Short Bond Portfolio, PIMCO must also provide the following at its own expense: (i) all necessary facilities and personnel, including salaries, expenses and fees of any personnel required to perform the services listed in the subadvisory agreement and (ii) all administrative facilities, including bookkeeping, and all equipment necessary for it to carry out the services it is required to perform under the PIMCO Agreement.

697636.1

## 2.    EQ/Large Cap Value PLUS Portfolio

75.    AXA Equitable Funds Management Group, LLC, serves as the investment adviser to the EQ/Large Cap Value PLUS Portfolio, however, the fund's sub-adviser, AllianceBernstein, performs, with minor exceptions, all of the investment management services for this fund.

76.    An SEC filing dated November 30, 2012, which was signed by Steven M. Joenk who serves as President, Chief Executive Officer and Chairman of AXA Equitable Funds Management Group, LLC, as well as Trustee, President and Chief  Executive Officer of the Advisors Trust, states:

> The Manager [AXA Equitable Funds Management Group, LLC] currently has retained 36 Advisers to provide the day-to-day investment advisory services for 60 of the 72 current Portfolios.  Pursuant to the Advisory Agreements, each Adviser [i.e., AllianceBernstein] generally performs the following functions:  (i) furnishes an investment program for its Portfolio(s); (ii) makes investment decisions for its Portfolio(s); (iii) places all orders for the purchase and sale of those investments; and (iv) certain limited related administrative functions.

The EQ/Large Cap Value PLUS Portfolio is one of these 60 Portfolios.

77.    The May 2012 N-1A, with respect to the EQ/Large Cap Value PLUS Portfolio, states the following:

> **Adviser: AllianceBernstein L.P. ('AllianceBernstein')**
>
> **Portfolio Managers:** The members of the team are jointly and primarily responsible for the management of the Active Allocated Portion of the Portfolio are: [listed are the names of three AllianceBernstein Vice Presidents and two AllianceBernstein Senior Portfolio Managers ].
>
> **Portfolio Manager:** The Index Allocation Portion of the Portfolio is managed by: [listed is the name of an AllianceBernstein Senior Vice President].

697636.1

78.     Three AXA Equitable Funds Management, LLC, employees are also listed as

"Portfolio Managers," for the EQ/Large Cap Value PLUS Portfolio, but unlike with respect to the

AllianceBernstein employees, there is no disclosure regarding the services, if any, that are

performed by these three AXA Equitable Funds Management, LLC, employees.

79.     Under the terms of the AllianceBernstein Agreement between AXA Equitable

Funds Management Group, LLC, and AllianceBernstein, with respect to the EQ/Large Cap Value

PLUS Portfolio, AllianceBernstein has to, among other things,: (i) formulate and implement a

continuous investment program for the fund; (ii) take "whatever" steps are necessary to

implement the investment program for the fund by arranging for the purchase and sale of

securities and other investments, including issuing directives to the administrator of the trust as

necessary for the appropriate implementation of the investment program of the fund; (iii) obtain

and evaluate the necessary economic, statistical and financial data with respect to the securities

that are included in the fund or those that are under consideration for inclusion; (iv) keep the

Board and AXA Equitable Funds Management Group, LLC, informed, in writing, on an ongoing

basis, of all material facts concerning the investment and reinvestment of the assets of the fund

and of its key investment personnel and operations, and to make written reports of other

information that either the Board or AXA Equitable Funds Management Group, LLC, may

periodically request; and (v) provide any and all information, records and supporting

documentation about accounts AllianceBernstein manages, which have investment objectives,

policies and strategies that are substantially similar to those employed by AllianceBernstein in

managing the fund, to allow the fund to present information concerning AllianceBernstein's prior

performance in the fund's SEC filings.

697636.1

80.     Furthermore, under the terms of the AllianceBernstein Agreement, in connection with performing, with minor exceptions, all of the investment management services to the EQ/Large Cap Value PLUS Portfolio, AllianceBernstein must also provide the following at its own expense: (i) all necessary facilities and personnel, including salaries, expenses and fees of any personnel required to perform the services listed in the subadvisory agreement and (ii) all administrative facilities, including bookkeeping, and all equipment necessary for it to carry out the services it is required to perform under the AllianceBernstein Agreement.

### 3.     EQ/T. Rowe Price Growth Stock Portfolio

81.     AXA Equitable Funds Management Group, LLC, serves as the investment adviser to the EQ/T. Rowe Price Growth Stock Portfolio, however, the fund's sub-adviser, T. Rowe Price, performs, with minor exceptions, all of the investment management services for this fund.

82.     An SEC filing dated November 30, 2012, which was signed by Steven M. Joenk who serves as President, Chief Executive Officer and Chairman of AXA Equitable Funds Management Group, LLC, as well as Trustee, President and Chief Executive Officer of the Advisors Trust, states:

> The Manager [AXA Equitable Funds Management Group, LLC] currently has retained 36 Advisers to provide the day-to-day investment advisory services for 60 of the 72 current Portfolios.  Pursuant to the Advisory Agreements, each Adviser [i.e., T. Rowe Price] generally performs the following functions: (i) furnishes an investment program for its Portfolio(s); (ii) makes investment decisions for its Portfolio(s); (iii) places all orders for the purchase and sale of those investments; and (iv) certain limited related administrative functions.

The EQ/T. Rowe Price Growth Stock Portfolio is one of these 60 Portfolios.

83.     The May 2012 N-1A, with respect to the EQ/T. Rowe Price Growth Stock Portfolio, states the following:

**Adviser: T. Rowe Price Associates, Inc. ("T. Rowe Price").**

697636.1

**Portfolio Managers**: [Listed is the name of a Vice President of T. Rowe Price. ]

84.      Under the terms of the T. Rowe Price Agreement between AXA Equitable Funds

Management Group, LLC, and T. Rowe Price, with respect to the EQ/T. Rowe Price Growth Stock

Portfolio, T. Rowe Price has to, among other things,: (i) formulate and implement a continuous

investment program for the fund; (ii) take "whatever" steps are necessary to implement the

investment program for the fund by arranging for the purchase and sale of securities and other

investments, including issuing directives to the administrator of the trust as necessary for the

appropriate implementation of the investment program of the fund; (iii) obtain and evaluate the

necessary economic, statistical and financial data with respect to the securities that are included in

the fund or those that are under consideration for inclusion; (iv) keep the Board and AXA Equitable

Funds Management Group, LLC, informed, in writing, on an ongoing basis, of all material facts

concerning the investment and reinvestment of the assets of the fund and of its key investment

personnel and operations, and to make written reports of other information that either the Board or

AXA Equitable Funds Management Group, LLC, may periodically request; and (v) provide any and

all information, records and supporting documentation about accounts T. Rowe Price manages,

which have investment objectives, policies and strategies that are substantially similar to those

employed by T. Rowe Price in managing the fund, to allow the fund to present information

concerning T. Rowe Price's prior performance in the fund's SEC filings.

85.      Furthermore, under the terms of the T. Rowe Price Agreement, in connection with

performing, with minor exceptions, all of the investment management services to the EQ/T. Rowe

Price Growth Stock Portfolio, T. Rowe Price must also provide the following at its own expense:

(i) all necessary facilities and personnel, including salaries, expenses and fees of any personnel

697636.1

required to perform the services listed in the subadvisory agreement and (ii) all administrative

facilities, including bookkeeping, and all equipment necessary for it to carry out the services it is

required to perform under the T. Rowe Price Agreement.

### 4.   EQ/Global Multi-Sector Equity Portfolio

86.   AXA Equitable Funds Management Group, LLC, serves as the investment adviser

to the EQ/Global Multi-Sector Equity Portfolio, however, the fund's sub-advisers, BlackRock

and MSIM, perform, with minor exceptions, all of the investment management services for this

fund.

87.   An SEC filing dated November 30, 2012, which was signed by Steven M. Joenk

who serves as President, Chief Executive Officer and Chairman of AXA Equitable Funds

Management Group, LLC, as well as Trustee, President and Chief Executive Officer of the

Advisors Trust, states:

> The Manager [AXA Equitable Funds Management Group, LLC] currently
> has retained 36 Advisers to provide the day-to-day investment advisory
> services for 60 of the 72 current Portfolios.  Pursuant to the Advisory
> Agreements, each Adviser [i.e., BlackRock and MSIM] generally performs
> the following functions:  (i) furnishes an investment program for its
> Portfolio(s); (ii) makes investment decisions for its Portfolio(s); (iii) places
> all orders for the purchase and sale of those investments; and (iv) certain
> limited related administrative functions.

The EQ/Global Multi-Sector Equity Portfolio is one of these 60 Portfolios.

88.   The May 2012 N-1A, with respect to the EQ/Global Multi-Sector Equity

Portfolio, states the following:

> **Adviser: Morgan Stanley Investment Management Inc. ('MSIM')**
>
> **Portfolio Managers**: The members of the team that are jointly and primarily
> responsible for the management of the Active Allocated Portion of the Portfolio
> are: [listed are the names of Managing and Executive Directors of MSIM]

697636.1

**Adviser: BlackRock Investment Management, LLC ('BlackRock')**

**Portfolio Managers:** The Members of the team that are jointly and primarily responsible for the management of the Index Allocated Portion of the Portfolio are: [listed are the names of Managing Directors of BlackRock].

89.     Three AXA Equitable Funds Management, LLC, employees are also listed as "Portfolio Managers," for the EQ/Global Multi-Sector Equity Portfolio, but unlike with respect to the BlackRock and MSIM employees, there is no disclosure regarding the services, if any, that are performed by these three AXA Equitable Funds Management, LLC, employees.

90.     As stated above, both BlackRock and MSIM serve as the sub-advisers to the EQ/Global Multi-Sector Equity Portfolio.  The BlackRock Agreement and the MSIM Agreement entered into between AXA Equitable Funds Management Group, LLC, and BlackRock and MSIM, respectively, on behalf of this fund, contain the same material terms regarding the services that each sub-adviser must provide to the fund.  Specifically, under the terms of the BlackRock Agreement and the MSIM Agreement, with respect to the EQ/Global Multi-Sector Equity Portfolio, BlackRock and MSIM have to, among other things,: (i) formulate and implement a continuous investment program for the fund; (ii) take "whatever" steps are necessary to implement the investment program for the fund by arranging for the purchase and sale of securities and other investments; (iii) obtain and evaluate the necessary economic, statistical and financial data with respect to the securities that are included in the fund or those that are under consideration for inclusion; (iv) keep the Board and AXA Equitable Funds Management Group, LLC, informed, in writing, on an ongoing basis, of all material facts concerning the investment and reinvestment of the assets of the fund and to make reports of other information that either the Board or AXA Equitable Funds Management Group, LLC, may

697636.1

periodically request; and (v) provide material performance information, records and supporting

documentation about accounts BlackRock and MSIM manage, which have investment

objectives, policies and strategies that are substantially similar to those employed by BlackRock

and MSIM in managing the fund, to allow the fund to present information concerning BlackRock

and MSIM's prior performance in the fund's SEC filings.

91.     Furthermore, under the terms of the BlackRock Agreement and the MSIM

Agreement, in connection with performing, with minor exceptions, all of the investment

management services to the EQ/Global Multi-Sector Equity Portfolio, BlackRock and MSIM

must also provide the following at their own expense: (i) all necessary facilities and personnel,

including salaries, expenses and fees of any personnel required to perform the services listed in

the subadvisory agreement and (ii) all administrative facilities, including bookkeeping, and all

equipment necessary for them to carry out the services they are required to perform under the

BlackRock Agreement and the MSIM Agreement.

### 5.     EQ/GAMCO Small Company Value Portfolio

92.     AXA Equitable Funds Management Group, LLC, serves as the investment adviser

to the EQ/GAMCO Small Company Value Portfolio, however, the fund's sub-adviser, GAMCO,

performs, with minor exceptions, all, of the investment management services for this fund.

93.     An SEC filing dated November 30, 2012, which was signed by Steven M. Joenk who

serves as President, Chief Executive Officer and Chairman of AXA Equitable Funds Management

Group, LLC, as well as Trustee, President and Chief Executive Officer of the Advisors Trust, states:

> The Manager [AXA Equitable Funds Management Group, LLC] currently
> has retained 36 Advisers to provide the day-to-day investment advisory
> services for 60 of the 72 current Portfolios.  Pursuant to the Advisory
> Agreements, each Adviser [i.e., T. Rowe Price] generally performs the

697636.1

following functions: (i) furnishes an investment program for its Portfolio(s); (ii) makes investment decisions for its Portfolio(s); (iii) places all orders for the purchase and sale of those investments; and (iv) certain limited related administrative functions.

The EQ/GAMCO Small Company Value Portfolio is one of these 60 Portfolios.

94.     The May 2012 N-1A, with respect to the EQ/GAMCO Small Company Value Portfolio, states the following:

**Adviser: GAMCO Asset Management, Inc. ('GAMCO')**

**Portfolio Manager:** [Listed is the name of GAMCO's Chief Executive Officer and Chief Investment Officer].

95.     Under the terms of the GAMCO Agreement between AXA Equitable Funds Management Group, LLC, and GAMCO, with respect to the EQ/GAMCO Small Company Value Portfolio, GAMCO has to, among other things,: (i) formulate and implement a continuous investment program for the fund; (ii) take "whatever" steps are necessary to implement the investment program for the fund by arranging for the purchase and sale of securities and other investments, including issuing directives to the administrator of the trust as necessary for the appropriate implementation of the investment program of the fund; (iii) obtain and evaluate the necessary economic, statistical and financial data with respect to the securities that are included in the fund or those that are under consideration for inclusion; (iv) keep the Board and AXA Equitable Funds Management Group, LLC, informed, in writing, on an ongoing basis, of all material facts concerning the investment and reinvestment of the assets of the fund and of its key investment personnel and operations, and to make written reports of other information  make reports of other information that either the Board or AXA Equitable Funds Management Group, LLC, may periodically request; and (v) provide material performance information, records and supporting

34

697636.1

documentation about accounts GAMCO manages, which have investment objectives, policies and strategies that are substantially similar to those employed by GAMCO in managing the fund, to allow the fund to present information concerning GAMCO's prior performance in the fund's SEC filings.

96.     Furthermore, under the terms of the GAMCO Agreement, in connection with performing, with minor exceptions, all of the investment management services to the EQ/GAMCO Small Company Value Portfolio, GAMCO must also provide the following at its own expense: (i) all necessary facilities and personnel, including salaries, expenses and fees of any personnel required to perform the services listed in the subadvisory agreement and (ii) all administrative facilities, including bookkeeping, and all equipment necessary for it to carry out the services it is required to perform under the GAMCO Agreement.

### 6.     EQ/Mid Cap Value PLUS Portfolio

97.     AXA Equitable Funds Management Group, LLC, serves as the investment adviser to the EQ/Mid Cap Value PLUS Portfolio, however, the fund's sub-advisers, BlackRock and Wellington, perform, with minor exceptions, all of the investment management services for this fund.

98.     An SEC filing dated November 30, 2012, which was signed by Steven M. Joenk who serves as President, Chief Executive Officer and Chairman of AXA Equitable Funds Management Group, LLC, as well as Trustee, President and Chief Executive Officer of the Advisors Trust, states:

> The Manager [AXA Equitable Funds Management Group, LLC] currently has retained 36 Advisers to provide the day-to-day investment advisory services for 60 of the 72 current Portfolios.  Pursuant to the Advisory Agreements, each Adviser [i.e., BlackRock and Wellington] generally performs the following functions: (i) furnishes an investment program for its Portfolio(s); (ii) makes investment decisions for its Portfolio(s); (iii) places all orders for the purchase and sale of those investments; and (iv) certain limited related administrative functions.

697636.1

The EQ/Mid Cap Value PLUS Portfolio is one of these 60 Portfolios.

99.    The May 2012 N-1A, with respect to the EQ/Mid Cap Value PLUS Portfolio, states the following:

> **Adviser: Wellington Management Company, LLP ('Wellington')**
>
> **Portfolio Managers:** The Active Allocated Portion of the Portfolio is management by: [listed is the name of a Wellington Senior Vice President]
>
> **Adviser: BlackRock Investment Management, LLC ('BlackRock')**
>
> **Portfolio Managers:** The members of the team that are jointly and primarily responsible for the management of the Index Allocated Portion of the Portfolio are:  [listed are the names of Managing Directors of BlackRock]

100.    Three AXA Equitable Funds Management, LLC, employees are also listed as "Portfolio Managers," for the EQ/Mid Cap Value Plus Portfolio, but unlike with respect to the Wellington and BlackRock employees, there is no disclosure regarding the services, if any, that are performed by these three AXA Equitable Funds Management, LLC, employees.

101.    As stated above, both BlackRock and Wellington serve as the sub-advisers to the EQ/Mid Cap Value PLUS Portfolio.  The BlackRock Agreement and the Wellington Agreement entered into between AXA Equitable Funds Management Group, LLC, and BlackRock and Wellington, respectively, on behalf of this fund, contain the same material terms regarding the services that each sub-adviser must provide to the fund.  Specifically, under the terms of the BlackRock Agreement and the Wellington Agreement, with respect to the EQ/Mid Cap Value PLUS Portfolio, BlackRock and Wellington have to, among other things,: (i) formulate and implement a continuous investment program for the fund; (ii) take "whatever" steps are necessary to implement

the investment program for the fund by arranging for the purchase and sale of securities and other investments, including issuing directives to the administrator of the trust as necessary for the appropriate implementation of the investment program of the fund; (iii) obtain and evaluate the necessary economic, statistical and financial data with respect to the securities that are included in the fund or those that are under consideration for inclusion; (iv) keep the Board and AXA Equitable Funds Management Group, LLC, informed, in writing, on an ongoing basis, of all material facts concerning the investment and reinvestment of the assets of the fund and of its key investment personnel and operations, and to make written reports of other information that either the Board or AXA Equitable Funds Management Group, LLC, may periodically request; and (v) provide material performance information, records and supporting documentation about accounts BlackRock and Wellington manage, which have investment objectives, policies and strategies that are substantially similar to those employed by BlackRock and Wellington in managing the fund, to allow the fund to present information concerning BlackRock and Wellington's prior performance in the fund's SEC filings.

102.    Furthermore, under the terms of the BlackRock Agreement and the Wellington Agreement, in connection with performing, with minor exceptions,   all of the investment management services to the EQ/Mid Cap Value PLUS Portfolio, BlackRock and Wellington must also provide the following at their own expense: (i) all necessary facilities and personnel, including salaries, expenses and fees of any personnel required to perform the services listed in the subadvisory agreement and (ii) all administrative facilities, including bookkeeping, and all equipment necessary for them to carry out the services they are required to perform under the BlackRock Agreement and the Wellington Agreement.

697636.1

7.     **EQ/Core Bond Index Portfolio**

103.    AXA Equitable Funds Management Group, LLC, serves as the investment adviser

to the EQ/Core Bond Index Portfolio, however, the fund's sub-adviser, SSgA FM performs, with

minor exceptions, all of the investment management services for this fund.

104.    An SEC filing dated November 30, 2012, which was signed by Steven M. Joenk who

serves as President, Chief Executive Officer and Chairman of AXA Equitable Funds Management

Group, LLC, as well as Trustee, President and Chief Executive Officer of the Advisors Trust, states:

> The Manager [AXA Equitable Funds Management Group, LLC] currently
> has retained 36 Advisers to provide the day-to-day investment advisory
> services for 60 of the 72 current Portfolios.  Pursuant to the Advisory
> Agreements, each Adviser [i.e., SSgA FM] generally performs the following
> functions: (i) furnishes an investment program for its Portfolio(s); (ii) makes
> investment decisions for its Portfolio(s); (iii) places all orders for the
> purchase and sale of those investments; and (iv) certain limited related
> administrative functions.

The EQ/Core Bond Index Portfolio is one of these 60 Portfolios.

105.    The May 2012 N-1A, with respect to the EQ/Core Bond Index Portfolio, states the

following:

> **Adviser: SSgA Funds Management, Inc. ('SSgA FM')**
>
> **Portfolio Manager:** The members that are jointly and primarily
> responsible for the management of the Portfolio are: [listed is the
> name of a Managing of SSgA FM  and one of its Vice Presidents]

106.    The May 2012 N-1A, with respect to the EQ/Core Bond Index Portfolio, states the

following:

> **Portfolio Manager:** The members of the team that are jointly and
> primarily responsible for the Portfolio's ETF [Exchange Traded
> Funds] investments are: [listed are the names of three AXA Equitable
> Funds Management Group, LLC, employees.]

697636.1

According to the semi-annual report, dated June 30, 2012, only 3.1% of the total assets of the EQ/Core Bond Index Portfolio were invested in ETFs. Counsel for the Plaintiffs in this action filed a Complaint on July 21, 2011 against AXA Equitable Funds Management, LLC, regarding its investment advisory fees (*Sivolella et al. v. AXA et al.*, No. 3:11-cv-04919-PGS-DEA; Defendants' Motion to Dismiss that case was denied). Thus, the December 31, 2010 statement of holdings/portfolio of investments for the EQ/Core Bond Index Portfolio, which was made publicly available on March 4, 2011, was the last statement of holdings for this portfolio to be publicly filed before litigation commenced against the Defendant. No ETF investments are listed on the December 31, 2010 statement of holdings/portfolio of investments for the EQ/Core Bond Index Portfolio.

107.    Under the terms of the SSgA FM Agreement between AXA Equitable Funds Management Group, LLC, and SSgA FM, with respect to the EQ/Core Bond Index Portfolio, SSgA FM has to, among other things,: (i) formulate and implement a continuous investment program for the fund; (ii) take "whatever" steps are necessary to implement the investment program for the fund by arranging for the purchase and sale of securities and other investments, including issuing directives to the administrator of the trust as necessary for the appropriate implementation of the investment program of the fund; (iii) obtain and evaluate the necessary economic, statistical and financial data with respect to the securities that are included in the fund or those that are under consideration for inclusion; (iv) keep the Board and AXA Equitable Funds Management Group, LLC, informed, in writing, on an ongoing basis, of all material facts concerning the investment and reinvestment of the assets of the fund and to make written reports  of other information that either the Board or AXA Equitable Funds Management Group, LLC, may periodically request; and (v) provide material performance information, records and supporting documentation about accounts

697636.1

SSgA FM manages, which have investment objectives, policies and strategies that are substantially similar to those employed by SSgA FM in managing the fund, to allow the fund to present information concerning SSgA FM's prior performance in the fund's SEC filings.

108.     Furthermore, under the terms of the SSgA FM Agreement, in connection with performing, with minor exceptions, all of the investment management services to the EQ/Core Bond Index Portfolio, SSgA FM must also provide the following at its own expense: (i) all necessary facilities and personnel, including salaries, expenses and fees of any personnel required to perform the services listed in the subadvisory agreement and (ii) all administrative facilities, including bookkeeping, and all equipment necessary for it to carry out the services it is required to perform under the SSgA FM Agreement.

### 8.     EQ/Global Bond PLUS Portfolio

109.     AXA Equitable Funds Management Group, LLC, serves as the investment adviser to the EQ/Global Bond PLUS Portfolio, however, the fund's sub-advisers', BlackRock and First International/WellsCap, perform, with minor exceptions, all of the investment management services for this fund.

110.     An SEC filing dated November 30, 2012, which was signed by Steven M. Joenk who serves as President, Chief Executive Officer and Chairman of AXA Equitable Funds Management Group, LLC, as well as Trustee, President and Chief Executive Officer of the Advisors Trust, states:

> The Manager [AXA Equitable Funds Management Group, LLC] currently has retained 36 Advisers to provide the day-to-day investment advisory services for 60 of the 72 current Portfolios. Pursuant to the Advisory Agreements, each Adviser [i.e., BlackRock and First International/WellsCap] generally performs the following functions: (i) furnishes an investment program for its Portfolio(s); (ii) makes investment decisions for its Portfolio(s); (iii) places all orders for the purchase and sale of those investments; and (iv) certain limited related administrative functions.

697636.1

The EQ/Global Bond PLUS Portfolio is one of these 60 Portfolios.

111.    The May 2012 N-1A, with respect to the EQ/Global Bond PLUS Portfolio, states the following:

> **Adviser:    First    International    Advisors,    LLC    ("First International") and Wells Capital Management, Inc.**
>
> **Portfolio Managers:** The members of the team that are primarily responsible for the management of the Index Allocated Portion of the Portfolio are: [listed are the names of the Chief Investment Officer of First Interntational/WellsCap and one of its Managing Directors. ]
>
> **Adviser:    BlackRock    Investment    Management,    LLC ("BlackRock")**
>
> **Portfolio Managers:** The members of the team that are primarily responsible for the management of the Index Allocated Portion of the Portfolio are: [listed are the names of a Portfolio Manager and Director of BlackRock.]

112.    As stated above, both BlackRock and First International/WellsCap serve as the sub-advisers to the EQ/Global Bond PLUS Portfolio.   The BlackRock Agreement and the First International/Wells Cap Agreement entered into between AXA Equitable Funds Management Group, LLC, and BlackRock and First International/Wells Cap, respectively, on behalf of this fund, contain the same material terms regarding the services that each sub-adviser must provide to the fund. Specifically, under the terms of the BlackRock Agreement and the First International/Wells Cap Agreement, with respect to the EQ/Global Bond PLUS Portfolio, BlackRock and First International/Wells Cap have to, among other things,: (i) formulate and implement a continuous investment program for the fund; (ii) take "whatever" steps are necessary to implement the investment program for the fund by arranging for the purchase and sale of securities and other investments, including issuing directives to the administrator of the trust as necessary for the

697636.1

appropriate implementation of the investment program of the fund; (iii) obtain and evaluate the necessary economic, statistical and financial data with respect to the securities that are included in the fund or those that are under consideration for inclusion; (iv) keep the Board and AXA Equitable Funds Management Group, LLC, informed, in writing, on an ongoing basis, of all material facts concerning the investment and reinvestment of the assets of the fund and of its key investment personnel and operations, and to make written reports of other information that either the Board or AXA Equitable Funds Management Group, LLC, may periodically request; and (v) provide material performance information, records and supporting documentation about accounts  BlackRock and First International/Wells Cap manage, which have investment objectives, policies and strategies that are substantially similar to those employed by BlackRock and First International/Wells Cap in managing the fund, to allow the fund to present information concerning BlackRock's and First International/Wells Cap's prior performance in the fund's SEC filings.

113.    Furthermore, under the terms of the BlackRock Agreement and the First International/Wells Cap Agreement, in connection with performing, with minor exceptions, all of the investment management services to the EQ/Global Bond PLUS Portfolio, BlackRock and First International/Wells Cap must also provide the following at their own expense: (i) all necessary facilities and personnel, including salaries, expenses and fees of any personnel required to perform the services listed in the subadvisory agreement and (ii) all administrative facilities, including bookkeeping, and all equipment necessary for them to carry out the services they are required to perform under the BlackRock Agreement and the First International/Wells Cap Agreement.

697636.1

(b)    **Nature and Quality of Services: Statements Regarding the Investment Management Services Provided to the AXA Funds That Apply Equally To All Funds**

114.    The May 1, 2012 SAI provides that AXA Equitable Funds Management Group, LLC, has "entered into one or more Advisory Agreements on behalf of each Portfolio", which "obligate the Advisers [i.e., sub-advisers] to: (i) make investment decisions on behalf of their respective Portfolios (or portions thereof); (ii) place all orders for the purchase and sale of investments for their respective Portfolios (or portions thereof) with brokers or dealers selected by the Manager and/or the Advisers; and (iii) perform certain related administrative functions in connection therewith."

115.    Consistent with the May 1, 2012 SAI, the Advisors Trust Annual Report, dated December 31, 2011, provides that: "[e]ach of the Advisory Agreements [i.e., sub-advisory agreements] obligates the Advisers [i.e., sub-advisers] for the respective Portfolios to: (i) continuously furnish investment programs for the Portfolios; (ii) place all orders for the purchase and sale of investments for the Portfolios with brokers or dealers selected by the Manager or the respective Advisers; and (iii) perform certain limited related administrative functions in connection therewith."

116.    AXA Equitable Funds Management Group, LLC's, fee schedule varies for each of the AXA Funds. Each AXA Fund (through the Advisors Trust) pays an investment management fee to AXA Equitable Funds Management Group, LLC, which then subcontracts with AllianceBernstein, BlackRock, MSIM, Wellington, GAMCO, SSgA FM, PIMCO, T. Rowe Price, and First International/WellsCap at a fraction of AXA Equitable Funds Management Group, LLC's, investment management fee.

697636.1

117.    In 2011 alone, AXA Equitable Funds Management Group, LLC, was paid $81,423,963 in investment management fees from the AXA Funds at issue in this Complaint for allegedly providing minimal management services that were predominately supervisory in nature to the Funds, while the sub-advisers collectively were paid $30,233,612 in investment management fees, despite the fact that the sub-advisers performed, with minor exceptions, all of the investment management services to the AXA Funds (*see* Table,¶67).  This is a clear breach of AXA Equitable Funds Management Group, LLC's, fiduciary duties and a violation of ICA § 36(b), 15 U.S.C. § 80a-35(b).[12]

118.    AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-adviser of the EQ/PIMCO Ultra Short Bond Portfolio by 207%.  AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-adviser of the EQ/Core Bond Index Portfolio by 2017%.  AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-adviser of the EQ/Large Cap Value PLUS Portfolio by 251%.  AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-adviser of the EQ/T. Rowe Price Growth Stock Portfolio by 109%.  AXA Equitable Funds Management Group, LLC's,  investment management fee exceeds the investment management fee paid to the sub-adviser of the EQ/GAMCO Small

---

[12] On information and belief, with respect to each of the AXA Funds, for the 2012 calendar year, the amount of investment management fees that were/will be paid to AXA Equitable Funds Management Group, LLC, and the investment management fees that will be paid to each fund's sub-adviser(s), will not be materially different than the 2011 values.

697636.1

Company Value Portfolio by 109%. AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-advisers of the EQ/Mid Cap Value PLUS Portfolio by 217%. AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-adviser of the EQ/Global Multi-Sector Equity Portfolio by 234%. AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-advisers of the EQ/Global Bond PLUS Portfolio by 665%. The average amount (in percentage terms) by which AXA Equitable Funds Management Group, LLC's, investment management fee exceeds that of the Funds' sub-adviser(s) is 476% (*see* Table ¶67)

119.    In addition to AXA Equitable Funds Management Group, LLC's "[i]nvestment management fees," the Annual Report for the period ended December 31, 2011, with respect to the AXA Funds, confirmed that the AXA Funds' paid fees in addition to the Defendant's investment management fees.

120.    Pursuant to the IMA (a copy of which AXA Equitable Funds Management Group, LLC, filed with the Court on December 19, 2011, (Docket No. 3:11-cv-04194, PGS-DEA; 19-6))[13], AXA Equitable Funds Management Group, LLC, as the AXA Funds' investment manager, alleges/claims, it performs, for its investment management fees, the following services:

> Subject always to the direction and control of the Trustees of the Trust, Manager [*i.e., AXA Equitable Funds Management Group, LLC*] will have (i) overall supervisory responsibility for the general management and investment of each Portfolio's assets; (ii) full discretion to select new or additional Advisers [*i.e., sub-adviser*] for each Portfolio [*i.e., AXA Fund*]; (iii) full

---

[13] Through the inclusion of the text of the IMA, which the Defendant filed with this Court, Plaintiffs are in no way conceding that AXA Equitable Funds Management Group, LLC, actually provides or provided the alleged services contained in the IMA.

697636.1

discretion to enter into and materially modify existing Advisory Agreements [*i.e., sub-advisory agreements*] with Advisers; (iv) full discretion to terminate and replace any Adviser; and (v) full investment discretion to make all determinations with respect to the investment of a Portfolio's assets not then managed by an Adviser. In connection with Manager's responsibilities herein, Manager will assess each Portfolio's investment focus and will seek to implement decisions with respect to the allocation and reallocation of each Portfolio's assets among one or more current or additional Advisers from time to time, as the Manager deems appropriate, to enable each Portfolio to achieve its investment goals. In addition, Manager will monitor compliance of each Adviser with the investment objectives, policies and restrictions of any Portfolio or Portfolios (or portions of any Portfolio) under the management of such Adviser, and review and report to the Trustees of the Trust on the performance of each Adviser. Manager will furnish, or cause the appropriate Adviser(s) to furnish, to the Trust such statistical information, with respect to the investments that a Portfolio (or portions of any Portfolio) may hold or contemplate purchasing, as the Trust may reasonably request. On Manager's own initiative, Manager will apprise, or cause the appropriate Adviser(s) to apprise, the Trust of important developments materially affecting each Portfolio (or any portion of a Portfolio that they advise) and will furnish the Trust, from time to time, with such information as may be appropriate for this purpose. Further, Manager agrees to furnish, or cause the appropriate Adviser(s) to furnish, to the Trustees of the Trust such periodic and special reports as the Trustees of the Trust may reasonably request. In addition, Manager agrees to cause the appropriate Adviser(s) to furnish to third-party data reporting services all currently available standardized performance information and other customary data.

121.    Thus, the services AXA Equitable Funds Management Group, LLC, allegedly provides to the AXA Funds pursuant to the IMA are all predominantly oversight/supervisory services.

122.    Further, while AXA Equitable Funds Management Group, LLC, alleges it is providing oversight services to the AXA Funds, these services are also limited because, according to the sub-advisory agreements, it is the fund's sub-adviser(s) who "formulate and implement a continuous investment program for [each fund]", which is the core investment management service needed for a mutual fund.

697636.1

123.    Further, AXA Equitable Funds Management Group, LLC's, supervisory role is also presumably limited given that the Advisors Trust's Board is charged with the substantial supervision of the Funds.  According to the May 1, 2012 SAI, "the Trust's Board is responsible for the overall management of the Trust and the Portfolios, including general supervision and review of the Portfolios' investment activities and their conformity with federal and state law as well as the stated policies of the Portfolios. The Board elects the officers of the Trust who are responsible for administering the Trust's day-to-day operations."

124.    Further, AXA Equitable Funds Management Group, LLC's, investment management services are also limited because only ten of its employees perform investment advisory functions and these employees allegedly provides services to an additional ninety (90) other AXA Funds Management Group, LLC, funds, in addition to the eight AXA Funds.

125.    If AXA Equitable  Funds Management Group, LLC, performed all of the alleged services listed in the IMA at ¶120, for each AXA Fund, if the fees charged for these alleged services were the product of arm's-length bargaining, they should have been, for each AXA Fund, much smaller than the fees charged by each fund's sub-adviser(s), in light of the substantial investment management services the sub-advisers provide to the AXA Funds under the terms of their respective sub-advisory agreements.  However, on average, AXA Equitable Funds Management Group, LLC's, investment management fee was 476% times greater than the fee paid to the sub-advisers, and in all cases, their investment management fees charged to each AXA Funds exceeded the fee paid to the sub-advisers (and in most cases that excess is significant and up to 2017%).

126.    By comparison to the services AXA Equitable Funds Management Group, LLC, claims to provide, all of the sub-advisory agreements, as stated above, require the following

697636.1

investment management services from the sub-advisers (all at their own expense): (i) formulate and implement a continuous investment program for the fund; (ii) take "whatever" steps are necessary to implement the investment program for the fund by arranging for the purchase and sale of securities and other investments, including issuing directives to the administrator of the trust as necessary for the appropriate implementation of the investment program of the fund; (iii) obtain and evaluate the necessary economic, statistical and financial data with respect to the securities that are included in the fund or those that are under consideration for inclusion; (iv) keep the Board and AXA Equitable Funds Management Group, LLC, informed, in writing, on an ongoing basis, of all material facts concerning the investment and reinvestment of the assets of the fund and to make written reports of other information that either the Board or AXA Equitable Funds Management Group, LLC, may periodically request; and (v) provide material performance information, records and supporting documentation about accounts the sub-adviser manages, which have investment objectives, policies and strategies that are substantially similar to those employed by the sub-adviser in managing the particular AXA Fund, to allow the AXA Fund to present information concerning the sub-adviser's prior performance in the fund's SEC filings.

127.    Thus, a comparison of (A) the fees paid to the AXA Fund's sub-advisers for performing, with minor exceptions, all of the investment management services for the AXA Funds, and (B) the fees paid to AXA Equitable Funds Management Group, LLC, for its alleged minor amount of investment management services, reflects that a substantial portion of the investment management fees paid to AXA Equitable Funds Management Group, LLC, for its investment management services were so disproportionately large that they bore no reasonable relationship to

48

697636.1

the services it rendered and could not have been the product of arm's-length bargaining and thus in violation of ICA § 36(b), 15 U.S.C. § 80a-35(b).

128.   On information and belief, the fee practices associated with AXA Equitable Funds Management Group, LLC's, excessive fees have been ongoing for the entire time period applicable to Plaintiffs' claims.

129.   In light of the foregoing, the nature and quality of the investment management services performed by AXA Equitable Funds Management Group, LLC, were minimal because, with minor exceptions, all of the services needed for each AXA Fund were provided by each AXA Fund's sub-adviser.

130.   Further, as the December 31, 2011 Annual Report on behalf of the AXA Funds reflect, the AXA Funds were also charged a host of other fees, in addition to AXA Funds Management Group, LLC's, investment management fees.

131.   Plaintiffs, on behalf of the AXA Funds and/or the Advisors Trust, are entitled to recover a substantial portion of the investment management fees received (continued to be received) by AXA Equitable Funds Management Group, LLC, in breach of its fiduciaries duty under ICA § 36(b), 15 U.S.C. § 80a-35(b) to the AXA Funds and/or Advisors Trust.

**B.   THE ECONOMIES OF SCALE ENJOYED IN CONNECTION WITH THE INVESTMENT MANAGEMENT SERVICES WERE NOT PASSED ON TO PLAINTIFFS AND THE OTHER SECURITY HOLDERS OF THE AXA FUNDS AS REQUIRED BY ICA § 36(b), 15 U.S.C. § 80a-35(b), BUT WERE KEPT BY AXA EQUITABLE FUNDS MANAGEMENT GROUP LLC, IN VIOLATION OF ITS FIDUCIARY DUTIES**

132.   The legislative history of ICA § 36(b), 15 U.S.C. § 80a-35(b), recognizes that an investment adviser's failure to pass on economies of scale to the fund is a cause of excessive fees:

697636.1

> It is noted . . . that problems arise due to the economies of scale attributable to the dramatic growth of the mutual fund industry. In some instances these economies of scale have not been shared with investors. Recently there has been a desirable tendency on the part of some fund managers to reduce their effective charges as the fund grows in size. Accordingly, the best industry practice will provide a guide.

*S. Rep. No. 91-184*, at 5-6 (1969), as reprinted in *1970 U.S. Code Cong. & Ad. News*, at 4901-02.

133.    The amount of the compensation received by the investment adviser should be evaluated in context with the economies of scale realized by a fund. Economies of scale are created when assets under management increase more quickly than the cost of advising and managing those assets. The work required to operate a mutual fund does not increase proportionately with the assets under management.

> [I]nvestment management efforts, the most important (and most expensive) input into portfolio management, do not increase along with portfolio size. A portfolio manager can invest $5 billion nearly as easily as $1 billion and $20 billion nearly as easily as $10 billion. (Size may impair performance, but it imposes little logistical challenge.)

*Unconventional Success: A Fundamental Approach to Personal Investment*, David Swensen, Free Press (2005), p. 238. "The intrinsic characteristics of the mutual-fund...suggest that economies of scale should lead to lower fees as assets under management [i.e., the amount people invest in a fund] increase." *Id.* at 237. Economies of scale with respect to a mutual fund exist, and are available to be passed along to the fund's investors, because "investment management efforts...do not increase along with portfolio size." *Id.* at 238. Therefore, "[a]s scale increases, fees as a percentage of assets ought to decline, allowing both fund manager and fund shareholders to benefit." *Id.*

697636.1

134.    On a per share basis, it does not cost more to manage additional assets in a growing fund because economies of scale occur on both the fund complex and portfolio level for various costs incurred.  Moreover, fixed costs are spread over more assets as a fund grows in size.

135.    Indeed, investment management organizations can realize economies of scale from increased assets within a particular mutual fund and from increased total assets in all mutual funds under management.

136.    As an example, if a fund has fifty million dollars ($50,000,000) of assets under management and is charged a fee of 75 basis points (100 basis points = 1%; 1 basis point equals 1/100th of a percent), the fee equals $375,000 per year.  A comparable mutual fund with five hundred million dollars ($500,000,000) of assets under management would generate a fee of three million seven hundred and fifty thousand dollars ($3,750,000).  Similarly, a mutual fund worth five billion dollars ($5,000,000,000) would generate a fee of thirty-seven million, five hundred thousand dollars ($37,500,000) per year.

137.    As assets under management increase, however, the cost of providing services to additional assets does not increase at the same rate, resulting in tremendous economies of scale.  In other words, it simply does not cost a fund's adviser ten times as much to render services to a ten billion dollar ($10,000,000,000) fund as compared to a one billion dollar ($1,000,000,000) fund. In fact, the investment management services or securities selection process for a ten billion dollar fund and a one billion dollar fund, or even a one million dollar fund, are virtually identical, generating enormous economies of scale.  Indeed, at some point, the additional cost to advise each additional dollar in the fund (whether added because of a rise in the value of the securities or additional contributions by current or new shareholders) approaches a number at or close to zero.

697636.1

138.    The existence of economies of scale in the mutual fund industry has been confirmed by both the SEC and the Governmental Accounting Office (the "GAO"). Both conducted in-depth studies of mutual fund fees in 2000, and both concluded that economies of scale exist in the provision of management services. *See SEC Division of Investment Management: Report on Mutual Fund Fees and Expenses* (Dec. 2000), at 30-31;  GAO, *Report on Mutual Fund Fees to the Chairman, Subcommittee on Finance and Hazardous Materials; and the Ranking Member, Committee on Commerce, House of Representatives* (June 2000) ("GAO Report"), at 9. The GAO has estimated as much as 64% of mutual fund asset growth has been the result of market appreciation rather than additional purchases of new shares of a fund. *Id.*

139.    Economies of scale exist not only fund by fund but also exist with respect to an entire fund complex and even with respect to an investment adviser's entire scope of operations, including services provided to institutional and other clients. *See John P. Freeman & Stewart L. Brown, Mutual Fund Advisory Fees: The Cost of Conflicts of Interest,* 26 J. CORP. L. 610, at 621 n. 62 (2001) (the "Freeman & Brown Study") (citing Victoria E. Schonfeld & Thomas M.J. Kerwin, *Organization of a Mutual Fund*, 49 BUS. LAW 107 (1993))

140.    As fund portfolios grow, they quickly create economies of scale and eventually the incremental cost of servicing additional assets approaches zero. As the GAO confirms, it is possible for the adviser to service the additional assets with zero additional costs. *See* GAO Report, at 9 (noting that growth from portfolio appreciation is unaccompanied by costs).

141.    Although significant economies of scale exist for each of the AXA Funds, the associated cost savings largely have been appropriated for the benefit of AXA Equitable Funds Management Group, LLC, rather than being shared with the AXA Funds or their investors. The

697636.1

economies-of-scale benefits that have been captured and misappropriated by AXA Equitable Funds Management Group, LLC, can and have generated huge unreasonable and excessive, undeserved profits for AXA Equitable Funds Management Group, LLC, in breach of its fiduciary duties with respect to such compensation.

142.    Management fees received by AXA Equitable Funds Management Group, LLC, are paid as a varying percentage of assets under management. Some of the AXA Funds employ a declining rate structure in which the percentage fee rate decreases in steps or at designated breakpoints as assets increase.  The fees vary based on the amount of assets under management, and are reduced as the total amount of assets under management increase.  *See* the following table.

### AXA FUNDS' FEE BREAKPOINT SCHEDULE
#### ("M" refers to "Million" and "B" refers to "Billion")

| AXA Fund | Investment Advisory Agreement(s) | AXA Equitable's Fee Schedule (annual rate based on average daily net assets) | Sub-Advisor Fee Schedule (annual rate based on average daily net assets) |
|---|---|---|---|
| EQ/PIMCO Ultra Short Bond Portfolio | PIMCO | First $750 Million – 0.500%<br>Next $750 Million – 0.475%<br>Next $1 Billion – 0.450%<br>Next $2.5 Billion – 0.430%<br>Thereafter – 0.420% | All Assets – 0.150% |
| EQ/T. Rowe Price Growth Stock Portfolio | T. Rowe Price | First $400 Million – 0.800%<br>Next $400 Million – 0.750%<br>Thereafter – 0.70% | First $250 Million – 0.40%<br>$250M to $500M – 0.375%<br>Over $500M – 0.350% |

697636.1

| | | | |
|---|---|---|---|
| EQ/Large Cap Value PLUS Portfolio | Alliance-Bernstein | First $2 Billion – 0.500%<br>Next $1 Billion – 0.450%<br>Next $3 Billion – 0.425%<br>Next $5 Billion – 0.400%<br>Thereafter – 0.375% | First $100 Million – 0.490%<br>Next $100 Million – 0.300%<br>Over $200M – 0.250%[14] |
| EQ/ Core Bond Index Portfolio | SSgA FM | First $4 Billion – 0.350%<br>Thereafter – 0.340% | First $2 Billion – 0.020%<br>Over $2B – 0.015% |
| EQ/Global Bond PLUS Portfolio | BlackRock | First $4 Billion – 0.550%<br>Next $4 Billion – 0.530%<br>Thereafter – 0.510% | All Assets – 0.020% |
| EQ/Global Bond PLUS Portfolio | First International/ WellsCap | First $4 Billion – 0.550%<br>Next $4 Billion – 0.530%<br>Thereafter – 0.510% | First $100 Million – 0.300%<br>$100M to $150M – 0.200%<br>Over $150M – 0.150% |
| EQ/GAMCO Small Company Value Portfolio | GAMCO | First $400 Million – 0.800%<br>Next $400 Million – 0.750%<br>Thereafter – 0.700% | First $1 Billion – 0.400%<br>Over $1B – 0.300% |
| EQ/Mid Cap Value PLUS Portfolio | BlackRock | First $2 Billion – 0.550%<br>Next $1 Billion – 0.500%<br>Next $3 Billion – 0.475%<br>Next $5 Billion – 0.450%<br>Thereafter – 0.425% | First $5 Billion – 0.075%<br>$5B to $10B – 0.055%<br>Over $10B – 0.050% |
| EQ/Mid Cap Value PLUS Portfolio | Wellington | First $2 Billion – 0.550%<br>Next $1 Billion – 0.500%<br>Next $3 Billion – 0.475%<br>Next $5 Billion – 0.450%<br>Thereafter – 0.425% | First $150 Million – 0.550%<br>Over $150M – 0.450% |

---

[14]    This Portfolio/Fund has an "Active Allocation Portion of the Portfolio" and an "Index Allocation Portion of the Portfolio." The breakpoint presented in the table is AllianceBernstein's breakpoint schedule regarding the "Active Allocation Portion of the Portfolio." AllianceBernstein's break point schedule regarding the "Index Allocation Portion of the Portfolio" is 0.075% on the assets in this portion of the portfolio that do not exceed $5 billion; 0.055% on the assets in this portion of the portfolio that exceed $5 billion, up to, and including $10 billion; and 0.050% on assets in this portion of the portfolio that exceed $10 billion.

697636.1

| EQ/Global Multi-Sector Equity Portfolio | BlackRock | First $1 Billion – 0.750%<br>Next $1 Billion – 0.700%<br>Next $3 Billion – 0.675%<br>Next $5 Billion – 0.650%<br>Thereafter – 0.625% | First $5 Billion – 0.075%<br>$5B to $10B – 0.055%<br>Over $10B – 0.050% |
|---|---|---|---|
| EQ/Global Multi-Sector Equity Portfolio | MSIM | First $1 Billion – 0.750%<br>Next $1 Billion – 0.700%<br>Next $3 Billion – 0.675%<br>Next $5 Billion – 0.650%<br>Thereafter – 0.625% | First $100 Million – 1.00%<br>$100M to $400M – 0.800%<br>$400M to $500M – 0.600%<br>Over $500M – 0.400% |

143.     This fee structure, known as "breakpoints," implicitly recognizes the economies of scale and gives the appearance that the AXA Funds share in those benefits. A fee breakpoint has been explained as follows:

> Many funds employ a declining rate structure in which the percentage fee rate decreases in steps or at designated breakpoints as assets increase. The declining rate schedule reflects the expectation that costs efficiencies or scale economies will be realized in the management and administration of the fund's portfolio and operations as the fund grows.

*See Freeman & Brown Study*, at 620, n. 59.

144.     Economies of scale can be passed on to and shared with the mutual funds as assets increase if management fee breakpoints are installed at higher asset levels (but at asset levels that are reachable), or if lower asset based investment advisory fees are adopted by the management company in response to increases in the overall level of assets under management.

145.     The benefits achieved by the AXA Funds' economies of scale can and should have been shared with their security holders by reducing the management fees that AXA Equitable Funds Management Group, LLC, charge the security holders of the AXA Funds.

146.     The breakpoints are designed by AXA Equitable Funds Management Group, LLC,

697636.1

to benefit itself rather than the AXA Funds and investments into them. The initial breakpoints are set too high, the reductions made at breakpoints are far too small and/or the breakpoints are spaced too far apart, thereby depriving Plaintiffs, and the other security holders of the AXA Funds, of the benefits of the economies of scale created by the contribution of their capital to the AXA Funds.

147.    With respect to the EQ/T. Rowe Price Growth Stock Portfolio, the EQ/Large Cap Value PLUS Portfolio, the EQ/Core Bond Index Portfolio, the EQ/Global Bond PLUS Portfolio (portion managed by First International/Wells Cap), the EQ/Mid Cap Value PLUS Portfolio (portion managed by Wellington) and the EQ/Global Multi Sector Equity Portfolio (portion managed by MSIM), AXA Equitable Funds Management Group, LLC, negotiated with the sub-advisers to those funds (or portion thereof) a requirement that they start granting fee reductions (i.e, breakpoints) at a level significantly below the level that AXA Equitable Funds Management Group, LLC, starts granting fee reductions to the AXA Funds.   For example, AXA Equitable Funds Management Group, LLC, negotiated a breakpoint schedule with AllianceBernstein, the sub-adviser for the EQ/Large Cap Value PLUS Portfolio, by which AllianceBernstein grants fee reductions at levels starting at $100 million in assets under management. *See* Table ¶142.  Conversely, the breakpoint schedule that AXA Equitable Funds Management Group, LLC, charges to this AXA Fund does not even start until $2 billion.

148.    Similarly, AXA Equitable Funds Management Group, LLC, has also negotiated a breakpoint schedule with Wellington, the sub-adviser for the EQ/Mid Cap Value PLUS Portfolio, by which Wellington grants fee reductions at levels starting at $150 million in assets under management.  However, the breakpoint schedule that AXA Equitable Funds Management Group, LLC, charges to this fund does not even start until $2 billion. *See* Table ¶142.  AXA Equitable

697636.1

Funds Management Group, LLC, has also negotiated a breakpoint schedule with MSIM, a sub-adviser for the EQ/Global Multi-Sector Equity Portfolio, by which MSIM grants fee reductions at levels starting at $100 million in assets under management. However, the breakpoint schedule that AXA Equitable Funds Management Group, LLC, charges to this AXA Fund does not even start until $1 billion. *See* Table ¶142. AXA Equitable Funds Management Group, LLC, has also negotiated a breakpoint schedule with Wells/First International, a sub-adviser for the EQ/Global Bond PLUS Portfolio, by which First International/Wells Cap grants fee reductions at levels starting at $100 million in assets under management. However, the breakpoint schedule that AXA Equitable Funds Management Group, LLC, charges to this AXA Fund does not even start until $4 billion. *See* Table ¶142.

149.   AXA Equitable Funds Management Group, LLC, negotiated with all of the AXA Funds' sub-advisers a breakpoint schedule (or simply a flat fee) that is significantly below the Defendant's breakpoint schedule, which were the product of arm's-length bargaining.

150.   With respect to the EQ/Global Bond PLUS Portfolio, AXA Equitable Funds Management Group, LLC's, initial breakpoint is set so high that this fund had not reached that initial breakpoint as of December 31, 2011. It is unclear if the EQ/Global Bond PLUS Portfolio will ever reach its initial $4 billion breakpoint because this fund continued to hold below $1.5 billion in assets from December 31, 2008 through December 31, 2011.

151.   With respect to the EQ/PIMCO Ultra Short Bond Portfolio, the EQ/Core Bond Index Portfolio and the EQ/GAMCO Small Company Value Portfolio, these funds currently have assets well in excess of AXA Equitable Funds Management Group, LLC's, final breakpoint, yet the Defendant has failed to install additional breakpoints to capture any additional economies-of-scale

savings. For instance, as of December 31, 2011, the EQ/PIMCO Ultra Short Bond Portfolio's net assets totaled to approximately $3.4 billion. Thus, the EQ/PIMCO Ultra Short Bond Portfolio passed AXA Equitable Funds Management Group, LLC's, last breakpoint by more than $800 million, yet the Defendant has not installed an additional breakpoint. The EQ/Core Bond Index Portfolio's net assets totaled to approximately $6.7 billion as of December 31, 2011. AXA Equitable Funds Management Group, LLC's, final fee breakpoint for the EQ/Core Bond Index Portfolio occurred when assets exceeded $4 billion. Thus, the EQ/Core Bond Index Portfolio passed its last breakpoint by more than $2.6 billion, yet AXA Equitable Funds Management Group, LLC, still uses the fee schedule it designed for a fund with just over $4 billion in assets. As of December 31, 2011, the EQ/GAMCO Small Company Value Portfolio's net assets totaled to approximately $1.9 billion. AXA Equitable Funds Management Group, LLC's, final fee breakpoint for the EQ/GAMCO Small Company Value Portfolio occurred when assets exceeded $800 million. Thus, the EQ/GAMCO Small Company Value Portfolio has surpassed AXA Equitable Funds Management Group, LLC's, final breakpoint by more than a billion dollars without the installation of an additional breakpoint.

152.     By December 31, 2009, (earlier with respect to the EQ/GAMCO Small Company Value Portfolio), the EQ/PIMCO Ultra Short Bond Portfolio, the EQ/Core Bond Index Portfolio and the EQ/GAMCO Small Company Value Portfolio had assets in an amount that surpassed AXA Equitable Funds Management Group, LLC's, final breakpoint for each of these funds. Thus, from 2009 through 2011, the management fees for these three funds increased significantly as their assets under management have grown, thereby confirming that the economies-of-scale savings realized from each fund's asset increase were not shared with these funds and their investors, but rather were retained by AXA Equitable Funds Management Group, LLC.

697636.1

153.    Even if AXA Equitable Funds Management Group, LLC, performed all of the investment management services it claims to have provided for the AXA Funds, a large portion of those services are fixed in costs, which would result in lower breakpoints than those of the sub-advisers.

154.    Morever, as assets under management have grown, the management fees paid to AXA Equitable Funds Management Group, LLC, have grown dramatically, despite the economies of scale realized by AXA Equitable Funds Management Group, LLC. AXA Equitable Funds Management Group, LLC, has not shared with the Plaintiffs, and the AXA Funds, the economies of scale it has gained from that growth.

155.    Given that AXA Equitable Funds Management Group, LLC, provided (allegedly) minimal investment management services to the AXA Funds (especially when compared to the sub-advisers investment management services), any economies-of-scale-benefits enjoyed by AXA Equitable Funds Management Group, LLC, have not been, and could not have been, adequately shared with the AXA Funds, as required by § 36(b), 15 U.S.C. § 80a-35(b), in breach of AXA Equitable Funds Management Group, LLC's, fiduciary duty to the AXA Funds with respect to such compensation.

### C.    THE AXA FUNDS' BOARD OF TRUSTEES WAS NOT ACTING INDEPENDENTLY AND CONSCIENTIOUSLY IN APPROVING THE INVESTMENT MANAGEMENT AGREEMENT

156.    In *Jones*, the Supreme Court adopted a fiduciary duty standard for ICA § 36(b), 15 U.S.C. § 80a-35(b), that requires both a fair outcome and good faith in the negotiation process. 130 S.Ct. at 1427. Fund directors have a fiduciary duty to mutual funds and to their shareholders (who

697636.1

individually have no power to negotiate such fees for the funds) to negotiate fees that are both beneficial to the mutual funds and are comparable to fees that would be negotiated at arm's-length.

157.    Congress has fortified fund directors' oversight responsibilities by adopting ICA § 15(c), 15 U.S.C. § 80a-15(c), which requires directors to be adequately informed of the terms of any investment management contracts.

158.    ICA § 15(c), 15 U.S.C. § 80a-15(c), requires investment advisers to furnish documents and other information so that fund directors can make informed and independent decisions when evaluating investment advisory contracts. This section also gives directors the authority to demand such information from advisers. *Id.*

159.    When AXA Equitable Funds Management Group, LLC, starts a new mutual fund, it not only contracts to provide all the services each fund needs, it also nominates and elects the members of the fund's board (including all "independent"[15] board members).

160.    Each of the AXA Funds is governed by a Board of Trustees. The Board of each AXA Fund is currently is comprised of the same 10 Trustees. One of the Trustees is considered to be an "[i]nterested" Trustee, while the remaining nine are classified as "[d]isinterested" Trustees.

161.    Nine of the Trustees to each of the AXA Funds also simultaneously serve on the Boards of 64 other AXA Equitable Funds Management Group, LLC, sponsored funds. Further, one of the Trustees to each of the AXA Funds also simultaneously serves on the Boards of 84 other AXA Equitable Funds Management Group, LLC, sponsored funds.

---

[15]    "Independent" board members are those who are not "interested persons" as defined under the 1940 Act. *See* ICA § 2(a)(19), 15 U.S.C. § 80a-2(a)(19).

697636.1

162.     Public disclosure for all of the Board members, except for one, reveals that they are compensated for their services with a fee that consists of an annual retainer component and a meeting fee component.  For the fiscal year ending December 31, 2011, according to publicly-available information, the Board members for the AXA Funds received total compensation in the following amounts:

| | |
|---|---|
| Theodossios Athanassiades | $230,000 |
| Jettie M. Edwards | $252,500 |
| David W. Fox | $252,500 |
| William M. Kearns, Jr. | $230,000 |
| Christopher P.A. Komisarjevsky | $245,000 |
| Harvey Rosenthal | $230,000 |
| Gary S. Schpero | $237,500 |
| Steven J. Joenk | $000,000 |
| Kenneth Walker | $75,000 |
| Caroline Williams | $75,000 |

163.     Steven M. Joenk is the "interested" director by virtue of his current position as an AXA Equitable Life Insurance Company executive, and presumably, he is compensated separately for his services as an executive.

164.     As detailed below, the Board failed to act conscientiously by continuing to approve a substantial portion of the investment management fees that AXA Equitable Funds Management Group, LLC, charged to, and received from, the Plaintiffs and the AXA Funds, but did not pay to the sub-advisers of the AXA Funds.  The fee-setting process undertaken by the Board lacked the requisite integrity, care and good faith and was, therefore, defective.

165.     The Board has a separate and distinct fiduciary duty to each AXA Fund to enter into serious and substantive negotiations with respect to all fees charged by AXA Equitable Funds Management Group, LLC.  *See* Am. Bar. Ass'n, *Fund Director's Guidebook* (2d ed. 2003), at 10 ("Although there are areas of common interest among the funds, the directors must exercise their

specific board responsibilities on a fund-by-fund basis."). Correspondingly, AXA Equitable Funds Management Group, LLC, has a reciprocal fiduciary duty to each mutual fund under its management to assure that the fees it charges for services rendered are reasonably related to the services provided and correspond to fees that would be charged in an arm's length negotiation.

166.    Annually, AXA Equitable Funds Management Group, LLC, must obtain the approval of the Trustees for the investment management fee it seeks to charge each AXA Fund.

167.    The nine independent or "non-interested" Trustees are supposed to be "watchdogs" for the AXA Funds' shareholders. However, since the same Trustees are charged with, at a minimum, 64 other AXA sponsored funds, regardless of the dedication, sophistication, and the individual educational and business qualifications of the independent members of the Board of Trustees of the AXA Funds, the amount of documentation that must be reviewed for each meeting would be daunting if the Trustees were to look at each fund individually.

168.    Furthermore, even if statutorily "non-interested," the Trustees are in all practical respects dominated and unduly influenced by AXA Equitable Funds Management Group, LLC, in reviewing the fees paid by the AXA Funds and their shareholders. The Trustees' continuation in the role of an independent Trustee from year-to-year, and the compensation they earn, is at least partially dependent on the continued good will and support of AXA Equitable Funds Management Group, LLC. With respect to the all of the "non-interested" Board members, their 2011 compensation, except for Ms. Williams and Mr. Walker, represented an increase from their 2010 compensation. Ms. Williams and Mr. Walker were not Board members in 2010 or 2011, "rather for the period June 1, 2011 to December 31, 2011 they served as consultants and advisory board members...." Ms.

697636.1

Williams and Mr. Walker became full-time members of the Board of Trustees for the Advisors Trust in January 2012.

169.    The Board does not hold separate meetings for each mutual fund.  Instead, upon information and belief, the Board's practice has been to consider all funds at one time.  The Board approved the investment management fees AXA Equitable Funds Management Group, LLC, requested, with respect to each of the AXA Funds, over a two day period.  During this same two day period, the same 10 individuals that compose the Board of each of the AXA Funds also approved, at a minimum, the investment management fees for an additional 64 AXA sponsored funds.

170.    A truly independent board of trustees acting conscientiously would not have tolerated the investment management fees charged by AXA Equitable Funds Management Group, LLC, if they had obtained and sufficiently reviewed adequate information regarding, among other things: (1) the magnitude of the sub-advisers' investment management services and its fees; (2) the amount/type of investment management services AXA Equitable Funds Management Group, LLC, provided for its fee; (3) the economies of scale enjoyed by AXA Equitable Funds Management Group, LLC; and (4) the profitability of the AXA Funds to AXA Equitable Funds Management Group, LLC.

171.    The Board failed to act conscientiously by continuing to approve a substantial portion of the investment management fees that AXA Equitable Funds Management Group, LLC, charged to the AXA Funds, but did not pay to the sub-advisers of each of the AXA Funds.

172.    The Advisory Agreements, which were accessible to the Board, reveal that the sub-advisers rendered, with minor exceptions,  all of the investment management services for the AXA Funds.  Thus, the Board was not acting conscientiously when it approved investment management fees of AXA Equitable Funds Management Group, LLC, that were at a minimum 109%, and at a

63                                    697636.1

maximum 2017%, of the fees that were paid to the AXA Funds' sub-advisers (and on average AXA Equitable Funds Management Group, LLC's, investment management fee was 476% greater than the fee paid to the AXA Funds' sub-advisers).

173.    In light of the fact that the documents, which revealed that the sub-advisers to the AXA Funds performed, with minor exceptions, all of the investment management services for these funds, were publicly available, the Board knew, or should have known, that it was approving a grossly excessive investment management fee for AXA Equitable Funds Management Group, LLC.

174.    As further evidence of the Board's lack of conscientiousness, the December 31, 2011 Annual Report for the AXA Funds states the following:

> The Manager [AXA Equitable Funds Management Group, LLC] **advised the Board that it does not regard Adviser profitability as meaningful to an evaluation of the Advisory Agreements with the Advisers because the willingness of the Advisers to serve in such capacity depends primarily upon arm's-length negotiations with the Manager, the Manager generally is aware of the fees charged by the Advisers to other clients, and the Manager believes that the fees agreed upon with the Advisers are reasonable in light of the quality of investment advisory services rendered. The Board accepted the Manager's explanations** in light of the Board's findings as to the reasonableness of the aggregate investment advisory fees paid by each Portfolio and the fact that each Adviser's fee is paid by the Manager and not the Portfolio.

In light of the fact that documents revealed that the sub-advisers to the AXA Funds performed, with minor exceptions, all of the investment management services for these funds, the Board, had it been acting conscientiously, would have considered information regarding the profitability of the sub-advisers in approving AXA Equitable Funds Management Group, LLC's, fees.

175.    As further evidence that the Board violated its fiduciary responsibilities when it approved a substantial portion of the investment management fees that AXA Equitable Funds

697636.1

Management Group, LLC, charged to, and received from, the AXA Funds, for the reasons set forth in paragraphs 147 to 152, the Board approved fee breakpoint schedules that failed to allow the AXA Funds to share in any economies-of-scale-benefits enjoyed by AXA Equitable Funds Management Group, LLC.  This failure, presumably occurred, because, according to the Annual Report for the AXA Funds, regarding the Board's consideration of economies of scale with respect to its approval of AXA Equitable Funds Management Group, LLC's, investment management fees, the Board stated:

> While recognizing that any precise determination is inherently subject to assumptions and subjective assessments, the Board considered that any economies of scale or efficiencies may be shared **with certain** Portfolios and their shareholders through management and/or administration fee breakpoints so that as the Portfolios grow in size, their effective fee rates decline.

The Board's brief and generic statement regarding economies of scale (which includes the above), reflects that the Board did not sufficiently consider, with respect to each of the 72 portfolios in the Advisors Trust (which includes the AXA Funds), whether the Defendant adequately shared economies-of-scale savings with each of these portfolios.

176.    The Board therefore violated its fiduciary responsibilities when it approved a substantial portion of the investment management fees AXA Equitable Funds Management Group, LLC, charged to the AXA Funds, but did not pay to the AXA Funds' sub-advisers

177.    As a result of the foregoing acts, the Board did not act conscientiously and fulfill its fiduciary duty when it approved a substantial portion of AXA Equitable Funds Management Group, LLC's, investment management fees, with respect to each of the AXA Funds. The Board's lack of conscientiousness resulted in fees that constitute a breach of AXA Equitable Funds

697636.1

Management Group, LLC's, fiduciary duty under ICA § 36(b), 15 U.S.C. § 80a-35(b), to the AXA Funds with respect to such compensation.

**D. THE COSTS AND PROFITABILITY OF PROVIDING INVESTMENT MANAGEMENT SERVICES DID NOT JUSTIFY AXA EQUITABLE FUND MANAGEMENT GROUP, LLC'S, EXCESSIVE FEE**

178.     "The 'profitability of the fund to the adviser' [must] be studied in order that the price paid by the fund to its advisor be equivalent to 'the product of arm's-length bargaining.'" *See Freeman & Brown Study,* at 627-28. The profitability of a fund to an adviser-manager is a function of revenues minus the costs of providing services.

179.     Following discovery, AXA Equitable Funds Management Group, LLC's, true profitability can be determined on either an incremental basis or a full-cost basis. In light of the services it provides, AXA Equitable Funds Management Group, LLC's, incremental costs of providing those management services to the Plaintiffs, and other shareholders of the AXA Funds, should be nominal, while the additional fees received by them are unreasonable and grossly excessive. This is especially true because the sub-advisers to the AXA Funds perform the substantial investment management service they are responsible for at their own expense, but are compensated with much lower investment management fees than AXA Equitable Funds Management Group, LLC.

180.     The tables in Paragraphs 67 and 142 show the investment management fee schedule that AXA Equitable Funds Management Group, LLC, charged to each of the AXA Funds as compared to the fee schedule that AXA Equitable Funds Management Group, LLC, pays the sub-advisers to whom it delegates, with minor exceptions, all of the investment management services

697636.1

needed by the AXA Funds.  These percentages translate into substantial fees when applied to the AXA Funds' assets.

181.    In 2011 alone, AXA Equitable Funds Management Group, LLC, was paid $81,423,963 in investment management fees from the AXA Funds at issue in this Complaint for providing minimal management services that were predominately supervisory in nature to the funds, while the sub-advisers collectively were paid $30,233,612 in investment management fees, despite the fact that the sub-advisers, with minor exceptions, performed all of the investment management services to the AXA Funds.  *Id.* On average, AXA Equitable Funds Management Group, LLC's, fees exceed the sub-advisers' fees by 476%.

182.    "[F]und managers ... routinely add a hefty 'premium' or 'monitoring fee' to the sub-advisers' charge.  True, the sub-adviser may charge only 30 bps for its investment advice, but the manager will typically pad the bill, adding an additional twenty to thirty basis points 'premium' before passing along the advisory charge to fund shareholders." *See* John P. Freeman, Stewart L. Brown and Steve Pomerantz, *Mutual Fund Advisory Fees: New Evidence and a Fair Fiduciary Test*, 61 OKLA. L. REV. 83, 113, n. 104 (2008).  Indeed, "overall fee levels for sub-advised funds are substantially higher than for funds managed in-house." *Id.* at 118.  As demonstrated above, AXA Equitable Funds Management Group, LLC, charged over $51 million dollars in fiscal year 2011 alone, for providing limited investment management services that are supervisory in nature to the AXA Funds.

183.    Despite delegating, with minor exceptions, all of their investment management duties to sub-advisers, AXA Equitable Funds Management Group, LLC, receives an investment management fee that in all cases exceeds the fees paid to the funds' sub-adviser(s). *See* Table ¶67.

697636.1

184.     Put another way, the true cost of investment management services should generally correlate to the fees (or at most minimally exceed) charged by BlackRock, MSIM, GAMCO, Wellington, SSgA FM, PIMCO, T. Rowe Price, AllianceBernstein and First International/WellsCap.

185.     This sub-contracting arrangement led to fees that were substantially disproportionate to the services actually rendered and to enormous profits to AXA Equitable Funds Management Group, LLC.

186.     A substantial portion of these markups resulted in fees that could not be the product of negotiations conducted at arm's-length and therefore constitute a breach of AXA Equitable Funds Management Group, LLC's, fiduciary duty to the AXA Funds with respect to the receipt of such compensation.

187.     Since the AXA Funds' sub-advisers were providing, with minor exceptions, all of the investment management services at their own expense to the AXA Funds, and AXA Equitable Funds Management Group, LLC, provided minimal investment management services to the AXA Funds that were predominantly supervisory in nature, the Defendant was incurring only minimal expenses, and therefore a substantial portion of the fees AXA Equitable Funds Management Group, LLC, charged to the AXA Funds that it did not pay to the sub-advisers, were almost entirely in the form of profit to the Defendant and thus were necessarily so disproportionately large that they bore no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining.

E.     **COMPARATIVE FEE STRUCTURES DEMONSTRATE THAT AXA EQUITABLE FUNDS MANAGEMENT GROUP, LLC, CHARGED TO, AND RECEIVED FROM, THE AXA FUNDS EXCESSIVE INVESTMENT MANAGEMENT FEES THAT BREACHED ITS FIDUCIARY DUTY**

697636.1

188.     An analysis of the fees paid by AXA Equitable Funds Management Group, LLC's, to the AXA Funds' sub-advisers demonstrates that AXA Equitable Funds Management Group, LLC, charges investment advisory fees to the AXA Funds that are much higher than what would have been charged had the fees been bargained for at arms-length. Thus, almost all of the fees that the Defendant charged to, and received from, the AXA Funds that are in excess of the fees the Defendant pays to the AXA Funds' sub-advisers, violate its fiduciary duty with respect to the receipt of compensation.

189.     AXA Equitable Funds Management Group, LLC, hired sub-advisers for all of the AXA Funds that assumed the obligation of providing, with minor exceptions, all of the investment advisory services to their designated funds.   As each sub-adviser is a for-profit investment management company that negotiated its fee with AXA Equitable Funds Management Group, LLC, the fees they charge provide a benchmark of the cost of the investment advisory services provided to the AXA Funds, presumably including a comfortable profit margin.  Compared to the fees charged by the sub-advisers who actually perform, with minor exceptions, all of the advisory services to the AXA Funds, the additional fees charged by AXA Equitable Funds Management Group, LLC, for its alleged investment management services to the AXA Funds are unjustified and excessive.

190.     The fees paid to the sub-advisers of the AXA Funds provide a measure of how much should be charged for the investment advisory services that the AXA Funds require.  Indeed, the fees charged by each AXA Fund's sub-adviser(s) is indicative of the fees the AXA Funds should pay for the investment management services.

697636.1

191.    AXA Equitable Funds Management Group, LLC, charge far more than the sub-advisers it hires for the AXA Funds, even though the sub-advisers assume, with minor exceptions, all of the investment management obligations of AXA Equitable Funds Management Group, LLC.

192.    For example, AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-adviser of the EQ/PIMCO Ultra Short Bond Portfolio by 207%. AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-adviser of the EQ/Core Bond Index Portfolio by 2017%. AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-adviser of the EQ/Large Cap Value PLUS Portfolio by 251%. AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-adviser of the EQ/T. Rowe Price Growth Stock Portfolio by 109%. AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-adviser of the EQ/GAMCO Small Company Value Portfolio by 109%. AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-advisers of the EQ/Mid Cap Value PLUS Portfolio by 217%. AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-adviser of the Global Multi-Sector Equity Portfolio by 234%. AXA Equitable Funds Management Group, LLC's, investment management fee exceeds the investment management fee paid to the sub-advisers of the EQ/Global Bond PLUS Portfolio by 665%.    The average amount (in percentage terms) by which AXA Equitable Life Insurance Company and AXA Equitable Funds Management Group,

697636.1

LLC's, investment management fee exceeds that of the Funds' sub-adviser(s) is 476% (*see* Table ¶67)

193.    Thus, even if AXA Equitable Funds Management Group, LLC provided the services it alleges to provide, its fees should not exceed the fees charged by the AXA Funds' subadvisers, who pursuant to their sub-advisory agreements are charged with providing, with minor exceptions, all of the  investment management services needed for each AXA Fund.

194.    Since the amount of AXA Equitable Funds Management Group, LLC's, investment management fees charged to Plaintiffs and the AXA Funds and retained by it, were in far excess of the sub-adviser fee amounts, a substantial portion of the investment management fees received by AXA Equitable Funds Management Group, LLC, were necessarily so disproportionately large that they bore no reasonable relationship to services rendered and could not have been the product of arm's-length bargaining and thus were in violation of ICA § 36(b), 15  U.S.C. § 80a-35(b) .

**VI.    DERIVATIVE ALLEGATIONS FOR CLAIM PURSUANT TO ICA § 36(b), 15 U.S.C. § 80a-35(b)**

195.    Plaintiffs bring this action, derivatively, pursuant to ICA § 36(b), 15 U.S.C. § 80a-35(b), on behalf of, and for the benefit of, each of the AXA Funds to recover substantially all of the investment management fees that AXA Equitable Funds Management Group, LLC, charged to, and collected from, the AXA Funds, but did not pay to these funds' sub-advisers.

196.    Plaintiffs brings this action, derivatively, pursuant to ICA § 36(b), 15 U.S.C. § 80a-35(b), on behalf of, and for the benefit of the Advisors Trust to recover substantially all of the investment management fees AXA Equitable Funds Management Group, LLC, charged to, and collected from the Advisors Trust/AXA Funds, but did not pay to the AXA Funds' sub-advisers.

697636.1

## COUNT I

### Breach Of Fiduciary Duties Pursuant To ICA § 36(b), 15 U.S.C. § 80a-35(b), For The AXA Excessive Investment Management Fees Charged By AXA Equitable Funds Management Group, LLC

#### AXA Funds

197.     Plaintiffs incorporate by reference the allegations in the previous paragraphs of this Complaint.

198.     AXA Equitable Funds Management Group, LLC, had a fiduciary duty to the AXA Funds and their investors with respect to the receipt of compensation for services and payments of a material nature made by and to AXA Equitable Funds Management Group, LLC.

199.     As set forth in Section V of the Complaint, substantially all of the fees charged by AXA Equitable Funds Management Group, LLC,  for investment management and/or advisory services that it retained and did not pay to the AXA Funds' sub-advisers, represent a breach of AXA Equitable Funds Management Group, LLC's,  fiduciary duties to the AXA Funds with respect to such compensation because these fees were unreasonable, excessive, and so disproportionately large that they bore no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining.

200.     This Count is brought by Plaintiffs derivatively on behalf of the respective AXA Funds in which they are security holders against AXA Equitable Funds Management Group, LLC, pursuant to ICA § 36(b), 15 U.S.C.  § 80a-35(b), for breach of fiduciary duties with respect to the receipt of compensation.

201.     By reason of the conduct described herein, AXA Equitable Funds Management Group, LLC, violated ICA § 36(b), 15 U.S.C.  § 80a-35(b). As a direct, proximate and foreseeable

697636.1

result of these breaches of fiduciary duties in AXA Equitable Funds Management Group, LLC's, role as investment adviser to the AXA Funds and the AXA Funds' investors, the AXA Funds and their security holders have sustained many millions of dollars in damages.

202.    In charging and receiving inappropriate and unlawful compensation, and in failing to put the interests of Plaintiffs, and the other security holders of the AXA Funds, ahead of its own interests, AXA Equitable Funds Management Group, LLC, breached, and continues to breach, its statutory fiduciary duties to Plaintiffs and the other security holders of the AXA Funds, in violation of ICA § 36(b), 15 U.S.C. § 80a-35(b).

203.    Plaintiffs seek, pursuant to ICA § 36(b)(3), 15 U.S.C. § 80a-35(b)(3), on behalf of the AXA Funds, the actual damages resulting from the breach of fiduciary duties by AXA Equitable Funds Management Group, LLC, up to, and including, substantially all of the compensation and payments received from the AXA Funds that were not paid to the AXA Funds' sub-advisers. Plaintiff seeks recovery from the earliest date permitted by the statute through the latest date permitted by the statute.

204.    Alternatively, Plaintiffs seek rescission of the contracts/agreements and restitution of substantially all of the investment management fees paid to AXA Equitable Funds Management Group, LLC, pursuant thereto (excluding those fees that were paid to the AXA Funds' sub-advisers). *See* ICA § 47(b), 15 U.S.C. § 80a-46(b). When a violation of the ICA has occurred, a court may order that the agreements between AXA Equitable Funds Management Group, LLC, and the AXA Funds that provided for the payment of excessive fees, on behalf of the AXA Funds, be rescinded, thereby requiring restitution of the excessive investment management fees paid to AXA Equitable Funds Management Group, LLC, by the AXA Funds from one year prior to the commencement of

697636.1

this action through the date of trial, together with interest, costs, disbursements, attorneys' fees, fees of expert witnesses, and such other items as may be allowed to the maximum permitted by law.

697636.1

## COUNT II

### Breach Of Fiduciary Duties Pursuant To ICA § 36(b), 15 U.S.C. § 80a-35(b), For The AXA Excessive Investment Management Fees Charged By Defendant AXA Equitable Funds Management Group, LLC

#### Advisors Trust

205.     Plaintiffs incorporate by reference the allegations in the previous paragraphs of this Complaint.

206.     AXA Equitable Funds Management Group, LLC, had a fiduciary duty to the Advisors Trust, the AXA Funds and their investors with respect to the receipt of compensation for services and payments of a material nature made to AXA Equitable Funds Management Group, LLC, from the Advisors Trust, in its capacity as the investment advisor.

207.     As set forth in Section V of the Complaint, substantially all of the fees charged by AXA Equitable Funds Management Group, LLC, for investment management and/or advisory services that it retained and did not pay to the AXA Funds' sub-advisers, represent a breach of AXA Equitable Funds Management Group, LLC's,  fiduciary duties to the Advisors Trust, which contained the AXA Funds, because these fees were unreasonable, excessive, and so disproportionately large that they bore no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining.

208.     This Count is brought by Plaintiffs derivatively on behalf of the Advisors Trust, which contains the AXA Funds, against AXA Equitable Funds Management Group, LLC, pursuant to ICA § 36(b), 15 U.S.C.  § 80a-35(b), for breach of fiduciary duties with respect to the receipt of compensation.

697636.1

209.    By reason of the conduct described herein, AXA Equitable Funds Management Group, LLC, violated ICA § 36(b), 15 U.S.C. § 80a-35(b). As a direct, proximate and foreseeable result of these breaches of fiduciary duties to the AXA Funds, the Advisors Trust and the AXA Funds'/Advisors Trust's security holders, these persons/entities have sustained many millions of dollars in damages.

210.    In charging and receiving inappropriate and unlawful compensation, and in failing to put the interests of Plaintiffs and the other security holders of the Advisors Trust, ahead of its own interests, AXA Equitable Funds Management Group, LLC, has breached, and continues to breach, its statutory fiduciary duties to Plaintiffs, and the other security holders of the Advisors Trust, that invested in the AXA Funds, in violation of ICA § 36(b), 15 U.S.C. § 80a-35(b).

211.    Plaintiffs seek, pursuant to ICA § 36(b)(3), 15 U.S.C. § 80a-35(b)(3), on behalf of the Advisors Trust, the actual damages resulting from the breach of fiduciary duties by AXA Equitable Funds Management Group, LLC, up to, and including, substantially all of the investment management fees, that AXA Equitable Funds Management Group, LLC, received from the Advisors Trust, on account of alleged investment management services to the AXA Funds, but did not pay to the AXA Funds' sub-advisers. Plaintiffs seek recovery from the earliest date permitted by the statute through the latest date permitted by the statute.

212.    Alternatively, Plaintiffs seek rescission of the contracts/agreements and restitution of substantially all of the investment management fees paid to AXA Equitable Funds Management Group, LLC, pursuant thereto (excluding those fees that were paid to the AXA Funds' sub-advisers). *See* ICA § 47(b), 15 U.S.C. § 80a-46(b). When a violation of the ICA has occurred, a court may order that the agreements between AXA Equitable Funds Management Group, LLC, and/or the

697636.1

Advisors Trust that provided for the payment of excessive fees, on behalf of the AXA Funds and/or the Advisors Trust, be rescinded, thereby requiring restitution of the excessive investment management fees paid to AXA Equitable Funds Management Group, LLC, by the AXA Funds, through the Advisors Trust, from one year prior to the commencement of this action through the date of trial, together with interest, costs, disbursements, attorneys' fees, fees of expert witnesses, and such other items as may be allowed to the maximum permitted by law.

697636.1

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.        An order declaring that AXA Equitable Funds Management, LLC, violated and continued to violate ICA § 36(b), 15 U.S.C. §80-35(b), through the receipt of fees from the AXA Funds/Advisors Trust that were in breach of its fiduciary duties with respect to the receipt of compensation;

B.        An order awarding compensatory damages to Plaintiffs on behalf of the security holders of the AXA Funds and/or Advisors Trust, in an amount sufficient to restore them to the position that they would have been in had the wrongs alleged herein not been committed, including repayment of all unlawful and/or excessive fees paid by the AXA Funds or their security holders from one year prior to the commencement of this action through the latest date permitted by the statute;

C.        An order rescinding the agreements between AXA Equitable Funds Management Group, LLC, and the AXA Funds/Advisors Trust, which provide for the fees/compensation complained of herein, pursuant to ICA § 47(b), 15 U.S.C. § 80a-46(b), including restitution of substantially all, of the investment management fees paid to AXA Equitable Funds Management, LLC, that exceeded the fees that were paid to these funds' sub-advisers, by the AXA Funds/Advisors Trust, from a period commencing one year prior to the commencement of this action through the date of the trial of this case;

D.        Award interest, costs, attorney fees, fees for expert witnesses and such other relief as it deems just;

E.        Plaintiffs reserve the right to seek punitive damages where applicable;

697636.1

and

    F.      Such other and further relief as may be just and proper under the circumstances.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all claims.

 

                                      Szaferman, Lakind,
                                      Blumstein & Blader, P.C.

Dated: January 15, 2013              s/  Robert  L.   Lakind
                                      Robert L. Lakind
                                      Arnold Lakind
                                      Steven Blader
                                      101 Grovers Mill Road
                                      Lawrenceville, NJ 08648

 

                                      Levy, Phillips & Konigsberg

Dated: January 15, 2013              s/Moshe Maimon
                                      Moshe Maimon
                                      Danielle Disporto
                                      800 Third Avenue
                                      New York, NY, 10022

697636.1