Jonathan M. Korn
BLANK ROME LLP
301 Carnegie Center, 3rd Floor
Princeton, NJ 08540
(609) 750-7700
Korn@BlankRome.com

James N. Benedict (*pro hac vice*)
Sean M. Murphy (*pro hac vice*)
Robert C. Hora (*pro hac vice*)
Andrea G. Hood (*pro hac vice*)
MILBANK, TWEED, HADLEY & McCLOY LLP
1 Chase Manhattan Plaza
New York, NY 10005
(212) 530-5000

*Attorneys for Defendant*
*AXA Equitable Funds Management Group, LLC*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| GLENN D. SANFORD, *et al.*,<br><br>                              Plaintiffs,<br><br>vs.<br><br>AXA EQUITABLE FUNDS MANAGEMENT GROUP, LLC,<br><br>                              Defendant. | Civil Action No. 3:13-cv-00312 (PGS)<br><br>RETURN DATE:  JUNE 2, 2015<br>ORAL ARGUMENT REQUESTED<br>FILED ELECTRONICALLY |

**DEFENDANT AXA EQUITABLE FUNDS MANAGEMENT GROUP, LLC'S
MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................ iii

PRELIMINARY STATEMENT ................................................................................... 1

SUMMARY OF MATERIAL FACTS......................................................................... 4

    A.    The Parties ............................................................................................. 4

    B.    FMG's Extensive Services To The EQAT Funds................................... 6

    C.    The Broad Array Of Services Provided By AXA To The EQAT Funds............... 9

    D.    FMG's Use Of Subadvisers And A Subadministrator ........................... 10

    E.    The Independent Trustees' Active, Core Role In Approving The EQAT Funds' Contracts With FMG ................................................................ 11

        1.    The Independent Trustees' Qualifications And Independence ................ 11

        2.    The Independent Trustees' Comprehensive Year-Round Contract Evaluation Process ..................................................................... 12

        3.    The Independent Trustees' Careful Consideration Of The Bond Fund's Performance ..................................................................... 14

        4.    The Independent Trustees' Careful Evaluation Of The EQAT Funds' Fees In Relation To Industry Competitors................................... 15

        5.    The Independent Trustees' Active Negotiation Of Fee Reductions With Respect To The Bond Fund ........................................... 16

ARGUMENT.............................................................................................................. 17

I.    SECTION 36(B) DOES NOT AUTHORIZE EITHER PLAINTIFFS OR COURTS TO SUBSTITUTE THEIR BUSINESS JUDGMENT FOR THAT OF A MUTUAL FUND'S INDEPENDENT TRUSTEES.................................... 18

II.    THE INDEPENDENT TRUSTEES' DETERMINATIONS REGARDING THE NATURE AND QUALITY OF FMG'S SERVICES TO THE EQAT FUNDS SHOULD NOT BE SECOND-GUESSED....................................... 19

    A.    Plaintiffs Have Not Overcome The Independent Trustees' Business Judgment Based On Their Mischaracterization Of The Bond Fund's Performance ........................................................................................ 19

  B. Plaintiffs Do Not Address The Nature And Quality Of Defendants' Legal, Compliance, Accounting, Or Other Non-Investment Services ............................ 22

III. PLAINTIFFS HAVE NOT OVERCOME THE INDEPENDENT TRUSTEES' BUSINESS JUDGMENT REGARDING COMPARATIVE FEES ................................ 25

IV. THE INDEPENDENT TRUSTEES' EVALUATION OF THE EQAT FUNDS' PROFITABILITY TO FMG SHOULD NOT BE SECOND-GUESSED ........................ 28

V. THE INDEPENDENT TRUSTEES' CONSIDERATION OF ECONOMIES OF SCALE IS ENTITLED TO SUBSTANTIAL DEFERENCE ........................................... 32

VI. THE "FALL-OUT BENEFITS" RAISED BY PLAINTIFFS WERE DISCLOSED TO THE INDEPENDENT TRUSTEES .................................................... 35

VII. PLAINTIFFS' CRITICISMS OF THE BOARD PROCESS DO NOT ESTABLISH A CLAIM ................................................................................................... 36

CONCLUSION ...................................................................................................................... 39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Benak v. Alliance Capital Mgmt. L.P.*,
   No. 01-5734, 2004 U.S. Dist. LEXIS 12231 (D.N.J. Feb. 9, 2004) .................................23, 25

*Burks v. Lasker*,
   441 U.S. 471 (1979) ..............................................................................................................18

*CFTC v. Hanover Trading Corp.*,
   34 F. Supp. 2d 203 (S.D.N.Y. 1999) ....................................................................................30

*Gallus v. Ameriprise Fin., Inc.*,
   497 F. Supp. 2d 974 (D. Minn. 2007), *aff'd*, 675 F.3d 1173 (8th Cir. 2012) ................. passim

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
   528 F. Supp. 1038 (S.D.N.Y. 1981), *aff'd*, 694 F.2d 923 (2d Cir. 1982). .............24, 25, 31, 34

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
   573 F. Supp. 1293 (S.D.N.Y. 1983), *aff'd*, 740 F.2d 190 (2d Cir. 1984) ................................32

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
   694 F.2d 923 (2d Cir. 1982) ........................................................................................... passim

*GE v. Joiner*,
   522 U.S. 136 (1997) ..............................................................................................................29

*In re Am. Mut. Funds Fee Litig.*,
   No. 04-5593, 2009 U.S. Dist. LEXIS 120597 (C.D. Cal. Dec. 28, 2009), *aff'd*
   *sub nom. Jelinek v. Capital Research & Mgmt. Co.*, 448 F. App'x 716 (9th
   Cir. 2011) ..................................................................................................................... passim

*Jones v. Harris Assocs. L.P.*,
   559 U.S. 335 (2010) ....................................................................................................... passim

*Kalish v. Franklin Advisers, Inc.*,
   742 F. Supp. 1222 (S.D.N.Y. 1990), *aff'd*, 928 F.2d 590 (2d Cir. 1991) .............23, 25, 28, 33

*Krinsk v. Fund Asset Mgmt., Inc.*,
   715 F. Supp. 472 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 404 (2d Cir. 1989) ........................ passim

*Krinsk v. Fund Asset Mgmt., Inc.*,
   875 F.2d 404 (2d Cir. 1989) ..................................................................................................18

*Meyer v. Oppenheimer Mgmt. Corp.*,
   707 F. Supp. 1394 (S.D.N.Y. 1988), *aff'd*, 895 F.2d 861 (2d Cir. 1990) ...............................29

*Migdal v. Rowe Price-Fleming Int'l.*,
    248 F.3d 321 (4th Cir. 2001) ........................................................................23

*Sanford v. AXA Equitable Funds Mgmt. Grp., LLC*,
    No. 13-00312 (D.N.J. Jan. 15, 2013) .............................................................6

*Schuyt v. Rowe Price Prime Reserve Fund, Inc.*,
    663 F. Supp. 962 (S.D.N.Y. 1987), *aff'd*, 835 F.2d 45 (2d Cir. 1987) ...................................31

*Strougo v. Bea Assocs.*,
    188 F. Supp. 2d 373 (S.D.N.Y. 2002) ............................................................26

## Statutes

15 U.S.C. §§ 80a-1 *et seq.* ........................................................................18

15 U.S.C. § 80a-2(19) ..........................................................................12, 13

15 U.S.C. § 80a-35(b) ("Section 36(b)") .............................................. passim

15 U.S.C. § 80a-35(b)(1) ..........................................................................33

## Other Authorities

*In re Smith Barney Fund Mgmt. LLC, et al.*, SEC Admin. Proceeding, File No. 3-
    11935 (May 31, 2005), Release Nos. 51761 (Securities Exchange Act of
    1934), 2390 (Investment Advisers Act of 1940) ...........................................30

Investment Company Institute, *The Differences Between Mutual Funds and
    Hedge Funds* (Apr. 2007), *available at* http://www.ici.org/files/faqs_hedge
    (last accessed Jan. 20, 2015) .......................................................................10

S. Rep. No. 91-184 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897 ...................................18, 23, 34

## <u>PRELIMINARY STATEMENT</u>

This action purports to allege claims for "excessive fees" under Section 36(b) of the Investment Company Act of 1940 (the "<u>ICA</u>"), which imposes a "fiduciary duty with respect to the receipt of compensation" on mutual fund investment advisers.  15 U.S.C. § 80a-35(b).  Although Plaintiffs challenge the investment management and administrative fees that Defendant AXA Equitable Funds Management Group, LLC ("<u>FMG</u>") charged to 12 mutual funds, Plaintiffs have moved for partial summary judgment with respect to the fees charged to just one of those funds, the EQ/Core Bond Index Fund (the "<u>Bond Fund</u>"), for only the year 2012.  Yet even with respect to the fund that Plaintiffs obviously consider their best case, Plaintiffs do not come anywhere close to meeting their heavy burden of establishing a Section 36(b) violation.  In fact, Plaintiffs' motion—and the failures of proof it spotlights—only reinforce *Defendants'* entitlement to summary judgment on all the funds at issue.[1]

Plaintiffs' burden of proof under Section 36(b) is exceptionally heavy:  The Supreme Court has held that a fee violates Section 36(b) only if it is "so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining."  *Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 344 (2010).  Moreover, where the challenged fees have been approved by an independent board that considered the relevant factors—as they were here—a plaintiff faces a doubly heavy burden:  The board's

---

[1] FMG intends this memorandum to be read in conjunction with the Memorandum of Law In Support Of Defendants' Motion For Summary Judgment ("<u>Defendants' Summary Judgment Brief</u>" or "<u>Defs.' Summ. J. Br.</u>") (ECF No. 58), and Defendants' Statement of Material Facts in Support of Their Motion for Summary Judgment (the "<u>Statement of Material Facts</u>" or "<u>DSMF</u>") (ECF No. 55-2).  References to "Plaintiffs' Brief In Support Of Motion For Partial Summary Judgment" (ECF No. 59) take the form "Plaintiffs' Brief" or "Pls.' Br."  Capitalized terms not defined herein have the meanings ascribed to them in Defendants' Summary Judgment Brief.

decision to approve a fee is entitled to substantial deference, "even if a court might weigh the factors differently."[2] *Jones*, 559 U.S. at 351.

Plaintiffs have not met their heavy burden.  Like all of the funds at issue, the Bond Fund's investment management and administrative fees were approved by a board comprised of a supermajority of highly qualified independent trustees.  After careful consideration of extensive information pertinent to each *Gartenberg* factor, the Independent Trustees—guided by experienced independent counsel—concluded that the challenged fees were reasonable.

In challenging the Independent Trustees' business decision to approve the Bond Fund's fees, Plaintiffs' core arguments are that the Bond Fund's performance was poor and that its fees were too high.  But in making these arguments, Plaintiffs either (1) concede that the Independent Trustees considered the relevant facts, while Plaintiffs assert a different subjective view of those facts that they think is superior; (2) ignore critical items the Independent Trustees considered in approving the Bond Fund's fees; (3) mischaracterize what the Independent Trustees actually did; (4) set up standards of conduct that do not exist in law or fact; or (5) raise novel legal arguments rejected by well-settled case law.  Stripped to their essence, *all* of Plaintiffs' arguments amount to nothing more than subjective disagreements with the Independent Trustees' reasonable business judgment.  Such second-guessing of informed board decisions does *not* as a matter of

---

[2]  In applying the "so disproportionately large" standard, courts typically consider six factors referred to as the "*Gartenberg* factors":  (1) the nature and quality of services provided to the funds; (2) the independence and conscientiousness of the funds' trustees; (3) whether the adviser realized economies of scale in managing the funds and, if so, whether any such economies were adequately shared with the funds; (4) the fees charged to comparable mutual funds; (5) the profitability of the funds to the adviser; and (6) fall-out benefits (*i.e.*, indirect profits) to the adviser that would not occur but for the existence of the funds.  *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.* ("*Gartenberg II*"), 694 F.2d 923, 928-29 (2d Cir. 1982); *see also Jones*, 559 U.S. at 344 & n.5.

law establish a claim under Section 36(b).  *See Jones*, 559 U.S. at 353 (Section 36(b) does *not* call for "second-guessing of informed board decisions").

With respect to the Bond Fund's performance, for instance, the Independent Trustees considered detailed performance information from independent third-parties prior to approving the Bond Fund's 2012 fees.  Pointing to the same information as the Independent Trustees relied upon, Plaintiffs complain that the Bond Fund supposedly "underperformed" its benchmark index and competitor mutual funds.  But nowhere do Plaintiffs "allege that the performance figures [provided to the board]" with respect to the Bond Fund or any of the EQAT Funds "were incorrect or that Defendants improperly reported them."  *Gallus v. Ameriprise Fin., Inc.*, 497 F. Supp. 2d 974, 981 (D. Minn. 2007), *aff'd*, 675 F.3d 1173 (8th Cir. 2012).  Plaintiffs simply disagree with the conclusions the Independent Trustees drew from the data.  That, however, is insufficient to establish a claim.  *See Gallus*, 497 F. Supp. 2d at 981 (granting summary judgment for defendants under Section 36(b) where plaintiffs simply disagreed with board's view of undisputed performance data).  Moreover, when considered in context, that performance information shows that in 2012 the Bond Fund performed ***virtually*** identically to its relevant benchmark index (a pre-selected basket of securities whose performance the Bond Fund seeks to replicate, excluding the impact of the Bond Fund's fees).

With respect to fees, Plaintiffs characterize the Bond Fund's fees as high, but similarly subjectively disagree with the Independent Trustees' reasoned view of the comparative fee data they considered in reaching their decision to approve the Bond Fund's fees.  Worse yet, Plaintiffs ***ignore*** much of what the Independent Trustees actually evaluated, including industry-standard comparative fee rankings from an independent third-party, Lipper, Inc. ("Lipper").  That data, which numerous Section 36(b) cases endorse, compared all of the EQAT Funds' fees to those of

peer groups of competitor mutual funds that pursue similar investment objectives and that, notably, Lipper independently selected for the Independent Trustees' consideration. Although an above-median fee would not prove that a given fee is outside the *range* of arm's-length bargaining, here this industry-standard data shows that the Bond Fund's fees are in fact among the lowest of its competitors in the industry as independently determined by Lipper.

Plaintiffs make several other arguments regarding the remaining *Gartenberg* factors, including with respect to economies of scale, FMG's profitability, and fall-out benefits. These likewise have no merit. The Independent Trustees considered the same issues that Plaintiffs raise as the basis for their motion in determining that the Bond Fund's fees were fair. As the Supreme Court made clear in *Jones*, Section 36(b) is not a mechanism for either plaintiffs or courts to sit as super-trustees and second-guess the reasonable business decisions of a fund's board. At its core, that is exactly what Plaintiffs are trying to do in these actions. Plaintiffs' motion for partial summary judgment should be denied, and summary judgment should be granted in favor of *Defendants*, dismissing these actions in their entirety.

## SUMMARY OF MATERIAL FACTS

### A.    The Parties

Plaintiffs Robert and Mary Cusack are investors in a variable annuity sold by AXA, FMG's parent. (*See* Pls.' Br. at 1.) Under their variable annuity contract, Plaintiffs have the option of investing in a wide array of mutual funds. (DSMF ¶ 128.) In 2012, Plaintiffs had roughly<sup>Redacted</sup> invested in the Bond Fund through their annuity contract. (Declaration of Andrea G. Hood in Support of Defendant's Opposition to Plaintiffs' Motion for Partial Summary Judgment dated Mar. 20, 2015 ("Hood Decl. II"), Ex. 274 at 2.) The Bond Fund, which is a portfolio of a Delaware statutory trust known as the EQ Advisors Trust ("EQAT"), is currently configured as a fixed-income index fund that, as stated in its prospectus, seeks to achieve a return

- 4 -

before fees and expenses that approximates the returns of a benchmark index called the "Intermediate U.S. Government/Credit Index."  (DSMF ¶ 3; Hood Decl. II Ex. 156 at 150.)

A "benchmark index" is a pre-selected group of securities against which a mutual fund measures its performance.  (Hood Decl. Ex. 283.)  An index fund like the Bond Fund seeks to match its benchmark index's returns excluding the impact of the fund's fees by purchasing either all or a representative sampling of the securities that comprise the index.  (*Id.* Ex. 284.)  By contrast, an actively managed mutual fund seeks to outperform a given benchmark index through the selection of individual securities based on the manager's research and the fund's investment objectives.  (*Id.* Ex. 282.)

Like most mutual funds, the EQAT Funds do not have any employees of their own, but rather contract for investment management, administrative, and other services with third parties. (DSMF ¶ 2 n.2.)  Defendant FMG currently serves as the EQAT Funds' investment manager and administrator under separate agreements with EQAT.  (DSMF ¶¶ 4-5; Hood Decl. II Exs. 163**,** 164.)  Pursuant to those management and administrative agreements, FMG receives management and administrative fees from the EQAT Funds in exchange for performing a variety of specialized services, including creating the EQAT Funds' investment parameters, managing their risk profile, and implementing a mandatory compliance program.  (DSMF ¶ 12; Section II.B, *infra*.)  In 2012, FMG's management and administrative fees with respect to the Bond Fund, which are measured as a percentage of the Bond Fund's net assets, amounted to only roughly 35 basis points (35/100ths of a percent) and 10 basis points (10/100ths of a percent), respectively. (*See* Hood Decl. II Ex. 281 at D_AXA0256545.)

Remarkably, Plaintiff Cusack testified at his deposition that he had absolutely no idea what FMG's management or administrative fees were until after he met with Plaintiffs' counsel,

one week before his deposition in October 2013.  (Hood Decl. II Ex. 257, R. Cusack Tr. 43:22-25, 44:11-19.)  In 2012, Plaintiffs Mary and Robert Cusack paid only about $65 total in management and administrative fees in exchange for FMG's services to the Bond Fund.[3]

### B.     FMG's Extensive Services To The EQAT Funds

At least in their Complaints, Plaintiffs' basic theory as to why FMG's fees are supposedly excessive is that FMG purportedly delegated virtually "all" of the EQAT Funds' investment management and administrative services to subcontractors.[4]  Plaintiffs half-heartedly acknowledge that they cannot accept this allegation as true for the purposes of this motion.  (*See* Pls.' Br. at 8.)  Accordingly, they focus substantially on the Bond Fund's supposedly "poor" investment performance as a purported ground for challenging the fees FMG charged to that fund.  But even while doing so, Plaintiffs still cling to the assertion that FMG's services to the Bond Fund and the other EQAT Funds are "*de minimis*."  (*See id.*)  The fundamental defect in Plaintiffs' characterization of FMG's services can be succinctly summarized:  Plaintiffs simply ignore the vast majority of undisputed services that FMG and its parent, AXA, actually perform for the EQAT Funds—all of which the Independent Trustees considered in determining that FMG's fees were appropriate.

As the EQAT Funds' investment manager and administrator, FMG provides the EQAT Funds with a wide array of complex and specialized management and administrative services, the vast bulk of which Plaintiffs do not even cite in their brief.  FMG's management and

---

[3] For simplicity, this figure is based on the Cusacks' year-end account balance of ^Redacted, and the Bond Fund's 2012 total effective management and administrative fees of roughly 45 basis points (or 0.45%).  (*See* Hood Decl. II Ex. 274 at 2; *id.* Ex. 281 at D_AXA0256545.)

[4] *See* Am. Compl. ¶ 20, *Sanford v. AXA Equitable Funds Mgmt. Grp., LLC*, No. 13-00312 (D.N.J. Jan. 15, 2013) (ECF No. 20) (alleging that subadvisers perform substantially "all" the investment management services to the at-issue funds); *id.* ¶ 199 (alleging subadministrator performs virtually "all" fund administrative services).

administrative services to the EQAT Funds include but are not limited to:  establishing the EQAT Funds' investment strategy and risk profile; implementing the EQAT Funds' mandatory compliance program and supplying its Chief Compliance Officer; selecting, managing, and conducting regular due diligence of the EQAT Funds' subadvisers; supplying the EQAT Funds' officers; overseeing the calculation of the EQAT Funds' daily net asset value; and ensuring the EQAT Funds' compliance with a wide array of complex legal and regulatory requirements.  (*See* Defs.' Summ. J. Br. at 13-15; DSMF ¶¶ 68-94; *see also* Hood Decl. II Exs. 245-46, 248-50.)

In making the bald assertion that FMG provides "*de minimis*" services to the EQAT Funds*,* Plaintiffs specifically ignore the many significant initiatives that FMG, with the active involvement of the Independent Trustees, implemented with respect to the Bond Fund.  These initiatives include an array of actions that go well beyond the services performed by the Bond Fund's subcontractors—including meaningfully reorganizing the Bond Fund in 2009 and 2010 to provide investors with more consistent performance and a lower-fee fund.

Plaintiffs' summary judgment brief ignores that the Bond Fund was not an index fund prior to 2009.  (Hood Decl. II Ex. 153 at 127.)  JPMorgan Investment Management, Inc. ("JPMorgan") served as the Bond Fund's subadviser at the time, and pursued an active investment style that permitted investment in a variety of debt securities, including mortgage-backed securities, which as an asset class did not perform well during the 2008 financial crisis. (*Id*.)  From its inception in 1998 to the summer of 2007, the Bond Fund outperformed its benchmark index, the U.S. Aggregate Bond Index (the "Aggregate Bond Index").  (*Id.* Ex. 247.) Like many investment vehicles, however, the Bond Fund experienced performance challenges during the 2008 financial crisis.  (*Id.* Ex. 178 at 2.)

In January 2009, in reaction to these performance challenges, FMG, with the Independent Trustees' approval and involvement, reorganized the Bond Fund, converting it from an actively managed fund that sought to outperform the Aggregate Bond Index to an index fund designed to replicate that index.  (*Id.* Ex. 178 at 2; *id.* Ex. 211 at 4-5.)  The goal was to provide investors with smoother, more consistent returns:  Although investors in the Bond Fund could no longer expect to outperform the benchmark, they would largely be protected from the downside of underperformance as compared to the benchmark index by the new indexing approach.  As part of the reorganization, FMG ***replaced*** subadviser JPMorgan with SSgA Funds Management, Inc. ("State Street").  (*Id.* Ex. 211 at 5, 8.)  Directly contrary to Plaintiffs' suggestion that the Bond Fund has never had a fee reduction, (Pls.' Br. at 23), there can be no dispute that FMG, in conjunction with the Independent Trustees, also reduced the Bond Fund's management fee from 45 bps to 35 bps in connection with the 2009 reorganization.[5]  (Hood Decl. II Ex. 178 at 3; *id.* Ex. 211 at 6-7.)

FMG continued to make adjustments to the Bond Fund after 2009.  In December 2010, again in conjunction with the Independent Trustees, FMG changed the benchmark index that the Bond Fund sought to replicate from the Aggregate Bond Index to the Barclays Intermediate U.S. Government Credit Index (the "Government Credit Index").  (*Id*. Ex. 168 at D_AXA0123783-84; *id*. Ex. 212 at D_AXA0172409.)  In adopting this new investment approach, FMG and the Independent Trustees sought to reduce the Bond Fund's investment risk—unlike the Aggregate Bond Index, the Government Credit Index has no exposure to potentially volatile mortgage-backed or other asset-backed securities.  (*Id.* Ex. 168 at D_AXA0123784.)

---

[5] All investment dollars remained in the Bond Fund upon the reorganization.  (Hood Decl. II Ex. 178 at 2.)

These changes demonstrate FMG's wide array of services to the Bond Fund and have resulted in a fund that has consistently met its stated investment objective: As discussed below, in 2012, for instance, the only year at issue in Plaintiffs' motion, the Bond Fund performed virtually identically to the Government Credit Index, excluding the impact of fees and transaction costs. (*See* Section II.A, *infra*.) Such proactive modifications are hardly unique to the Bond Fund—a similar narrative plays out with the other funds at issue in these actions. (*See* Hood Decl. II Ex. 254, Wermers Rep. at 34-35 & Ex. 5 (describing numerous modifications made to other at-issue funds by FMG and the Independent Trustees).)

### C. The Broad Array Of Services Provided By AXA To The EQAT Funds

In claiming that FMG performs virtually no services for the EQAT Funds, Plaintiffs also fundamentally ignore that in executing its management and administrative responsibilities to the EQAT Funds, FMG draws upon significant resources from its parent, AXA—one of the largest life insurance companies in the U.S. (*See* Defs.' Summ. J. Br. at 15; DSMF ¶¶ 10, 61, 95-97.) Plaintiffs fail to mention that AXA and its employees provide a number of services directly to the EQAT Funds, such as transfer agency and tax services, printing the EQAT Funds' semi-annual and annual reports, and preparing *ad hoc* reports on shareholder holdings. (DSMF ¶ 95.) Moreover, Plaintiffs largely sweep under the rug the fact that AXA and its employees provide a host of resource-intensive services without which FMG could not operate, such as accounting, human resources, information technology (including managing FMG's phone and computer systems), cash management, accounts payable, and travel services. (*Id.* ¶ 96; *see also* Section II.B, *infra*.) In 2012 alone, FMG estimated the cost of AXA's services to the EQAT Funds to amount to more than $49 million. (DSMF ¶ 97.)

- 9 -

### D.      FMG's Use Of Subadvisers And A Subadministrator

As specifically contemplated by FMG's investment management and administrative agreements with EQAT, (DSMF ¶ 13), FMG has engaged subadvisers and a subadministrator to assist FMG in performing its duties under those agreements.  In general, the subadvisers' tasks include research, selection and trading of the EQAT Funds' securities; performing certain compliance monitoring tasks; and performing limited reporting to the EQAT Board.  (*See* Hood Decl. II Ex. 161; DSMF ¶¶ 100-106.)  The subadministrator's tasks include assisting in the calculation of the EQAT Funds' NAV; preparing the first draft of the EQAT Funds' financial statements for FMG's review; maintaining certain of the EQAT Funds' books and records; and providing certain compliance support to FMG.  (*See* Hood Decl. II Ex. 165; DSMF ¶¶ 107-111.)

Plaintiffs characterize these services as "nearly the entirety of" FMG's management and administrative functions.  (Pls.' Br. at 8.)  But as even the non-exclusive list of FMG and AXA services described above shows, the subadvisers' and subadministrator's services are hardly the only services involved in managing and administering a mutual fund.  Mutual funds are "among the most strictly regulated financial products"[6] in the world, and require a vast infrastructure to service.  (DSMF ¶ 106.)  Plaintiffs ignore that these responsibilities are largely retained by FMG and AXA.  (*See id.* ¶¶ 68-96.)  Plaintiffs likewise ignore that FMG's management agreement and administrative agreement with the EQAT Funds specifically make clear that FMG cannot delegate away its own responsibilities merely by hiring subcontractors.[7]  Rather, FMG retains *full* responsibility for—and assumes significant legal, regulatory, and operational risks

---

[6] *See* Investment Company Institute, *The Differences Between Mutual Funds and Hedge Funds* (Apr. 2007), *available at* http://www.ici.org/files/faqs_hedge (last accessed Jan. 20, 2015).

[7] *See* DSMF ¶ 14 ("[FMG] will have . . . overall supervisory responsibility for the general management and investment of each Portfolio's assets."); *id.* ¶ 15 ("[FMG] shall have general responsibility for the oversight of the Trust's administrative operations.").

associated with—the management and administration of the EQAT Funds.  (*See* Defs.' Summ. J. Br. at 17-18 (describing risks retained by FMG).)

### E.     The Independent Trustees' Active, Core Role In Approving The EQAT Funds' Contracts With FMG

Plaintiffs' brief reads almost as if the Independent Trustees barely existed, largely confining its discussion of their role to a short section at the end of the document.  But, in fact, the Independent Trustees play *the* key role in the EQAT Funds' fee-setting process:  A mutual fund's independent trustees must consider and approve the fund's fees annually, and have the primary responsibility of looking after the interests of fund investors.

In this case, as discussed below, the Independent Trustees, who are all highly qualified, took an extremely active and engaged role in the Bond Fund's annual fee approval process by, among other things, carefully analyzing the Bond Fund's performance and fees, considering the differences in services performed by FMG and its subcontractors, devoting substantial attention to reorganizing the Bond Fund in 2009, and repeatedly demonstrating their independence by negotiating additional breakpoints in the Bond Fund's fee schedule.  The results of these efforts have been palpable:  The Bond Fund has performed consistent with its relevant benchmark index since 2009, and has among the lowest fees of its industry competitors as independently determined by Lipper.

### 1.     The Independent Trustees' Qualifications And Independence

Although Plaintiffs strive to diminish the Independent Trustees' core role in setting the EQAT Funds' fees, they have not disputed that the Independent Trustees evaluate and approve FMG's management and administrative agreements and the fees thereunder on an annual basis.  (*See* Pls.' Br. at 18; Defs.' Summ. J. Br. at 6; DSMF ¶¶ 16-17.)  While Plaintiffs say nothing about the Independent Trustees' qualifications in their brief, there can be no dispute that the

- 11 -

Independent Trustees are some of the most prominent individuals in their fields and have included, among others, the former head of the law firm Simpson Thacher & Bartlett LLP's Investment Management and Investment Company practice group, the former President of Metropolitan Life Insurance Company, and numerous other accomplished individuals with substantial investment experience.  (Defs.' Summ. J. Br. at 7-8; DSMF ¶ 18.)

Significantly, Plaintiffs do not contest the Independent Trustees' statutory independence. *See* 15 U.S.C. § 80a-2(19) (defining "interested person" under the ICA.  In fact, a full nine out of ten (or *90%*) of the trustees on the EQAT Funds' Board are, by statutory definition, "independent trustees."  (*See* DSMF ¶ 17; 15 U.S.C. § 80a-2(19).)

2. **The Independent Trustees' Comprehensive Year-Round Contract Evaluation Process**

Nowhere do Plaintiffs mention that the Independent Trustees' evaluation of the EQAT Funds' fees, including the Bond Fund's fees, is an extensive year-round process, involving numerous Board meetings and the consideration of voluminous materials relating to each *Gartenberg* factor with regard to each fund.  (DSMF ¶¶ 24-67.)  Among many other materials, the Independent Trustees receive extensive information regarding the nature and quality of FMG's and the subadvisers' respective services and personnel (*id.* ¶¶ 38, 40-41); FMG's and the subadministrator's administrative services (*id.* ¶¶ 39, 42-43); the EQAT Funds' performance (*id.* ¶ 44); potential economies of scale (*id.* ¶ 45);[8] potential fall-out benefits (*id.* ¶ 49);[9] and FMG's

---

[8]  Economies of scale occur when the average cost of producing a good or service decreases, on a per unit basis, as the level of output increases.  *See In re Am. Mut. Funds Fee Litig.*, No. 04-5593, 2009 U.S. Dist. LEXIS 120597, at *77 (C.D. Cal. Dec. 28, 2009), *aff'd sub nom. Jelinek v. Capital Research & Mgmt. Co.*, 448 F. App'x 716 (9th Cir. 2011).

[9]  Fall-out benefits are indirect benefits that an investment manager or its affiliates would not have received "*but for* the existence of the Fund[s]."  *In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *142 (emphasis in original) (quoting *Krinsk v. Fund Asset Mgmt., Inc.*, 715 F. Supp. 472, 495 (S.D.N.Y. 1988)), *aff'd*, 875 F.2d 404 (2d Cir. 1989).

costs and profitability from managing and administering the EQAT Funds (*id*. ¶ 48). This information includes extensive, industry-standard data concerning the EQAT Funds' performance and fees from independent third parties, such as Lipper. (DSMF ¶¶ 44, 47.)

In noticeably failing to mention the bulk of what the Independent Trustees actually considered before approving FMG's management and administrative contracts, Plaintiffs carefully avoid mentioning that the Independent Trustees expressly considered each *Gartenberg* factor, and specifically determined that the EQAT Funds' fees were reasonable in light of each of those factors. (*See* Hood Decl. II Ex. 267, Schpero Tr. 157:14-159:6.) Strikingly, Plaintiffs also fail to mention that the Independent Trustees were guided by their own independent and experienced mutual fund counsel from the law firm Bingham McCutchen LLP. (Defs.' Summ. J. Br. at 8; DSMF ¶ 23.)

Plaintiffs carefully ignore that, in approving FMG's fees, the Independent Trustees also specifically took into account FMG's many specialized services to the EQAT Funds; AXA's services to both the EQAT Funds and FMG; *and* the extent of the subadvisers' and subadminstrator's services. (DSMF ¶¶ 38-43, 55, 61, 63-64, 102.) Before the Independent Trustees approved the EQAT Funds' fees, the Independent Trustees were specifically aware of the differences in services provided by FMG and its subcontractors, as well as the amount of fees retained by FMG. (DSMF ¶¶ 55, 63-64; *see also* Hood Decl. II Ex. 266, Rosenthal Tr. 167:2-169:6 (considered differences in services when approving fees); *id.* Ex. 267, Schpero Tr. 215:3-216:17 (Board has "extensive discussions about the services being provided by FMG" and FMG's services and subadvisers' services are "two different services").) Plaintiffs may disagree with the Independent Trustees' judgment about the relative value of FMG's and its

subcontractors' services, but as discussed below, that disagreement is insufficient as a matter of law to establish a Section 36(b) violation.

3.   **The Independent Trustees' Careful Consideration Of The Bond Fund's Performance**

Although Plaintiffs purport to invoke the Bond Fund's performance as a ground for challenging FMG's fees, they ignore that prior to approving all of the EQAT Funds' fees, the Independent Trustees considered detailed performance information from independent third parties like Lipper and Morningstar comparing the EQAT Funds' performance returns to their benchmarks and to the performance returns of competitor mutual funds.  (*See* DSMF ¶ 44; Declaration of Arnold Lakind dated Jan. 23, 2015 (ECF No. 59-3) ("Lakind Decl.") Exs. DD, GG; Hood Decl. Ex. 223; *see also id.* Ex. 180 (drawn from Lipper data), 188 (same).)

With respect to the Bond Fund in particular, Plaintiffs also ignore that, in the process of evaluating FMG's contracts, the Independent Trustees devoted significant attention to addressing the Bond Fund's performance, culminating in the Bond Fund's reorganization to an index fund in 2009.  (*See supra* at 7-8.)  Since its reorganization to an index fund in 2009, the Bond Fund has performed just like its relevant benchmark index.  (*Id.* Ex. 195 at D_AXA0281125; *id.* Ex. 254, Wermers Rep. Ex. 6A.)  As of December 31, 2012, for instance, the Bond Fund's one-year performance differed from its then benchmark, the Government Credit Index, by just roughly 70 basis points (or 70/100ths of a percent), *including* the impact of the Bond Fund's roughly 70 basis points in total fees, which lowered its returns in comparison to the benchmark.  (*See* Hood Decl. II Ex. 241 at D_AXA0264223; *id.* Ex. 205 at D_AXA0282120.)

Although Plaintiffs denigrate the Bond Fund's performance returns because they did not exactly match the returns of the relevant benchmark index that the Bond Fund sought to replicate, they omit a number of key details reasonably considered by the Independent Trustees

in exercising their business judgment to approve the Bond Fund's fees.  To begin with, a benchmark index is simply a basket of securities selected for performance measurement purposes, not a fund that has infrastructure and that actually purchases securities.  As a result, a benchmark index's performance returns do not take into account any fees or operating costs. (*See* Hood Decl. II Ex. 254, Wermers Rep. ¶ 122.)  By contrast, like every mutual fund, the Bond Fund incurs fees and transaction costs, which serve to lower its performance returns.[10]  (*See id.* Ex. 156 at 150.)

Before approving FMG's fees, the Independent Trustees reasonably took into account that, excluding the impact of fees and transaction costs, the Bond Fund has performed almost exactly the same as its relevant benchmark index since its reorganization to an index fund in 2009.  (*See id*. Ex. 150 at 1016; *id.* Ex. 227 at D_AXA0144354; Ex. 239 at D_AXA0262013; *id.* Ex. 254, Wermers Rep. Ex. 6A (identifying difference of just ***1/100th of a percent*** per month for the last five years ending May 2014, excluding fees).)

4.  **The Independent Trustees' Careful Evaluation Of The EQAT Funds' Fees In Relation To Industry Competitors**

While purporting to assert that FMG's fees are too high on a comparative basis, Plaintiffs ignore that the Independent Trustees carefully evaluated the EQAT Funds' fees in relation to their competitors using industry-standard data from Lipper, an independent expert in fee comparisons.  *See In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *71-72 (endorsing board's consideration of Lipper in approving fees).  Much as performance rankings

---

[10]  Moreover, as the Bond Fund's prospectus discloses, like many index funds, the Bond Fund does not purchase all of the securities in its benchmark index due to transaction costs, but instead uses a sampling approach to attempt to approximate the index's returns.  (*See* Hood Decl. II Ex. 156 at 150.)  Thus, the Bond Fund may not perform exactly like its index.  The Bond Fund's performance can also differ from the benchmark index due to "the size and frequency of cash flow into and out of the Portfolio, and differences between how and when the Portfolio and the [benchmark index] are valued."  (*Id.*)

provided by Lipper compare a fund's performance to competitors, these rankings compare a mutual fund's *fees* to a peer group of competitor funds—independently selected by Lipper—that pursue similar investment objectives.  *See id.*

This information shows that the Bond Fund's total management and administrative fees have consistently ranked in or near the first (*i.e.*, lowest) quartile of the fee comparison group that Lipper independently selected, well below the median.  (*Id.* Exs. 199-201; DSMF ¶ 47.)  As of July 2012, for instance, the Bond Fund's Class IA management fee ranked 14th out of 64 peer funds (or in the 21st percentile), and its combined management and administrative fee ranked 16th out of 64 peer funds (or in the 24th percentile).  (Hood Decl. II Ex. 200 at D_AXA0155939.)  Similarly, the Bond Fund's Class IA total expenses excluding 12b-1 fees ranked it 15th out of 64 funds (or in the 22nd percentile).  (*Id.*)  In other words, the Bond Fund's fees are among the lowest of its variable annuity peers as independently selected by Lipper.

Although the fee comparison group that Lipper selected for the Bond Fund may not include other index funds due to the limited number of similarly styled index funds underlying variable annuities (*see* Hood Decl. Ex. 199 at 4), the Independent Trustees also evaluated the Bond Fund's fees in 2012 in relation to all index bond funds offered in variable annuities, as identified by Lipper.  (*See id.* Ex. 285.)  The Independent Trustees reasonably determined that the Bond Fund's total management and administrative fees *still* compare favorably across these various funds—ranking 9th out of 12 funds, but in a tight band just roughly 4.5 basis points (or 4.5/100ths of a percent) higher than the median.  (*See id.*)

5.   **The Independent Trustees' Active Negotiation Of Fee Reductions With Respect To The Bond Fund**

Consistent with their role as watchdogs for EQAT Fund investors, the Independent Trustees have routinely demonstrated their independence from FMG through active arm's-length

bargaining with FMG regarding the EQAT Funds' fees.  As noted above, in connection with the Bond Fund's reorganization in 2009, for example, the Bond Fund's management fee was reduced from 45 to 35 basis points.  (*See supra* at 8.)  Moreover, Plaintiffs do not dispute that the Independent Trustees have also negotiated a series of breakpoints to the Bond Fund's management fee—scheduled reductions in the rate of the fee as assets increase.

At the board meeting held in July 2011, for instance, as a result of negotiations with FMG, the Independent Trustees added a breakpoint to the Bond Fund's management fee schedule that became effective in September 2011, reducing the management fee from 35 basis points (*i.e.*, 0.35% or essentially one-third of one percent) to 34 basis points on asset levels exceeding $4 billion.  (*Id.* Ex. 214 at D_AXA0172602.)  Similarly, at the board meeting held in July 2012, as a result of further negotiations with FMG, the Independent Trustees negotiated yet another breakpoint to the Bond Fund, which became effective in September 2012, that reduced its management fee to 33 basis points on asset levels exceeding $8 billion.[11]  (*Id.* Ex. 216 at D_AXA0172754.)  Plaintiffs subjectively assert that the Independent Trustees should have negotiated additional breakpoints, but nowhere do they disclose that these breakpoints, combined with existing breakpoints in the EQAT Funds' administrative fee schedule, have saved investors in the Bond Fund more than $3 million from just 2012-2013 alone.  (*Id.* Ex. 275.)

## ARGUMENT

Plaintiffs' motion only reinforces *Defendants'* entitlement to summary judgment: Plaintiffs have identified no *genuine* issues of *material* fact on any *Gartenberg* factor that warrants overturning the Independent Trustees' business judgment to approve the Bond Fund's

---

[11]  The Independent Trustees also negotiated for a revised breakpoint schedule in 2013.  (Hood Decl. II Ex. 218 at D_AXA1184133.)  As of September 2013, the Bond Fund's management fee schedule was as follows:  35 bps on the first $4 billion, 34 bps on the next $4 billion, 33 bps on the next $2 billion, and 32 bps thereafter.  (*Id.*)

2012 management and administrative fees—or indeed any of the EQAT Funds' fees—under the

Supreme Court's demanding standard.

## I. SECTION 36(B) DOES NOT AUTHORIZE EITHER PLAINTIFFS OR COURTS TO SUBSTITUTE THEIR BUSINESS JUDGMENT FOR THAT OF A MUTUAL FUND'S INDEPENDENT TRUSTEES

In bringing these actions, Plaintiffs essentially ask this Court to disregard the Independent

Trustees' business judgment that the fees charged to the twelve EQAT Funds at issue were

appropriate. But the ICA, which regulates mutual funds, expressly entrusts the independent

trustees who sit on a mutual fund's board with "the *primary* responsibility for looking after the

interests of the fund's shareholders" in dealings with the fund's manager. *Burks v. Lasker*, 441

U.S. 471, 484 (1979) (emphasis added); *see also* 15 U.S.C. §§ 80a-1 *et seq.* Accordingly, the

ICA specifically gives the independent trustees "a host of special responsibilities," including that

they must evaluate and approve the contracts of the investment adviser annually, and a majority

of these directors must approve an adviser's compensation. *Jones*, 559 U.S. at 340, 351.

In recognition of the core role that independent trustees play in the fee-setting process,

Section 36(b) does not authorize the Court to sit as a super-trustee charged with setting a fee or

to second-guess informed board decisions. *See Jones*, 559 U.S. at 352. Nor does it oblige

trustees to negotiate the "'best deal' possible." *Krinsk v. Fund Asset Mgmt., Inc.*, 875 F.2d 404,

409 (2d Cir. 1989). Rather, it requires *plaintiffs* to prove that the result of the independent

trustees' negotiation was so disproportionately excessive that it is *outside* the range of what

"could" have been bargained for at arm's-length. *Jones*, 559 U.S. at 344.

Plaintiffs fall well short of making that showing here. At best, Plaintiffs simply express

their subjective disagreement with the Independent Trustees' reasonable business conclusions.

That, however, does not establish a Section 36(b) claim. *See Jones*, 559 U.S. at 353; *see also* S.

Rep. No. 91-184 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4902-03 (Section 36(b) "is not

- 18 -

intended to authorize a Court to substitute its business judgment for that of the mutual fund's board of directors . . . .").[12]

## II. THE INDEPENDENT TRUSTEES' DETERMINATIONS REGARDING THE NATURE AND QUALITY OF FMG'S SERVICES TO THE EQAT FUNDS SHOULD NOT BE SECOND-GUESSED

None of Plaintiffs' arguments regarding the nature and quality of FMG's services meets Plaintiffs' heavy burden of establishing a breach of fiduciary duty under Section 36(b).

### A. Plaintiffs Have Not Overcome The Independent Trustees' Business Judgment Based On Their Mischaracterization Of The Bond Fund's Performance

In claiming that FMG charged the Bond Fund excessive fees in 2012, Plaintiffs focus substantially on the Bond Fund's supposedly "dismal" investment performance.  (Pls.' Br. at 3, 10-13.)  But where, as here, a mutual fund board has considered a fund's performance results in context, simply characterizing the undisputed performance of a fund as "poor" is not enough to establish a Section 36(b) claim.  *Gallus*, 497 F. Supp. 2d at 980.[13]  Rather, a plaintiff must "allege that the performance figures [provided to the board] were incorrect or that Defendants improperly reported them."  *Id.*  Plaintiffs do not even pretend to do that here, nor could they.

The Independent Trustees considered the Bond Fund's performance and the performance of all the EQAT Funds through multiple prisms, evaluating a host of performance information as part of their annual fee deliberations.  (*See supra* at 14-15.)  In fact, ***all*** of the data that Plaintiffs

---

[12] Although, as Plaintiffs note, *Jones* states that a fee theoretically may be excessive even if it was negotiated by a board that had all relevant information, it expressly cautions that Section 36(b) does not call for second-guessing of informed board decisions.  *Jones*, 559 U.S. at 351-52.  Under *Jones*, a finding that a fee violates Section 36(b) must be based a showing that it is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining.  *Id.*  No Section 36(b) plaintiff has ever met this burden.  For all the reasons discussed herein, Plaintiffs also fail to do so here.

[13] Defendants' Motion for Summary Judgment contains an extensive discussion of *Gallus* and its procedural history, including its ultimate affirmance by the United States Court of Appeals for the Eighth Circuit.  (*See* Defs.' Summ. J. Br. at 22.)

cite as evidence that the Bond Fund supposedly performed poorly comes straight out of the materials FMG provided to the Independent Trustees, underscoring their consideration of it. Plaintiffs do not question that data, nor do they claim that FMG improperly reported it. Plaintiffs simply have a different view of it. That, however, is not good enough as a matter of law. *Gallus*, 497 F. Supp. 2d at 981.

Moreover, as a direct result of FMG's and the Independent Trustees' reorganization of the Bond Fund in 2009—which Plaintiffs ignore—the Bond Fund's performance was anything but poor in 2012, the year at issue in Plaintiffs' motion. Plaintiffs misrepresent the performance data on which they rely—all of which the Independent Trustees considered in approving the reasonableness of FMG's fees. Far from showing that the Bond Fund performed poorly, that data shows that the Bond Fund performed just like its relevant benchmark index in 2012, and every year since its reorganization to an index fund in 2009.

Plaintiffs, for instance, complain that the Bond Fund's performance returns were lower than its benchmark index's returns.[14] (Pls.' Br. at 12.) But in exercising their business judgment to approve the Bond Fund's 2012 fees, the Independent Trustees expressly took into account a key fact not cited by Plaintiffs—because a benchmark index is a performance measuring tool, not a mutual fund, its returns do not include the impact of any operating fees. Such fees, however, *are* accounted for in calculating the performance returns of a real, operating mutual fund. (*See supra* at 15.) The Independent Trustees reasonably considered that even a perfectly

---

[14] Plaintiffs assert that, for the period ending May 31, 2012, the Bond Fund's Class IA shares "underperformed" their benchmark index for the year-to-date, one-, three-, and five-year periods by .23%, .12%, a purportedly "inexplicable" 4.29%, and 2.06%. (Pls.' Br. at 12 (citing Lakind Decl. Ex. DD at D_AXA154616).) Plaintiffs' math is wrong. As of May 31, 2012, the Bond Fund's Class IA share performance differed from the Government Credit Index by .22% (year-to-date, attributable to fees and expense), .63% (one-year, attributable to fees and expenses), .32% (three-year, attributable to fees and expenses), and 4.29% (five-year, when the Bond Fund was not an index fund). (Lakind Decl. Ex. DD at D_AXA154616.)

operated index fund would "underperform" its benchmark index by fees and trading costs. (*See* Hood Decl. II Ex. 267, Schpero Tr. 236:2-6; *see also id.* Ex. 151 at 1044; *id.* Ex. 150 at 1016.) Since its reorganization to an index fund in 2009, the Bond Fund has consistently met the investment objective stated in its prospectus: Excluding the impact of fees, the Bond Fund has performed virtually ***identically*** to its relevant benchmark index. (*See supra* at 15.)[15]

Plaintiffs also complain that, over various short and long-term periods ending in 2011 and 2012, the Bond Fund's performance ranked in the fourth (or worst-performing) quartile of performance-comparison groups of mutual funds with similar investment objectives selected by Lipper as well as by a similar industry data source, Morningstar. (*See* Pls.' Br. at 11.) But the Independent Trustees took a more nuanced view of this information to better understand the Bond Fund's performance, and reached perfectly reasonable conclusions regarding it. To begin with, Plaintiffs ignore that the longer-term performance information they cite, like the five- and ten-year performance rankings cited at page 11 of Plaintiffs' brief, sweeps in the Bond Fund's performance during the pre-2009 period when it was ***not*** an index fund. In approving the Bond Fund's 2012 fees, the Independent Trustees were undisputedly aware of the Bond Fund's five- and ten-year performance, but reasonably considered the Bond Fund's post-2009 performance as an index fund to be more significant. (*See* Hood Decl. II Ex. 151 at 1044; *id.* Ex. 150 at 1016.)

Further, with respect to the Bond Fund's performance after it was reorganized as an index fund in 2009, the Independent Trustees considered several critical facts that Plaintiffs do not

---

[15]  Plaintiffs assert that Defendants' expert, Dr. Wermers, concluded that the EQ/Core Bond Index "underperformed" its benchmark index by 6 basis points each month for a period of 5 years ending May 31, 2014. (Pls.' Br. at 12-13.) Dr. Wermers concluded nothing of the sort. Here, Plaintiffs again reference data that includes the impact of fees. (*See* Hood Decl. II Ex. 254, Wermers Rep. Ex. 6A.) Excluding the impact of fees, over a period of 5 years ending May 31, 2014, the Bond Fund had levels of returns extremely close to its relevant benchmark index—a difference of a mere 1/100th of a percent per month. (*See id.*)

- 21 -

mention.  First, the Bond Fund's stated investment objective in its prospectus is to match, not outperform, its benchmark index excluding the impact of fees.  (Hood Decl. II Ex. 156 at 150.) Second, these performance comparison groups include actively managed funds.  (*See* Hood Decl. II Ex. 180 at D_AXA0141321; *id.* Ex. 189 at D_AXA0167339; *id.* Ex. 151 at 1044.)[16]  Third, the Bond Fund's benchmark index was *also* in the comparison groups' fourth quartile during this period, because the actively managed funds on the whole performed better than the benchmark index.  (*See* Hood Decl. II Ex. 180 at D_AXA0141321; *id.* Ex. 188 at D_AXA0167280; *id.* Ex. 151 at 1044; *see also id.* Ex. 194 at D_AXA0281029.)  An index fund cannot be expected to outperform its benchmark index.  The Independent Trustees reasonably concluded that the Bond Fund performed just as intended since 2009—consistent with its relevant benchmark index.  (*See* Hood Decl. II Ex. 151 at 1044; *id.* Ex. 150 at 1016.)

The Independent Trustees devoted significant attention to addressing the Bond Fund's performance, considered that performance through multiple lenses, and made a reasonable judgment that the Bond Fund had been performing consistent with expectations heading into 2012.  Plaintiffs' pejorative characterization of that same performance data does not satisfy their heavy burden of establishing a claim under Section 36(b).  *Gallus*, 497 F. Supp. 2d at 981.

> **B.**      **Plaintiffs Do Not Address The Nature And Quality Of Defendants' Legal, Compliance, Accounting, Or Other Non-Investment Services**

In suggesting that FMG provided poor quality services to the Bond Fund, Plaintiffs focus overwhelmingly on the Bond Fund's investment performance.  (*See* Pls.' Br. at 10-13.)  That, however, is not sufficient to establish a Section 36(b) claim.  "[U]nder § 36(b) it is the *overall* nature and quality of the services provided by the investment adviser that is at issue—not merely

---

[16] (*See also* Lakind Decl. Ex. GG (based on "Category Description" and number of funds in group).)

some small *percentage* of those services." *Benak v. Alliance Capital Mgmt. L.P.*, No. 01-5734, 2004 U.S. Dist. LEXIS 12231, at *25 (D.N.J. Feb. 9, 2004) (emphasis added).[17]  In approving FMG's management and administrative contracts, the Independent Trustees properly also considered the host of non-investment services provided by FMG to the EQAT Funds, like legal, compliance, and fund administration services—all of which are imperative to running a fund. (*See* DSMF ¶¶ 38, 54-55.)  They also considered the myriad services provided by AXA, including transfer agency, tax advice, publishing the funds' semi-annual and annual report, and a host of other services without which the EQAT Funds and FMG could not operate.  (DSMF ¶ 61.)  Plaintiffs' failure to address the *quality* of *these* services is fatal.

Plaintiffs crudely divide the number of FMG employees by the number of funds that FMG manages, and on that basis claim that FMG performs its services with a small number of employees at a minimal cost.  (Pls.' Br. at 7-10.)  Consistent with the legislative history of Section 36(b), however, courts addressing Section 36(b) claims have uniformly rejected such a "cost-plus" approach to evaluating mutual fund fees.  *See Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. 1222, 1226-27 (S.D.N.Y. 1990), *aff'd*, 928 F.2d 590 (2d Cir. 1991); *see also* S. Rep. No. 91-184, at 6 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4902 ("[T]he investment adviser is entitled to make a profit.  Nothing in the Bill is intended to imply otherwise or to suggest that a 'cost-plus' type of contract would be required.").

Moreover, in reaching their business judgment about the fairness of the EQAT Fund's fees, the Independent Trustees expressly considered the personnel providing services to the EQAT Funds—including those employed by FMG in relation to those employed by the

---

[17] *See also Migdal v. Rowe Price-Fleming Int'l.*, 248 F.3d 321, 327 (4th Cir. 2001) ("While performance may be marginally helpful in evaluating the services which a fund offers, allegations of underperformance alone are insufficient to prove that an investment adviser's fees are excessive.  Investing is not a risk-free endeavor.").

subadviser and subadministrator.  (DSMF ¶¶ 38-43.)  And, significantly, in coming up with their overly simplistic calculation, Plaintiffs improperly ignore the hundreds of AXA employees who service the EQAT Funds at an estimated annual cost of $49 million.[18]  (DSMF ¶¶ 95-97.).  Indeed, the *Gartenberg* court expressly rejected the novel approach taken by Plaintiffs here, explaining:

> Nothing in Section 36(b) obligates this Court, in assessing the fairness of the investment advisory compensation, to restrict its vision only to those services performed directly by [the adviser]. Indeed, the statute recognizes that in order to properly assess the fairness of advisory compensation, the *courts cannot* be strictly bound by corporate structure and *ignore closely related entities whose functions intimately impinge on one another.*  The statute itself speaks of payment for the services of the advisor "or any affiliated person of such investment adviser."

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.* ("*Gartenberg I*"), 528 F. Supp. 1038, 1049 (S.D.N.Y. 1981) (emphasis added) (quoting 15 U.S.C. § 80a-35(b)), *aff'd*, 694 F.2d 923 (2d Cir. 1982).

Relying on an internal transfer pricing agreement between AXA and FMG called the "Shared Services Agreement," Plaintiffs claim that none of AXA's costs or services may be considered, because FMG's direct expenses purportedly account for them.  (Pls.' Br. at 9.)  In making this argument, however, Plaintiffs ignore the unrebutted fact testimony that the expenses charged to FMG under this agreement are *not* inclusive of all expenses AXA incurs in servicing the EQAT Funds.  (Hood Decl. II Ex. 262, Joenk Tr. 164:13-25, 234:23-238:18.)  Plaintiffs have no evidence to the contrary, relying instead on their experts' improper *ipse dixit*.

---

[18]  Plaintiffs also cite a section of the EQAT compliance manual dealing with the maintenance of required books and records, which states in part that "FMG LLC has delegated the day-to-day investment management of the [EQAT Funds] to various sub-advisers."  (Pls.' Br. at 2; Hood Decl. II Ex. 278 at D_AXA0250578.)  But whatever this statement means, it does not change the many and undisputed services that FMG performs on behalf of the EQAT Funds.

In approving the EQAT Funds' fees, the Independent Trustees appropriately took into account the *overall* services provided to the Bond Fund by both FMG *and* AXA, as well as the differences between those services and the services provided by FMG's subcontractors.  By excluding AXA's services and focusing overwhelmingly on the Bond Fund's investment performance, Plaintiffs fundamentally ignore Defendants' overall services.  On this basis alone, the Court should grant summary judgment for Defendants.  *See Gartenberg I*, 528 F. Supp. at 1049; *Benak*, 2004 U.S. Dist. LEXIS 12231, at *25.

## III. PLAINTIFFS HAVE NOT OVERCOME THE INDEPENDENT TRUSTEES' BUSINESS JUDGMENT REGARDING COMPARATIVE FEES

In addition to claiming that the Bond Fund performed poorly, Plaintiffs claim FMG's fees are excessive because they are supposedly higher than fees charged by other investment managers with respect to similar mutual funds.  (Pls.' Br. at 20.)

But as with all of the EQAT Funds, the Independent Trustees considered the Bond Fund's fees in relation to fees charged by managers of similar funds, using industry-standard comparative fee rankings provided by Lipper. [19]  (*See* Hood Decl. II Exs. 198-201.)  Plaintiffs do not bother to mention Lipper's fee rankings in their brief.  Their failure to do so is not surprising: the Bond Fund's fees have consistently ranked in or near the first (*i.e.*, lowest-fee) quartile of the fee comparison group that Lipper independently selected.  (Hood Decl. II Exs. 198-201).  Based on this industry-standard information, the Independent Trustees reasonably concluded that the

---

[19]  Courts considering Section 36(b) claims have consistently endorsed Lipper as a leading independent source of mutual fund information.  *See In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *71-72 ("[Lipper] . . . is a recognized industry-leading third-party source for mutual fund industry data."), *aff'd sub nom. Jelinek v. Capital Research & Mgmt. Co.*, 448 F. App'x 716 (9th Cir. 2011); *Kalish*, 742 F. Supp. at 1230 n.3 (describing Lipper as a leading recognized source for mutual fund statistical information).

Bond Fund's fees were fair on a comparative basis.[20]  (*See* Hood Decl. II Ex. 150 at 1014);
*Strougo v. Bea Assocs.*, 188 F. Supp. 2d 373, 384 (S.D.N.Y. 2002) (granting summary judgment
where fees were "within the range of fees and expenses for similar funds").

Here too, the Independent Trustees evaluated the Bond Fund from many perspectives in
concluding that the Bond Fund's fees were reasonable.  As noted above, because the expense
comparison group that Lipper independently selected for the Bond Fund may not include other
index funds due to the limited number of similarly styled index funds underlying variable
annuities, the Independent Trustees also compared the Bond Fund's fees in 2012 to all other
variable annuity index bond funds as identified by Lipper, including those that have different
investment objectives.  (*See supra* at 16.)  In concluding that the Bond Fund's fees were fair, the
Independent Trustees reasonably took into account that the Bond Fund's fees *still* fall tightly
around the median fees of these other funds.[21]  (*Id.*)

Faced with the Independent Trustees' consideration of all of this data, Plaintiffs serve up
a trade association research paper that states that the average total expense ratio for index bond
funds was 13 basis points and 12 basis points in 2012 and 2013, respectively.  (Pls.' Br. at 20.)
But no Section 36(b) case has ever used this information to rank a mutual fund's fees, and
Plaintiffs' reliance on it suffers from a number of deficiencies:  As the paper itself shows, this

---

[21] Citing the version of this comparison included in the 2013 board materials, Plaintiffs complain
that the Bond Fund's combined management and administrative fees for the preceding year were
greater than 9 of 11 variable annuity funds used in the comparison (actually, 10 of 13 funds as
shown in the last column of the document cited by Plaintiffs).  (Pls.' Br. at 20.)  Once again, the
Bond Fund had a small differential (just about 5 basis points) from the median in a tightly
dispersed group.  And here too, Plaintiffs' citation to the board materials demonstrates that the
Independent Trustees considered this information in evaluating the appropriateness of FMG's
fees.  (*See* Lakind Decl. Ex. DDD.)  Nothing in the chart establishes that the Bond Fund's fees
are outside the *range* of arm's-length bargaining.  The chart only reinforces that the Independent
Trustees reasonably determined that FMG's fees are *within* the ranges charged by other funds.

average (1) consists of all index bond funds, including many that are very different from the Bond Fund; (2) is asset-weighted, which substantially lowers the reported average because "investor demand for index funds is disproportionately concentrated in the lowest cost funds"; and (3) *excludes* "mutual funds available as investment choices in variable annuities," like the Bond Fund.  (*See* Lakind Decl. Exs. ZZ, AAA.)  Plaintiffs cannot prove FMG's fees are outside the *range* of arm's-length bargaining simply by showing that they are above an average (which they are not)—let alone an atypical, broad average "disproportionately" drawn from the lowest cost funds.

Plaintiffs also complain that FMG retains 92.5% of the Bond Fund's management fee to offset its costs, paying the other 7.5% to the Bond Fund's subadviser.  (Pls.' Br. at 21; Lakind Decl. Ex. XX.)  In doing so, Plaintiffs cite a document from the board materials showing that the median management-subadvisory fee spread for all fixed income funds (including *both* index funds *and* non-index funds) in 2011 was 66%.  (Pls.' Br. at 21; Lakind Decl. Ex. YY.)  But Plaintiffs' reliance on this information—which notably is not limited to index funds—only reinforces that the Independent Trustees evaluated it in determining that the Bond Fund's fees were reasonable.  And while Plaintiffs have a different personal view of this data, there is nothing unreasonable about the Independent Trustees' evaluation:  An index fund subadviser charges a low fee because it has a narrow mandate to track a particular index, while the adviser still has at least as many legal, compliance, and administrative requirements as it would have for any other type of fund and thus must charge a much higher amount than the subadviser.  (*See* Hood Decl. II Ex. 266, Rosenthal Tr. 109:19-110:1; *id.* Ex. 260, James Tr. 88:17-89:14.)

Plaintiffs' focus on the fact that FMG's fee for managing the Bond Fund is "twenty times" larger than the subadviser's fee is simply another variation of their spread argument, and

is inapt for the same reasons. (Pls.' Br. at 21.) Significantly, as the board materials demonstrate, the Independent Trustees considered the spread between management and subadvisory fees every year during their fee deliberations in determining the Bond Fund's fees were appropriate. (*See* Hood Decl. Exs. 202-205; *see also* Lakind Decl. Ex. YY.) In doing so, the Independent Trustees reasonably took into account the host of unique services provided by FMG and AXA discussed in Section II.B above, none of which Plaintiffs mention. The Plaintiffs may subjectively disagree with the Independent Trustees' conclusions, but they identify no legitimate reason to supplant their business judgment.

## IV. THE INDEPENDENT TRUSTEES' EVALUATION OF THE EQAT FUNDS' PROFITABILITY TO FMG SHOULD NOT BE SECOND-GUESSED

Plaintiffs also claim that FMG's fees are excessive because FMG's profit margins on the Bond Fund, in their opinion, are too high. (Pls.' Br. at 16.) But Plaintiffs cannot establish a violation of Section 36(b) simply by alleging that FMG "just plain made too much money." *Kalish*, 742 F. Supp. at 1237; *see also Krinsk*, 875 F.2d at 410 (holding that high profitability alone does not support a finding that the fee is excessive). It is well-settled that Section 36(b) "does not prohibit an investment adviser from making a profit, nor does it regulate the level of profit." *In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *134-36.

The Independent Trustees considered FMG's profit margins for managing and administering the EQAT Funds prior to approving the reasonableness of the EQAT Funds' management and administrative fees. (*See* Lakind Decl. Exs. RR, LL; *see also* DSMF ¶ 48.) As Plaintiffs' citation to the EQAT Funds' board materials shows, FMG provided the Independent Trustees with detailed information about its profits, revenues, and direct and variable expenses prior to their consideration of FMG's contracts. (*See id.*) Faced with the Independent Trustees' undisputed consideration of the EQAT Funds' profitability, which commands deference under

*Jones*, Plaintiffs resort to criticizing the method that FMG used to calculate that profitability. None of these criticisms, however, rescues their claim.

First, Plaintiffs' recalculation of FMG's profit margins with respect to the Bond Fund makes no difference:  Regardless of which margins are used (FMG's calculation of roughly 70% or Plaintiffs' unsupported 90% figure), each falls right within the zone of profit margins upheld in prior Section 36(b) cases.[22]  *See Meyer v. Oppenheimer Mgmt. Corp.*, 707 F. Supp. 1394, 1401 (S.D.N.Y. 1988) (pre-tax fund profit margins of 89%), *aff'd*, 895 F.2d 861 (2d Cir. 1990).

Second, Plaintiffs' criticisms do not stand up to scrutiny.  Relying on their expert Kent Barrett—whose testimony Defendants have moved to strike—Plaintiffs argue that FMG should have treated subadvisory fees as contra-revenue (*i.e.*, a deduction from revenue), rather than an expense.  (Pls.' Br. at 13-15.)  But this argument plainly fails.  Barrett ***conceded*** that FMG's treatment of subadvisory fees was ***consistent*** with generally accepted accounting practices.[23] Although Barrett baldly alleges that subadvisory fees should somehow be treated differently for board reporting purposes, he cites no authority for this proposition.[24]  His testimony amounts to nothing more than inadmissible *ipse dixit*.[25]

---

[22]  Defendants' overall pre-tax profitability for the EQAT Funds, which ranged from 12.44% to 24.91% from 2010 to 2012, is similarly in line with overall profit margins upheld in other Section 36(b) cases.  (Lakind Decl. Ex. LL at D_AXA0264137; *id*. Ex. KK at D_AXA0131387); *In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *135 (overall pre-tax profit margin from operating the American Funds mutual fund complex ranged from 30% to 35%).  Plaintiffs calculate higher margins in their brief, but directly contravene *Gartenberg II* by excluding AXA allocated costs.  (*See* Pls.' Br. at 18; *supra* at Section II.B.)

[23]  (Lakind Decl. Ex. PPPP, Barrett Rebuttal Rep. at 24 ("I agree that for external accounting and financial reporting under GAAP, subadvised fees are generally reported as expenses."); *see also* Hood Decl. II Ex. 255, Barrett Tr. 187:14-17 ("Q: . . . GAAP would say sub-advisory fees should be treated as an expense, correct?  A: Correct.").)

[24]  At his deposition, Barrett was not able to identify any authority supporting his assertion that subadvisory fees should be treated differently for board reporting purposes.  (Hood Decl. II Ex. 255, Barrett Tr. 186:20-187:4); *see GE v. Joiner*, 522 U.S. 136, 146 (1997) (nothing in Federal

Plaintiffs try to bolster their argument by referencing an SEC consent decree touching upon Smith Barney's treatment of sub-transfer agent fees.[26]  This non-litigated settlement, however, has no precedential value,[27] and the facts here could not be more different.  The adviser in *Smith Barney* failed to disclose numerous facts to the board about the sub-transfer agent's fees, including that the adviser would receive substantial kickbacks from the sub-transfer agent under a secret side letter.  (Lakind Decl. Ex. NNNN at 3, 12.)  Here, as Plaintiffs tacitly concede by citing to the EQAT Funds' board materials, the Independent Trustees had full knowledge of the structure and amount of the subadviser's and subadministrator's fees.  (*See* Lakind Decl. Exs. LL and RR (listing subadvisory and subadministration fees under variable expenses).)

Plaintiffs next assert that FMG should not have included allocated costs from AXA in determining fund profitability.  (Pls.' Br. at 16.)  But as already discussed above, *Gartenberg I* rejected this same argument more than 30 years ago.  (*See* Section II.B, *supra*.)[28]  Plaintiffs again

---

Rules of Evidence "requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert").

[25] Plaintiffs also have not shown that it makes any difference that the EQAT Funds, as a matter of convenience, pay FMG and the subadvisers their respective net fees.  (*See* Pls.' Br. at 15.)  There can be no dispute that FMG retains the subadvisers, and is responsible for their payment out of its total management fee.  Plaintiffs cite no authority for the suggestion that the fact that the EQAT Funds pay FMG and the subadvisers their net amounts matters, and their experts' testimony directly contradicts Plaintiffs' suggestion.  (*See* Hood Decl. II Ex. 255, Barrett Tr. 196:17-197:9 (fact that fund pays FMG and the subadvisers their net amounts "not determinative of anything"); Hood Decl. II Ex. 265, Pomerantz Tr. at 265:12-266:24 (not significant if money is coming out of a fund if AXA is legally responsible for it); *see also id.* Ex. 251, Holder Rep. at 24-27 (consistent with GAAP to account for subadvisory fees as expenses).)

[26]  *See In re Smith Barney Fund Mgmt. LLC, et al.*, SEC Admin. Proceeding, File No. 3-11935 (May 31, 2005), Release Nos. 51761 (Securities Exchange Act of 1934), 2390 (Investment Advisers Act of 1940).

[27]  *See CFTC v. Hanover Trading Corp.*, 34 F. Supp. 2d 203, 206 n.19 (S.D.N.Y. 1999) (consent order provided limited value because it is "untested in the adversary crucible" and "simply memorializes an agreement of the parties to end litigation upon certain terms").

[28] Notably, Plaintiffs' expert conceded that, though he ignored them, it would have been appropriate to consider AXA's costs in the EQAT Funds' profitability calculations.  (Hood Decl. II Ex. 255, Barrett Tr. 164:13-165:15 ("[T]o quantify the total profitability from the investment

try to avoid *Gartenberg* by invoking the Shared Services Agreement, (Pls.' Br. at 16), but that agreement does not change anything: *Gartenberg I* specifically cautions courts not to exalt form over substance. *Gartenberg I*, 528 F. Supp. at 1052 (courts should "consider the totality of the values placed at the disposal of the shareholders . . . or else form would be substituted for substance"). Here, the unrebutted fact testimony is that the costs allocated to FMG under this agreement do *not* include all costs that AXA incurs in servicing the EQAT Funds. (*See id.*) And as Plaintiffs implicitly admit by citing to the EQAT Funds' board materials, there can be no dispute that the Independent Trustees considered the EQAT Funds' profitability through multiple prisms, *both* including *and* excluding allocated AXA expenses. (*See* Lakind Decl. Exs. LL, RR (showing profitability pre- and post-allocated expenses).)[29]

At bottom, Plaintiffs' profitability arguments depend on the flawed premise that FMG had a fiduciary duty to provide profitability information to the Independent Trustees using a single method—Plaintiffs'. But courts deciding cases under Section 36(b) have repeatedly recognized that estimating fund profitability for a board of trustees is an "art rather than a science." *See Krinsk*, 715 F. Supp. at 489; *see also Schuyt v. Rowe Price Prime Reserve Fund, Inc.*, 663 F. Supp. 962, 978 (S.D.N.Y. 1987) ("There are many acceptable ways to allocate common costs . . . ."), *aff'd*, 835 F.2d 45 (2d Cir. 1987). Just as in *Gallus*, "[a]lthough Plaintiffs suggest that the Board should have had different information," Plaintiffs "do not point to any

_____

management agreement, total profitability associated with providing the investment management services, you would include all of [AXA's] costs . . . .").)

[29] Plaintiffs also cannot dispute that two global accounting firms, PricewaterhouseCoopers and Ernst & Young, approved FMG's method for allocating AXA's costs. (Hood Decl. II Ex. 208 at D_AXA0255490; *id.* Ex. 209 at D_AXA0255507.) Plaintiffs' assertion that PwC "recommends that expenses of this nature be allocated according to time devoted to each task" (Pls.' Br. at 17) grossly mischaracterizes the deposition testimony of one of PwC's witnesses, Martin Jennings. Mr. Jennings—who did not work on the evaluation—does not recommend anything in the excerpt cited by Plaintiffs and explicitly states, "I'm not a specialist in that area [cost allocation] and I don't do projects in that area." (Lakind Decl. Ex. KKKK, Jennings Tr. 22:19-22.)

- 31 -

authority detailing requirements for the presentation of profitability data." [30]  *Gallus*, 497 F.

Supp. 2d at 981.  Nor do Plaintiffs demonstrate how any supposed failings in the profitability

data provided to the Independent Trustees actually impacted the EQAT Funds' fees.  *See id.*

(dismissing Section 36(b) claim where defendants "provided detailed reports on its profitability

to the Board" and plaintiffs failed to show how purported failings in the data would have

changed the fund's fees).  These failures are fatal to Plaintiffs' claim.  *See id.*

## V.   THE INDEPENDENT TRUSTEES' CONSIDERATION OF ECONOMIES OF SCALE IS ENTITLED TO SUBSTANTIAL DEFERENCE

Plaintiffs claim that FMG did not adequately share economies of scale with the Bond

Fund, (Pls.' Br. at 22), but here too Plaintiffs have not met their heavy burden of setting aside the

Independent Trustees' reasonable business judgment.

Plaintiffs ignore that, in concluding that the EQAT Funds' fees were reasonable, the

Independent Trustees considered extensive information relating to potential economies of scale

realized by FMG and the extent to which the benefits flowing from any such economies of scale

were shared with the EQAT Funds.  (DSMF ¶¶ 45, 57.)  As part of their evaluation of the Bond

Fund in particular, the Independent Trustees specifically ***added*** management fee breakpoints to

the Bond Fund each year from 2011-2013 that decrease the Bond Fund's fees as assets rise.[31]

Plaintiffs claim these breakpoints are inadequate but, as discussed below, that subjective opinion

---

[30] Plaintiffs complain that the magnitude of AXA's allocated costs exceeds FMG's direct costs.
(Pls.' Br. at 17.)  But courts have regularly endorsed allocations of affiliate costs in amounts
significantly larger than the adviser's direct costs.  In *Gartenberg II*, the affiliate costs were
between seven and nearly thirty times the adviser's direct costs.  *Gartenberg II*, 694 F.2d. at 931
n.4; *see also Gartenberg v. Merrill Lynch Asset Mgmt., Inc.* ("*Gartenberg III*"), 573 F. Supp.
1293, 1315 (S.D.N.Y. 1983) (affiliate costs more than fifty times larger than adviser's direct
costs).

[31] The Independent Trustees also approved an administrative fee schedule that contains a series of
breakpoints reducing fees as assets rise.  (*See* Hood Decl. II Ex. 164.)

cannot overcome the deference afforded to the Independent Trustees' informed conclusions under *Jones*, nor does it find any support in well-settled Section 36(b) case law.

As a threshold matter, Plaintiffs have not met their burden of showing that the Bond Fund or any of the EQAT Funds even experienced any economies of scale.[32]  In their brief, Plaintiffs focus on the fact that the Bond Fund's assets increased from the end of 2010 to September 2011, while the Bond Fund's management fee remained 35 basis points (or essentially one-third of one percent).  (Pls.' Br. at 24.)  But a plaintiff cannot prove economies of scale by arguing "that since a fund increased dramatically in size, economies [of] scale must have been realized."  *Kalish*, 742 F. Supp. at 1238.  Instead, the plaintiff must "create a detailed analysis of each element of a transaction surrounding [the fund], over an extended period of time, over different levels of activity," and show that the *per unit cost* of servicing the Bond Fund decreased as its assets grew. *Krinsk v. Fund Asset Mgmt., Inc.*, 715 F. Supp. 472, 496 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 404 (2d Cir. 1989).  By their own admission, Plaintiffs have failed to perform this analysis with respect to any of the at-issue EQAT Funds.[33]

Plaintiffs likewise have not shown that any economies of scale were so inadequately shared with the Bond Fund that its fees *could not* have been negotiated at arm's-length. Plaintiffs concede that any economies of scale experienced by FMG would be "small."  (*See*

---

[32] In their brief, Plaintiffs subtly try to shift their legal burden on this factor to Defendants.  (*See* Pls.' Br. at 25 ("Defendants have offered no evidence that AXA's expenses grew as revenue and assets under management grew."); *id.* at 23 ("Dr. James does not identify . . . .").)  Section 36(b), however, unambiguously assigns the burden of proof to the plaintiff, 15 U.S.C. § 80a-35(b)(1), and courts have uniformly held in Section 36(b) cases that the plaintiff must demonstrate both that economies of scale existed and that the benefits were not adequately shared with the fund. *See Kalish*, 742 F. Supp. at 1241.  No plaintiff has ever succeeded in doing so.

[33] Plaintiffs' experts admit that they have conducted no *per unit cost* analyses.  (Hood Decl. II Ex. 269, Vitagliano Tr. 277:14-279:10 (admitting that he had no understanding of, and undertook no investigation of, FMG's actual costs in providing management and administrative services and merely "estimated" those costs); Hood Decl. II Ex. 255, Barrett Tr. 66:23-67:22, 221:16-222:2 (admitting he did not analyze why ratio of expenses to assets moves up or down).)

- 33 -

Pls.' Br. at 22 ("[C]oncededly economies of scale would be *small*.") (emphasis added).)  And while they quibble with whether Defendants shared potential economies through other means, they admit that FMG shared *some* potential economies through the undisputed management and administrative fee breakpoints implemented by the Independent Trustees with respect to the Bond Fund.[34]  (*See* Pls.' Br. at 24-25 (acknowledging breakpoints introduced in 2011 and 2012).)  These breakpoints decreased the Bond Fund's management fee as assets rose, and resulted in close to $1.4 million in savings to the Bond Fund in 2012 alone.  (Hood Decl. II Ex. 275.)[35]  This is on point with *Gallus*, where the court granted summary judgment for defendants where disinterested directors expressly considered economies of scale and approved fee schedules with breakpoints.[36]  *See Gallus*, 497 F. Supp. 2d at 977, 982; *Gartenberg I*, 528 F. Supp. at 1054 (fee schedule that "diminishes progressively" "[c]learly . . . takes account of economies . . . .").

Particularly given that they (1) have not shown any economies exist, and (2) concede that any economies would be small, Plaintiffs' personal disagreements with the Independent Trustees' judgment regarding *Gartenberg*'s economies of scale factor do not make out a claim.

---

[34]  None of these quibbles has merit.  For instance, the Bond Fund *did* have a fee reduction.  In 2009, the Bond Fund's management fee decreased from 45 basis points to 35 basis points upon the Bond Fund's reorganization to an index strategy.  (Hood Decl. II Ex. 178 at 3.)

[35]  Plaintiffs criticize these breakpoints by asserting that the Bond Fund's subadviser sets its breakpoints at lower asset levels than FMG.  (Pls.' Br. at 25.)  But there is no requirement that a manager's breakpoints match a subadviser's.  Section 36(b) does not require that FMG pass on *all* the benefits of economies of scale to a fund, assuming those economies could be measured; rather, it only requires that investors share "equitably" in those benefits.  *See* S. Rep. No. 91-184 at 15 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4901 ("[T]his bill recognizes that investors should share equitably . . . in the economies available as a result of the growth and general acceptance of mutual funds.").  Moreover, Plaintiffs fail to disclose that, in 2012, the dollar amount of FMG's breakpoints actually exceeded the amount of the subadviser's and subadministrator's breakpoints with respect to the Bond Fund.  (Hood Decl. II Ex. 275.)

[36]  Plaintiffs also try to call into question FMG's breakpoints by complaining that FMG allocates AXA's expenses to the EQAT Funds in proportion to revenues.  (Pls.' Br. at 25.)  But this has nothing to do with the adequacy of FMG's breakpoints—the allocation is simply for the purpose of determining FMG's profitability; it *does not* change the fees that investors pay or the savings they experience from breakpoints.

## VI.   THE "FALL-OUT BENEFITS" RAISED BY PLAINTIFFS WERE DISCLOSED TO THE INDEPENDENT TRUSTEES

Plaintiffs also have not met their burden of setting aside the Independent Trustees' judgment regarding potential "fall-out benefits" associated with the EQAT Funds.

Plaintiffs suggest that the fees that FMG charged to manage and administer the EQAT Funds were excessive because AXA received separate "product wrapper" and "general account interest" revenues from variable annuity contracts like Plaintiffs'.  (Pls.' Br. at 26-27.)  Plaintiffs, however, *concede* that the Independent Trustees considered these revenues "could conceivably be a fall-out benefit" prior to determining that FMG's fees were fair.  (Pls.' Br. at 27.)  And while Plaintiffs quibble that FMG no longer included a slide in the board materials quantifying these revenues after 2007, they cannot legitimately dispute that the Independent Trustees continued to receive financial information every year that listed those revenues.  (DSMF ¶ 130.) The Independent Trustees reached an informed determination that the EQAT Funds' fees were appropriate even in light of these revenues.  As a matter of law, that determination is entitled to substantial deference.  *See Gallus*, 497 F. Supp. 2d at 982 (granting summary judgment for defendants where board considered reports addressing fall-out benefits).

Indeed, Plaintiffs have not even met their threshold burden of establishing that the product wrapper and general account revenues are in fact fall-out benefits as a matter of law. "'Fall-out benefits' are profits to the adviser that 'would not have occurred *but for* the existence of the Fund.'"  *In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *142 (emphasis in original) (quoting *Krinsk*, 715 F. Supp. at 495).  Plaintiffs claim that "without the mutual funds, there would be no asset base from which AXA could collect" these revenues.  (*See* Pls.' Br. at 26.)  But AXA's product wrapper revenue would still be earned even if any of funds at issue in these actions did not exist—there are literally dozens of other mutual funds offered in

- 35 -

each variable annuity that investors are free to select.  (DSMF ¶ 128.)  Likewise, AXA's general

account revenue does not depend on any of the EQAT Funds—AXA offers the general account

to its variable annuity holders as an *alternative* to investing in the mutual funds.  (Hood Decl. II

Ex. 252, James Rep. ¶¶ 165-167.)

In addition, Plaintiffs have not shown, as they must, "that [any fall-out] benefits were so

substantial that they rendered the [management] fee so disproportionately large" as to be beyond

the *range* of arm's-length bargaining.  *Gartenberg II*, 694 F.2d at 932.  Plaintiffs claim to

attribute $6.5 million in alleged product wrapper and general account fall-out benefits to the

Bond Fund from 2010 and 2012.  (Pls.' Br. at 28.)  But nothing about that level of profits would

support a finding of disproportionality.  As the Independent Trustees were aware and Plaintiffs

do not dispute, AXA earns them in exchange for *separate* product-level and general account-

related services.  (*See id.* at 26.)

## VII.  PLAINTIFFS' CRITICISMS OF THE BOARD PROCESS DO NOT ESTABLISH A CLAIM

Plaintiffs raise a series of criticisms with the EQAT Funds' board process.  (Pls. Br. at

30-34.)  In doing so, however, they ignore the undisputed breadth of the Independent Trustees'

analysis of the EQAT Funds' fees, discussed in detail above.  Plaintiffs cannot dispute that the

Independent Trustees met regularly, considered each *Gartenberg* factor, sought the advice of

independent counsel and independent consultants, and played an active role in negotiating with

FMG—including by negotiating breakpoints in FMG's fee schedule.

As set forth in Appendix A hereto and Defendants' Response to Plaintiffs' Statement of

Material Facts, none of Plaintiffs' criticisms of the board process has merit.  Plaintiffs, in large

part, set up a series of standards that do not exist either in fact or law.  For example:

- Plaintiffs complain that the Independent Trustees were not aware of the subadviser's profit margin.  (Pls.' Br. at 33.)  Plaintiffs, however, have not

identified any requirement that a board consider a subadviser's profitability in determining the *adviser's* compensation.  Here, as discussed above, there can be no dispute that the Independent Trustees received extensive information concerning FMG's profitability, which was appropriate.  (DSMF ¶¶ 48, 125-127.)

- Plaintiffs complain that the Independent Trustees did not receive a copy of the subadministration agreement.  (Pls.' Br. at 31.)  But here too, there is no requirement under the ICA that a mutual fund board review or approve a subadministration agreement to which the fund is not a party.  Even if the subadministrator's services were relevant in considering FMG's administrative fees, there can be no dispute that the Independent Trustees were specifically aware of the services provided and fees charged by the subadministrator when they approved the FMG's administrative fees, as even Plaintiffs' exhibits demonstrate.  (*See* Lakind Decl. Ex. HHHH, Schpero Tr. 47:15-24 (the Independent Trustees were "absolutely" aware of the fact that JPMorgan was performing subadministrative functions); DSMF ¶¶ 42-43 (describing presentations given to Independent Trustees by subadministrator), 64; *see also* Lakind Decl. Ex. LL at D_AXA0264211 (listing fees charged by subadministrator).)

- Plaintiffs assert that the Board did not independently "verify" the expenses FMG reported.  (Pls.' Br. at 31.)  But there is no requirement that a mutual fund board audit an adviser's expenses, and the Independent Trustees, among other things, receive and evaluate FMG's audited financial statements each year.  (*See, e.g.,* Lakind Decl. Ex. OO at D_AXA0264452.)  Plaintiffs' own purported board expert admitted that none of the mutual fund boards on which he has served has ever independently audited the adviser's expenses.  (Hood Decl. II Ex. 259, Goldstein Tr. 357:18-22.) [37]

In addition, though Plaintiffs claim the Independent Trustees should have done a number of things differently, they fail to show how any of the alleged deficiencies they identify actually affected the *results* of the negotiation.  This type of second-guessing—untethered to any proof of

---

[37]  None of the other testimony of Plaintiffs' alleged board expert, Philip Goldstein, whose testimony Defendants have moved to strike, establishes a claim.  Goldstein admitted that he did not even read the extensive materials provided to and considered by the Independent Trustees in approving the EQAT Funds' fees, or the minutes of the Board meetings.  (Hood Decl. II Ex. 259, Goldstein Tr. 46:7-47:25, 48:24-49:21, 234:7-9; *see also* Mem. In Supp. Of Defs.' Mot. To Strike The Expert Opinions Offered by Philip Goldstein, dated Jan. 23, 2015 (ECF No. 51-2).)  He also conceded at his deposition that he lacks familiarity with the customs and practices of mutual fund boards that use a subadvisory structure, and is not aware of any legal requirement or industry custom and practice that the Board failed to follow in approving FMG's fees.  (*See* Hood Decl. II Ex. 259, Goldstein Tr. 214:20-215:7, 219:20-220:4, 357:5-360:5.)

impact on the Bond Fund—as a matter of law does not establish a Section 36(b) claim. *See Gallus*, 497 F. Supp. 2d at 981 (granting summary judgment for defendants where "Plaintiffs fail[ed] to show how any . . . failings in the data [considered by the Board] create[d] a genuine issue of material fact regarding whether the board negotiates the fees at arm's length"); *id.* at 983 ("[W]hile Plaintiffs contend that the information Defendants provided the Board was misleading, Plaintiffs fail to describe how these alleged deficiencies affected the results of the Board's fee negotiation process.").

While Plaintiffs disagree with the Independent Trustees' business judgment, they fail to identify any reason of substance to conclude that the resulting fees are not "within the range" of arm's-length negotiation.  Moreover, even assuming Plaintiffs were right—and they are not— that the Bond Fund's fees were higher than average and its performance was below average, that cannot be sufficient as a matter of law to show the fees are disproportionate.  If that straightforward mathematical calculation were significant, there would be thousands of funds every year with excessive fees—half of all mutual funds have above average pricing, and no fund can outperform every year.  That is plainly not the law.  Not only should Plaintiffs' motion be denied, summary judgment should be entered for Defendants.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' motion for partial summary judgment should be denied, and Defendants' motion for summary judgment should be granted.

Dated:  March 20, 2015

BLANK ROME LLP

By:  /s/ Jonathan M. Korn
      Jonathan M. Korn
      301 Carnegie Center, 3rd Floor
      Princeton, NJ 08540
      (609) 750-7707

MILBANK, TWEED, HADLEY & McCLOY LLP
      James N. Benedict (*pro hac vice*)
      Sean M. Murphy (*pro hac vice*)
      Robert C. Hora (*pro hac vice*)
      Andrea G. Hood (*pro hac vice*)
      1 Chase Manhattan Plaza
      New York, NY  10005-1413
      (212) 530-5000

*Attorneys for Defendant AXA Equitable Funds*
*Management Group, LLC*

- 39 -

# APPENDIX A

### APPENDIX A: Summary Responses to Plaintiffs' Allegations Regarding Board Process

| | Alleged "Principle" | Alleged "Board Deficiency" | Summary Response:[1] |
|---|---|---|---|
| | **"Board Was Not Fully Informed" (p. 30)** | | |
| 1. | FMG failed to disclose material information to the Board. | (1)  FMG had once valued the product wrapper fees and general account fall-out benefit at hundreds of millions of dollars. After 2006, FMG ceased providing the Board with any estimate of the value of these fall-out benefits. (Plaintiffs' Statement of Material Facts Not In Dispute ("SMF") ¶¶ 164-170; 192-200) | No deficiency demonstrated.  Product wrapper fee and general account revenues are not fall-out benefits as a matter of law.  (Defs.' Mem. of Law in Opp. to Pls.' Mot. for Partial Summ. J. ("Defs' Opp. Br.") at 35.)  In any event, FMG told the Independent Trustees that product wrapper and general account revenues "could conceivably be considered" fall-out benefits, and every year, provided the Independent Trustees with financial information that listed those revenues.  (Defendants' Statement of Material Facts in Support of Their Motion for Summary Judgment ("DSMF") (*Sanford* Dkt. No. 55-2) ¶ 130.)  The Independent Trustees were not misled as to anything. |
| 2. | | (2)  The Board was not informed that currently the product wrapper and general account fall-out benefit could be valued at between $500 million (Defendants' expert) and $1.0 billion (Plaintiffs' expert) (SMF, ¶¶ 181, 196-200) | Duplicative.  *See* No. 1 above. |
| 3. | | (3)  The Board was not informed of the possibility of using more beneficial methods to allocate AXA's expenses which resulted in a $300 million expense allocation to EQAT. (SMF ¶ 209) | No deficiency demonstrated.  Whatever Plaintiffs mean by their vague reference to "more beneficial methods", there can be no dispute that two major global accounting firms, PricewaterhouseCoopers ("PwC"), (acting a consultant to FMG) and Ernst & Young ("E&Y") )(acting as an independent consultant to the Independent Trustees) jointly developed FMG's allocation methodology, and determined that it was reasonable and consistent with industry practice.  (Declaration of Andrea G. Hood in Support of Defendant's Opposition to Plaintiffs' Motion for Partial Summary Judgment dated Mar. 20, 2015 ("Hood Decl. II") Ex. 208, Jan. 28, 2000 Board Minutes at D_AXA0255490; *id.* Ex. 209, Jan. 24, 2000 Board Minutes at D_AXA0255507.)  This is hardly reflective of a "deficient" process. |

---

[1]  FMG also refers the Court to its Response to Plaintiffs' Statement of Material Facts Not In Dispute, filed concurrently herewith.  Nothing in this high-level summary appendix is intended to be construed in any way as an admission that any of Plaintiffs' purported deficiencies are factually correct or have merit.

| | Alleged "Principle" | Alleged "Board Deficiency" | Summary Response:[1] |
|---|---|---|---|
| | | | Moreover, Courts adjudicating Section 36(b) claims have repeatedly recognized that cost allocation is an art, not a science, and that there are many reasonable and appropriate ways to allocate common costs. (Defs.' Opp. Br. at 31.)  There is no requirement to use any single method.<br><br>In any event, Plaintiffs' complaints about allocated AXA expenses are immaterial.  There can be no dispute that the Independent Trustees considered fund profitability information both including and *excluding* allocated AXA expenses.  (*Id.*; Declaration of Arnold Lakind, dated Jan. 23, 2015 ("Lakind Decl.") Exs. LL, RR.) |
| 4. | | (4)  The Board was not informed that AXA and FMG were parties to a Shared Services Agreement that required FMG to pay only $13.6 million to AXA for provision of its services.  (SMF ¶¶ 230-234) | No deficiency demonstrated.  Plaintiffs' suggestion that AXA's costs associated with servicing the EQAT Funds amount to only $13.6 million is not supported by any of the testimony.  The unrebutted testimony is that the $13.6 million in costs allocated to FMG under the Shared Services Agreement are *not* inclusive of all costs incurred by AXA in serving the EQAT Funds.  (Defs.' Opp. Br. at 24; Hood Decl. II Ex. 262, Joenk Tr. 164:13-25, 234:23-238:18.)<br><br>In any event, the Shared Services Agreement and the amounts charged under that agreement are referenced in FMG's audited financial statements, which the Independent Trustees receive every year. (Lakind Decl. Ex. OO, 2012 FMG Audited Financials at D_AXA0264459.) |
| 5. | | (5)  The Board had never seen the Sub-Administration Agreement delegating administrative tasks to the Sub-Administrator, JPMorgan (SMF, ¶¶ 237, 238) | No deficiency demonstrated.  There is no requirement that the Board review or approve subadministrative agreements.  Regardless of whether the Independent Trustees had seen the agreement, there can be no dispute that they were aware of and considered the services provided by the subadministrator when they approved the Bond Fund's administrative fees.  (Lakind Decl. Ex. HHHH, Schpero Tr. 47:15-24 (the Independent Trustees were "absolutely" aware of the fact that JPMorgan was performing subadministrative functions); DSMF ¶¶ 42-43, 64.)<br><br>*See also* No. 8 below. |
| 6. | | (6)  The Board had not seen the document which stated that "[w]ith limited exceptions, | No deficiency demonstrated.  Plaintiffs mischaracterize the testimony.  Plaintiffs rely on a single page from the EQAT's Compliance Manual |

| | Alleged "Principle" | Alleged "Board Deficiency" | Summary Response:[1] |
|---|---|---|---|
| | | FMG LLC has delegated the day-to-day investment management of the … mutual funds to various sub-advisers" and ""FMG LLC also delegated the day-to-day fund accounting and fund administration functions to JPMorgan Investor Services …" (SMF ¶¶ 235, 236) | relating to maintenance of required books and records, for the quoted language. The Compliance Manual was approved by the Board. (Hood Decl. II Ex. 278 at D_AXA0250070.) Nothing in the testimony cited by Plaintiffs states that the Board had not seen it. Moreover, whatever this statement means, it does not change the many, undisputed services that FMG performs on behalf of the EQAT Funds, which the Independent Trustees considered in approving the Bond Fund's fees. (DSMF ¶¶ 55, 61, 63-64, 68-94.) |
| 7. | | (7) The Board did not know that the Subadvisory fee was paid by the EQAT; it incorrectly thought that FMG paid that fee. (SMF, ¶¶ 226-229) | No deficiency demonstrated. There can be no dispute that FMG engages the subadvisers, and must pay them out of its total management fee. Although, as a matter of convenience, the Bond Fund pays both FMG and the subadvisers their net fees, Plaintiffs have not shown that this makes any legal or practical difference. Plaintiffs' cite no authority for the proposition that these mechanics matter, and their experts' testimony directly contradicts their assertions. (Defs.' Opp. Br. at 30, n.25; Hood Decl. II Ex. 255, Barrett Tr. 196:17-197:9 (fact that fund pays FMG and the subadvisers their net amounts "not determinative of anything"); Hood Decl. II Ex. 265, Pomerantz Tr. at 265:12-266:24 (not significant if money is coming out of the EQAT Funds if AXA is legally responsible for it).) |
| | **"The Board's Process Was Not Robust"** | | |
| 8. | Board must evaluate and approve the investment management and subadvisors' agreements "for each Portfolio separately." (K&L Gates opinion, SMF ¶185)<br><br>The evaluation process requires consideration of both the management agreements and the subadvisory agreements. (Smythe Report and Deposition, SMF ¶186) | (1) The Board had no concern about relative values of advisor and subadvisor's work. (SMF, ¶¶ 239 to 242) | No deficiency demonstrated. Plaintiffs mischaracterize the testimony. The cited testimony does not state that the "Board had no concern about the relative value of the advisor and subadvisor's work." (*See, e.g.*, Lakind Decl. Ex. O, Rosenthal Tr. at 168:20-169:6 ("I developed an understanding of what those services were and what others were willing to pay for such services.").) There can be no legitimate dispute that the Independent Trustees were aware of the differences in services provided by FMG, the subadvisers, and the subadministrator, and considered those differences when they approved the EQAT Funds' management and administrative fees. (Defs. Opp. Br. at 25; DSMF ¶¶ 38-43, 55, 63-64.) |
| 9. | | (2) Defense Expert Marianne Smythe did not see anything in any Board minutes that reflected a *Gartenberg* analysis of the Sub- | No deficiency demonstrated. Plaintiffs mischaracterize the testimony. The cited testimony shows that Ms. Smythe testified that the board materials provided to the Independent Trustees were "replete with |

| | Alleged "Principle" | Alleged "Board Deficiency" | Summary Response:[1] |
|---|---|---|---|
| | Board must undertake same review of advisory and subadvisory contracts. (K&L Gates opinion, SMF ¶¶ 185, 186)<br><br>Board must consider services performed by the advisor and subadvisor. (2009 Report SMF ¶188) | Adviser's fees and expenses (Declaration of Arnold Lakind, Ex. R. p. 72) | responses from all of the subadvisors to the questions that are relevant in this process" and that Ms. Smythe did not expect a *Gartenberg* analysis of the Subadvisers' fees to be in the minutes. (*See* Lakind Decl. Ex. R at 72:1-14, 73:10-14 ("[Smythe:] Why would that be in the minutes?").<br><br>This case is not about whether the subadviser's fees were properly approved. In any event, there can be no dispute the Independent Trustees received extensive information reflecting the *Gartenberg* factors for each subadviser and considered those factors in approving the subadvisory agreements. (Lakind Decl. Ex. R, at 71:21-72:14; DSMF ¶¶ 40-41, 55, 102 (referencing minutes detailing consideration of subadvisory fees and *Gartenberg* factors); Hood Decl. II Ex. 235, SSgA Funds Management, Inc., 15(c) Response (July 2012), D_AXA0165044-083; *id.* Ex. 225, SSG Funds Management, Inc., 15(c) Response (July 2011), D_AXA0138912-974.) |
| 10. | | (3)  Board members did not know that FMG had stated it delegated work to subadvisors and JPMorgan. (SMF ¶235, 236) | Duplicative. *See* No. 6 above. |
| 11. | | (4)  The Board did not assess the relative value of advisor's and subadvisor's services. (SMF ¶239-242) | Duplicative. *See* No. 8 above. |
| 12 | Board must act in best interests of shareholders. *Smith Barney*, 595 F.3d at 93. | (1)  The Board never explored use of expense allocation methodologies that would have been more advantageous to shareholders. (SMF ¶ 120) | Duplicative. *See* No. 3 above. |
| 13. | Trustees of EQAT must put shareholders' interests ahead of "those of anyone else." (Bingham opinion, SMF ¶184; Smythe Report, FMG 186) | (2) The Board made no effort to verify that economies of scale were passed on or that breakpoints were at proper levels (SMF ¶¶ 243 -248). | No deficiency demonstrated. Plaintiffs mischaracterize the testimony. The Independent Trustees testified that they consulted with counsel and considered information from independent third parties, such as Lipper and Strategic Insights, to assist them in determining breakpoints. (Lakind Decl. Ex. HHHH 268:24-269:24; *see also* DSMF ¶¶ 45, 57 (describing information considered by Independent Trustees regarding potential economies of scale).)<br><br>Moreover, Plaintiffs fail to explain what "verification" the Independent |

| | Alleged "Principle" | Alleged "Board Deficiency" | Summary Response:[1] |
|---|---|---|---|
| | | | Trustees should have performed, nor do they attempt to perform any such "verification" themselves.  To the extent Plaintiffs suggest that other consultants should have been hired, there is no requirement to do so, and Plaintiffs' own expert testified that none of the mutual fund boards on which he had served had ever hired a consultant to assess the extent to which any benefits from economies of scale are passed on to shareholders or whether breakpoints should be entered for a fund. (Hood Decl. II Ex. 259, Goldstein Tr. at 357:5-17.) |
| 14. | It is the duty of the Board to "request and evaluate ... such information as may be reasonably necessary to evaluate the terms of any contract."  (K&L Gates opinion, SMF ¶185) | (1)  The Board was unaware of the Shared Services Agreement between AXA and FMG. (SMF ¶¶231 to 233). | Duplicative.  *See* No. 4 above. |
| 15. | | (2)  the Board was unaware of the Sub-Administration Agreement with JPMorgan (SMF ¶237) | Duplicative.  *See* No. 5 above. |
| 16. | The process should promote transparency.  (2004 Report, FMG ¶187) | (3)  The Board did not verify if any of the expenses FMG reported to the Board as incurred in the operations of the funds, were in fact for the operations of the funds.  (SMF ¶¶ 218-235). | No deficiency demonstrated.  The Independent Trustees regularly receive and review audited financial statements for FMG, which are prepared by PwC, an independent public accounting firm.  (Lakind Decl. Ex. OO, FMG 2012 Financial Statements and Report of Independent Auditors; Hood Decl. II Ex. 267, Schpero Tr. 220:17-221:2)  Given all of this, it is not clear what additional verification Plaintiffs believe the Independent Trustees should have performed.

There is no requirement that a mutual fund board audit an adviser's expenses.  Plaintiffs' own purported board expert admitted that none of the mutual fund boards on which he has served have independently audited the adviser's expenses.  (Hood Decl. II Ex. 259, Goldstein Tr., at 357:18-22.) |
| 17. | | (4)  The Board no longer received valuation of fall-out benefits from fees AXA earned on its insurance products (product wrapper fees and general account spread).  Board never inquired of FMG as to why it stopped providing the board with the value of these fall-out benefits. (SMF, ¶¶ 198-200) | Duplicative.  *See* No. 1 above. |

|  | Alleged "Principle" | Alleged "Board Deficiency" | Summary Response:[1] |
|---|---|---|---|
| 18. |  | (5) the Board did not consult any financial information to ensure economies of scale were passed along to shareholders. (SMF, ¶¶ 243-248). | Duplicative. *See* No. 13 above. |
| 19. |  | (6) The Board was not aware of Sub-Advisor's profit margin. (SMF ¶253) | No deficiency demonstrated. Plaintiffs have not identified any requirement that a board consider a subadviser's profitability in determining the *adviser's* compensation. Subadvisers perform distinct services and have their own cost structures. The question at issue in this case is whether the investment management and administrative fees paid by the EQAT Funds to FMG are "so disproportionately large that [they] bear[] no reasonable relationship to the services rendered" and could not have been the product of arm's length bargaining. *Jones v. Harris Assoc., L.P.* 559 U.S. 335, 344 (2010) (citation omitted). To determine whether an adviser's fees are disproportionately large, courts may consider, among other things, "the profitability of the fund *to the adviser.*" *Id.* at 345, n.5 (emphasis added). There can be no dispute that the Independent Trustees received extensive information concerning FMG's profitability. (DSMF ¶¶ 48, 125-127.) |
| 20. |  | (7) The Board did not know that the Sub-Adviser's fee was paid by the funds/EQAT; it incorrectly thought FMG paid it. (SMF, ¶¶ 226-227). | Duplicative. *See* No. 7 above. |
| 21. | Board should use independent consultants, p. 29. (2004 Report, SMF, ¶187; K&L Gates opinion, SMF ¶185). | (1) The Board claimed that PriceWaterhouse and Ernst & Young reviewed FMG's cost allocation methodology 15 years ago, but there is not a single document from either firm evaluating the methodology. (SMF ¶209-216). | No deficiency demonstrated. There can be no dispute that PwC and E&Y reviewed and approved FMG's allocation methodology in 2000, several years prior to this litigation. Contemporaneous Board Meeting Minutes expressly record the results of that review. (Defs.' Opp. Br. at 31, n.29; Hood Decl. II Ex. 209, Board meeting minutes (Jan. 24, 2000), D_AXA0255507; *id.* Ex. 208 Board meeting minutes (Jan. 28, 2000), D_AXA0255490-91 (discussing PwC and E&Y review).) This is corroborated by the sworn testimony of persons who attended those Board meetings, and of a PwC representative who acted as a liaison with FMG during the review. (*See* Hood Decl. Ex. 262, Joenk Tr. at 295:15-296:3; *id.* Ex. 273, Wiggins Tr. at 46:7-47:2.) It is hardly surprising that work papers generated 15 years ago may no longer exist. |

| | Alleged "Principle" | Alleged "Board Deficiency" | Summary Response:[1] |
|---|---|---|---|
| 22. | | (2) The Board does not retain an accountant to assist with evaluating FMG's cost allocation methodology.  (SMF, ¶¶ 209-216). | No deficiency demonstrated.  There can be no dispute that the Independent Trustees retained E&Y in 2000 as their independent consultant to help develop and evaluate FMG's cost allocation methodology.  That same methodology has been continuously used by FMG since 2000, during which time the business of FMG has not substantially changed.  (Hood Decl. II Ex. 262, Joenk Tr. at 295:8-296:3.)<br><br>In any event, there is no requirement that the Board retain an independent consultant to assist with evaluating FMG's cost allocation methodology.  Plaintiffs' own alleged "board" expert conceded that he was not aware of any custom or practice in the mutual fund industry that would require the same.  (Hood Decl. II Ex. 259, Goldstein Tr., at 214:20-215:7.)  Plaintiffs' expert also admitted that none of the mutual fund boards on which he has served have ever independently verified that a cost allocation methodology was properly applied.  (*Id.* Ex. 259 at 358:2-15.) |
| 23. | | (3)  The Board did not retain a consultant to assist in determining if FMG is sharing economies of scale with the funds.  (SMF 246). | Duplicative.  *See* No. 13 above. |
| 24. | Board should be sensitive to disparity in breakpoints between advisor and subadvisor.  (2004 Report, SMF ¶187). | The Board set breakpoint schedules so that subadvisors reduced the fees at lower asset levels than FMG.  The Board allowed FMG to retain the benefits that resulted when the Sub-Adviser reduced its fees on account of reaching a breakpoint.  (SMF, ¶¶ 146, 147). | No deficiency demonstrated.  There is no requirement that a manager's breakpoints match a subadviser's.  (Defs.' Opp. Br. at 34, n.35.)  In any event, there can be no dispute that the Independent Trustees added management fee breakpoints to the Bond Fund each year from September 2011-2013, and approved an administrative fee schedule that contains a series of breakpoints reducing fees as assets rise.  In 2012, the dollar amount of FMG's breakpoints exceeded the amount of the subadviser's and the subadministrator's breakpoints.  (*Id.*; Hood Decl. II Ex. 275.) |
| 25. | Board should consider whether profit is warranted "in view of the fund's performance."  (2004 Report, SMF, ¶187). | Performance of the EQ Core Bond Index was poor. | No deficiency demonstrated.  The Independent Trustees actively monitored the Fund's performance, and considered all of the data that Plaintiffs cite in exercising their reasonable business judgment to approve the Fund's fees.  (Defs.' Opp. Br. at 19-22; DSMF ¶ 56.)  None of the data supports the assertion that the Fund performed poorly in |

| | Alleged "Principle" | Alleged "Board Deficiency" | Summary Response:[1] |
|---|---|---|---|
| | | | 2012.  On a gross-of-fees basis, the Bond Fund has performed virtually identically to its benchmark indices since its conversion to an index fund.  (Defs.' Opp. Br. at 21.) |